UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.  05-11385 JLT

D'ANN McGILL
     Plaintiff

v.

CITY OF BOSTON and
CHRISTOPHER HAMILTON
     Defendants

**<u>Affidavit of Elizabeth L. Bostwick</u>**

1. My name is Elizabeth L. Bostwick.  I represent the City of Boston and Sergeant Hamilton in the above case.

2. Attached hereto as Exhibit "A" are true and accurate copies of the cited portions of the Plaintiff's deposition.

3. Attached hereto as Exhibit "B" are true and accurate copies of the cited portions of Sergeant Hamilton's deposition.

4. Attached hereto as Exhibit "C" is a true and accurate copy of Rule 315 of the Boston Police Department.

5. Attached hereto as Exhibit "D" is a true and accurate copy of Rule 102 of the Boston Police Department.

6. Attached hereto as Exhibit "E" is a true and accurate copy of Rule 109 of the Boston Police Department.

7. Attached hereto as Exhibit "F" is a true and accurate copy of Boston Police Academy materials on the handcuffing.

8. Attached hereto as Exhibit "G" is a true and accurate copy of Boston Police Academy materials on threshold inquiries.

9. Attached hereto as Exhibit "H" is a true and accurate copy of Boston Police Academy materials on use of force.

Signed under the pains and penalties this 16th day of February 2007.

/s/ L. Bostwick

_____
Elizabeth L. Bostwick

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
CA NO. 05-11385JLT

VOL: I
PAGES: 1-187
EXHIBITS: 1-2

## ORIGINAL

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                \*
                                \*

D'ANN MCGILL,
      Plaintiff
                                \*

vs.

CITY OF BOSTON AND CHRISTOPHER
HAMILTON,
      Defendants

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

      DEPOSITION OF D'ANN MCGILL, a
witness called on Behalf of the Defendants,
pursuant to Massachusetts Rules of Civil
Procedure, before Diane M. Durette, a
Registered Professional Reporter and Notary
Public in and for the Commonwealth of
Massachusetts, at the Law Department, Boston
City Hall, Boston, Massachusetts on
September 29, 2006, commencing at 10:30 a.m.

Page 19

1      him?

2   A.   On the night of the arrest.

3   Q.   How do you feel towards Officer Hamilton?

4   A.   I don't have any feelings one way or the

5        other.

6   Q.   Now, on the night of the incident you were

7        arrested, correct?

8   A.   Yes.

9   Q.   Had you ever been arrested by Sergeant

10       Hamilton in the past?

11  A.   Yes.

12  Q.   How many times had he arrested you?

13  A.   I don't remember.

14  Q.   Was it more than once?

15  A.   Yes.

16  Q.   Was it more than five times?

17  A.   I don't remember.

18  Q.   What did he arrest you for?

19  A.   My last arrest was larceny from a person.

20  Q.   Was that the arrest on the evening of the

21       incident we're here to discuss?

22  A.   Yes.

23  Q.   And by the way, do you remember the date of

24       the incident that we're here for?

Page 20

1    A.    I believe it was August 11, August 12.    It

2          was like after 12 midnight.

3    Q.    And what year was that?

4    A.    2002.

5    Q.    I'm sorry, so the arrest for larceny was for

6          that evening on August 11?

7    A.    Yes.

8    Q.    Okay.  And the arrest that occurred just

9          prior to that, you said there was at least

10         one, what was that arrest for?

11   A.    I don't remember.

12   Q.    You have no recollection at all?

13   A.    Not at all.

14   Q.    Do you remember what any of the other

15         arrests were about at all?

16   A.    Prostitution, common nightwalking.

17   Q.    How many times were you arrested by Sergeant

18         Hamilton for prostitution?

19   A.    I don't remember.

20   Q.    Was it more than once?

21   A.    Yes.

22   Q.    Was it more than twice?

23   A.    I don't remember.

24   Q.    I don't mean to press but I just need to

1    A.   Yes, I did.

2    Q.   Tell me about that.

3    A.   About what part of that?

4    Q.   Just tell me, you know, what time you left

5         and tell me what happened that evening.

6    A.   I can't remember exactly what time I left

7         home.  Is that the question that you're

8         asking me?

9    Q.   Can you give me an approximation?

10   A.   It was before 12 midnight.  That's the best

11        I can do.

12   Q.   Okay.  And did you leave your place alone?

13   A.   Yes, I did.

14   Q.   And where did you go?

15   A.   I went into Chinatown.

16   Q.   Okay.  And had you been to Chinatown before?

17   A.   At some point in time, other nights, you

18        know, other days, yes.

19   Q.   And for what reason would you go down to

20        Chinatown?

21   A.   I would go to Chinatown for the purpose of

22        prostitution.

23   Q.   And how many times had you been to Chinatown

24        before?

1     people while you were there?

2  A.  No.

3  Q.  Did you just sit at the bar and listen to

4     the music?

5  A.  Yes.

6  Q.  Did you do anything else?

7  A.  No.

8  Q.  So what time did you leave Dominic's?

9  A.  Oh, maybe about, I don't know, 5 of or so.

10 Q.  Five of 2?

11 A.  Yes.

12 Q.  Why did you leave?

13 A.  It was Last Call.  They were closing the

14    bar.

15 Q.  Sometimes I have to ask these sort of

16    obvious questions.  So you left.  And did

17    you leave alone?

18 A.  Yes.

19 Q.  And where did you go?

20 A.  I crossed the street at the red light of

21    Tremont and Stuart.  Then I crossed again to

22    the other side at Tremont to Kneeland.  I

23    went straight up Tremont Street to Essex.  I

24    made a right onto Essex and went down to

Page 65

1       Washington Street and crossed at the red

2       light and was on my way to my car.

3   Q.  Did you see anybody along the way or see

4       anything?

5   A.  I saw this young man, Mr. Wells.

6   Q.  And did anything happen with Mr. Wells?

7   A.  He was like behind me and he said to me

8       bitch, give me my money back.

9   Q.  And where were you when you first

10      encountered him?

11  A.  At the corner, close to the corner of the

12      Dunkin Donuts right there on Washington and

13      Essex.

14  Q.  Okay.  And were you on Essex Street or were

15      you on Washington Street?

16  A.  It's right there at the corner.

17  Q.  Okay.  Was it in the parking lot that it

18      happened?

19  A.  No, I was on my way to the parking lot.

20  Q.  No, I'm sorry, was it on the sidewalk then

21      that you first encountered this person?

22  A.  Yes.

23  Q.  So tell me about that encounter.

24  A.  He said to me bitch, give me my fucking

Page 66

1   money back.  I stopped and I looked around

2   and I said to him I don't have any money

3   belonging to you, what are you talking

4   about.  And he attempted to like kind of get

5   behind me but at the same time I always kept

6   my eyes on him and kept walking to my car,

7   going in the direction of where my car was

8   parked.  And at that time Officer Hamilton,

9   he called me by name and I cooperated.

10  Q.  So let me try to get some more details.  Did

11      you know who this person was when he came up

12      behind you?

13  A.  No.

14  Q.  Had you ever seen him before?

15  A.  No.

16  Q.  How old was he?

17  A.  I don't know, a kid, maybe in his 20s maybe.

18  Q.  Can you give me a physical description of

19      him in some way?

20  A.  I think he had curly hair, mousy like blond

21      hair kind of, maybe.  He was a white male.

22      And I noticed that I think it was he was on

23      drugs or something.

24  Q.  What made you think that?

Page 71

1          interrogation and the arrest process with

2          Hamilton I, you know, he was standing not

3          far from me and I, you know, I looked at

4          him.

5     Q.   So now, when Officer Hamilton at the time

6          called out to you, what did he say?

7     A.   Sadie Heaston, stop.

8     Q.   Why did he call you Sadie Heaston?

9     A.   Because that's my A/K/A.

10    Q.   How long had you been using that A/K/A?

11    A.   I don't remember.

12    Q.   Why were using that?

13    A.   Because I never wanted to damage my name.

14    Q.   And what is your true name?

15    A.   My true name on my birth certificate is

16         Dorothy Ann McGill.  And I swore as a little

17         girl if I ever got grown I would never use

18         the name of Dorothy ever again.

19    Q.   Now, why is it that?

20    A.   Because of the Wizard of Oz.

21    Q.   Why didn't you like the Wizard of Oz?

22    A.   No, I loved the show but you know, children

23         can be mean, you know when you're in

24         elementary school.  I was teased all my

1          life, every time, every year it would come

2          on it was, Dorothy, oh, Dorothy, where's

3          Toto.  And so I just said well, when I get

4          grown.

5    Q.   Did you legally change your name to D'Ann?

6    A.   No.

7    Q.   When did you start to use the name D'Ann?

8    A.   I don't remember.

9    Q.   Were you an adult or were you a teenager?

10   A.   I was an adult.

11   Q.   Were you under 30?

12   A.   I don't remember.

13   Q.   I'm sorry, Officer Hamilton yelled out, what

14        did he yell out, Sadie Heaston?

15   A.   Sadie Heaston or Sadie, stop.

16   Q.   Okay.  How did he know your name?

17   A.   From being downtown.  He had arrested me

18        before.

19   Q.   How many times?

20   A.   I don't remember.  You have access to the

21        records, I don't know.  I wouldn't be

22        accurate if I gave you a number.

23   Q.   Okay.  I'm just asking what you remember.

24        Where was Officer Hamilton in relation to

Page 73

1   you when he called out your name?

2   A.   I was at the mouth of the parking lot where

3        my car was parked.  He was across the street

4        from me, okay.  And he was on his bicycle

5        and when he asked me to stop, I stopped and

6        he rode over to me.

7   Q.   So he was on a bicycle?

8   A.   Yes.

9   Q.   What sort of bicycle was it?

10  A.   All I know is that it was a bicycle.  I

11       don't know if it was a two speed or a ten

12       speed.

13  Q.   No, was it a police bicycle?

14  A.   I guess.  I don't know what determines a

15       police bicycle from any other kind of

16       bicycle.  It was a bicycle.

17  Q.   Was he in a uniform?

18  A.   Yes.

19  Q.   Was he wearing shorts or long pants?

20  A.   It was in the summertime.  I believe he was

21       wearing shorts.

22  Q.   I'm talking about Mr. Wells, do you have any

23       idea why he thought that you took money from

24       him?

Page 74

1    A.   No.

2    Q.   Had you ever taken money from anybody else

3         downtown?

4    A.   I have not taken any money since I was

5         released from Clinton Women's institution in

6         1986, okay?  I lost the mechanism while I

7         was there, and I have never been able to

8         regain the mechanism of how to do it.

9    Q.   I don't know that much about this.  What

10        kind of mechanism are you talking about?

11   A.   I can't explain it to you, I don't know.  I

12        don't know, you know.  That's why I never

13        took money again.

14   Q.   Is it a mechanism like pickpocketing?

15   A.   Yeah.  Yes.

16   Q.   I was almost pickpocketed once.  That's my

17        big claim to fame.  And I caught the guy

18        with his hand in my pants.  It was gross.

19             Okay.  All right.  So Sergeant

20        Hamilton approached you, well, he called out

21        to you, right?

22   A.   Yes.

23   Q.   How far away was he when he called out to

24        you?

1      police officer to come down.  I have no

2      problem with doing a strip search in the

3      back of the parking lot behind a register.

4      I do not have any money on me.  I do not

5      have his money.  And he said give the man

6      his money back.  Hamilton, I don't have his

7      money.  Bitch, you're going to jail.

8   Q.  Who said that?

9   A.  Hamilton.

10  Q.  Okay.  Then what happened?

11  A.  At that time he cuffed me with my hands

12      behind my back.  Then he got in front of me,

13      standing directly face to face with me,

14      pointing his fingers in my face and he told

15      me, he said to me, you are a stupid bitch.

16      Any time I see you down here I'm going to

17      take you to jail.  I'm going to tell all my

18      buddies if they see you down here for them

19      to call me, and I will personally come and

20      take you to jail.

21  Q.  Okay.  Then what happened?

22  A.  I told him Hamilton, these cuffs are too

23      tight.  Bitch, shut the fuck up.  Or shut

24      the fuck up, bitch.  One way or the other.

1    the call, okay.  By now I was sitting on the

2    curb.  He had to take time to attend to that

3    call of the SUV so he told me sit down.  And

4    that's what I did.

5  Q.  So right after he got the call, he told you

6      to sit down on the curb?

7  A.  After I'll say, after he saw the white SUV

8      approaching.  I don't remember if it was

9      immediately after the call came through, I

10     don't remember that part of it.  But that's

11     what I remember, what I just told you.

12 Q.  And did you sit down on the curb yourself?

13 A.  It was like a bar or something where, you

14     know, where they had like a chain or

15     something going across the parking lot.  So

16     what I did was I braced myself up against

17     that pole and I kind of, you know, slid down

18     the pole kind of.

19 Q.  And so you sat down?

20 A.  Yes.

21 Q.  And how long were you sitting down?

22 A.  I have no idea.  I sat there until the paddy

23     wagon came to transport me.

24 Q.  And what were you thinking when the SUV came

Page 93

1    Q.  All right.  Why don't we break for lunch now

2        and we'll try to keep it to 30 minutes.

3                 (A lunch break was taken.)

4    Q.  Let's go back to the night of the incident

5        at the area where you were cuffed.  Did

6        Officer Hamilton tell you why he was cuffing

7        you?

8    A.  He told me what I was being arrested for.

9    Q.  Right.  So did he say you're under arrest or

10       something along those lines?

11   A.  Yes.

12   Q.  What did he say he was arresting you for?

13   A.  For larceny from a person.

14   Q.  So you said he put handcuffs on you?

15   A.  Yes.

16   Q.  Which hand did he put the cuffs on first?

17   A.  (Indicating).

18   Q.  He put the cuffs on the right hand first?

19   A.  Yes.

20   Q.  Then what did he do with your arm after he

21       -- well, back up.  Where was your hand when

22       he put the cuff on?

23   A.  (Indicating).

24   Q.  It was down at your side?

1    A.    They were down at my side.  I was standing

2          straight up.

3    Q.    So was he behind you when he put the cuffs

4          on?

5    A.    He moved from the front and in his movement

6          he grabbed my right hand and put it behind

7          me.  And he was like, you know, you're under

8          arrest.  You're going to jail and all that.

9          And he cuffed me and at the same time it was

10         like he clenched it or something.  I heard

11         it click, you know.

12   Q.    What did you hear click?

13   A.    The handcuffs.  I heard the handcuffs click.

14         And he, you know, attached -- he grabbed my

15         left arm and put it in handcuffs, too and

16         immediately I said to him these cuffs are

17         too tight.  They hurt.  And that's when he

18         said, bitch, shut the fuck up, or shut the

19         fuck up, bitch.

20   Q.    And so he took your right hand and put it

21         behind your back and it was cuffed, right?

22   A.    Yes.

23   Q.    And then he took your left hand and put it

24         behind your back and then cuffed it with the

Page 95

1          other cuff, right?

2   A.   Yes.

3   Q.   So both your hands were behind your back,

4          right?

5   A.   Yes.

6   Q.   And then you sat on the curb for awhile?

7   A.   Yes, until -- yes, until the paddy wagon

8          came to pick me up.

9   Q.   Okay.  So was your wrist hurting all the

10          while that you were sitting on the sidewalk?

11  A.   My wrist hurt upon him placing the cuffs on

12          my arm, immediately upon him cuffing my

13          right hand.

14  Q.   Had you ever felt anything like that before?

15  A.   No.

16  Q.   And so someone put you in the back of the

17          police truck, right?

18  A.   Yes.

19  Q.   Did you tell that person that you were in

20          any pain?

21  A.   No.

22  Q.   Why not?

23  A.   Because he had already, Officer Hamilton had

24          already told me that any time he saw me

Page 130

1    personally from it, why did you do it?

2    A.   Oh, I got things personally, you know and

3         sometimes, you know, I didn't give him all

4         of my money.  I mean, at age 48 I wasn't

5         real stupid, you know what I'm saying?

6         Still some stupid but not real stupid.

7    Q.   Okay.  So he didn't have any other name or

8         anything?

9    A.   Not that I know of.

10   Q.   So you called him and he had Stephanie come

11        down and bail you out?

12   A.   She came down to D-4.  She came down twice,

13        okay.  Now, this is what she told me when I

14        got out of jail.  She came down twice that

15        Sunday to get me out and the first time she

16        came down she said that they told her that I

17        didn't have a bail, I had not been given a

18        bail yet.  Then some time later she came

19        back down there again with $250 to make my

20        bail, and they told her that my bail was

21        more than $250.

22   Q.   Okay.  But it turned out that your bail

23        actually was $250?

24   A.   Yes, when I went to court.

1    Q.   Okay.

2    A.   And I wasn't there too long.  I don't know

3         how long I was there, if it was 5 minutes or

4         30 minutes or 20 minutes but they called me

5         and said bail has been set.  You're bailed

6         out.  Go upstairs to the 11th floor.  And I

7         went up there, signed a paper and I left.

8    Q.   Did you go with Stephanie?

9    A.   No, I didn't.  Wait a minute, I don't

10        remember.  I don't remember.  That's been

11        four years ago.  All I know is that she made

12        my bail, and I don't know, I don't remember

13        if she was there waiting for me or if we

14        walked out together.  I signed my paper and

15        my concern was getting to the hospital.

16   Q.   And what time were you released?

17   A.   It was in the daytime.  That's all I can

18        tell you.

19   Q.   Was it before lunchtime?

20   A.   I don't remember.  All I know is that it was

21        in the daytime.

22   Q.   When you were in the courtroom was your

23        wrist swollen?

24   A.   Yes, it was.  The whole hand was swollen.

# EXHIBIT B

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11385 JLT

---

D'ANN McGILL,

        Plaintiff

vs.

CITY OF BOSTON and
CHRISTOPHER HAMILTON,

        Defendants

---

Deposition of **CHRISTOPHER HAMILTON**, a witness called

on behalf of the Plaintiff, taken pursuant to notice

before Virginia Dodge, Registered Professional Reporter

and Notary Public in and for the Commonwealth of

Massachusetts, at the LAW OFFICES OF J. THOMAS KERNER,

Union Wharf, 343 Commercial Street, Suite 104, Boston,

Massachusetts, on Monday, October 2, 2006, commencing at

10:13 a.m.

---

BRAMANTI & LYONS COURT REPORTING, INC.
REGISTERED PROFESSIONAL REPORTERS
92 STATE STREET, 8TH FLOOR, BOSTON, MA 02109
TEL:  617.723.7321 / FAX:  617.523.5153
www.bramanti-lyons.com

1    individual?

2    A.    No.

3    Q.    No?  You don't remember seeing any teeth broken?

4    A.    No.

5    Q.    During the time of the arrest?

6    A.    No.

7    Q.    I'm going to go into the sequence of events that

8    happened on August 11, 2002, all right.

9         You were on duty on August 11, 2002, correct?

10   A.    Yes.

11   Q.    And you were in uniform?

12   A.    Yes.

13   Q.    You were on bike?

14   A.    Yes.

15   Q.    You were in the area of Washington and Beach Street,

16   correct?

17   A.    At what time, ma'am?

18   Q.    Between the hours of, say, 2 a.m. to 3 a.m., you

19   were in the area of Washington and Beach Street, correct?

20   A.    Yes.

21   Q.    And you observed a woman that you knew to be Sadie

22   Houston.  You observed her running down the street; is

23   that right?

24   A.    Yes.

DEPOSITION OF CHRISTOPHER HAMILTON

1  Q.    And you observed another individual chasing after

2  her, right?

3  A.    Yes.

4  Q.    And that individual's name was Kevin Wells?

5  A.    Yes.  I think that's what his name --

6  Q.    Do you remember Kevin Wells from any other event

7  before?

8  A.    No.

9  Q.    Do you remember whether this individual appeared to

10 be intoxicated?

11 A.    I don't recall that he appeared to be intoxicated.

12 No.

13 Q.    You don't recall that?

14 A.    I don't have a memory of him being intoxicated.

15 Q.    You observed this individual chasing after this

16 woman who you knew to be Sadie, correct?

17 A.    Yes.

18 Q.    Now, you knew Sadie from before, right?

19 A.    Yes.

20 Q.    How many times have you arrested her?

21 A.    Maybe three.  Three times.  Maybe four.

22 Q.    Three times?  What did you arrest her for?

23 A.    Common night walking.

24 Q.    And had you ever had any occasion to warn her about

DEPOSITION OF CHRISTOPHER HAMILTON

1  her behavior and not arrest her?

2  A.    Hundreds of times.

3  Q.    Hundreds?

4  A.    Hundreds.

5  Q.    So this woman was an annoyance to you, wasn't she?

6  A.    No.

7         MR. FORTON:  Objection.

8  Q.    (By Ms. White)  You didn't have very much respect

9  for this woman?

10        MR. FORTON:  Objection.

11 Q.    (By Ms. White)  Right?

12 A.    I don't think I knew her well enough to say that, to

13 answer that question.

14 Q.    You knew her well enough to give her hundreds of

15 warnings, didn't you?

16 A.    She -- I didn't know her.  No.  I encountered her

17 during the course of my work.

18 Q.    Okay.  And when Mr. Wells was chasing after her, did

19 you stop him and ask him what had happened?

20 A.    Yes.

21 Q.    And what did you get -- what did you ascertain from

22 him?

23 A.    He told me he had been robbed earlier in the

24 evening.

DEPOSITION OF CHRISTOPHER HAMILTON

1  Q.    And what did he tell you specifically about how he

2  had been robbed?

3  A.    He told me he had encountered Sadie Easton and that

4  she had begun a conversation with him and had started to

5  rub her hands over his body, and at some point in time,

6  she reached in his pocket and stole his money.

7  Q.    And did he tell you how much money she took from

8  him?

9  A.    I believe he said $140.

10  Q.    He told you specifically $140?

11  A.    I believe that's my memory.

12  Q.    And you were able to ascertain that he had taken

13  $140 before you placed Ms. McGill into custody; is that

14  right?

15  A.    That he had taken a hundred dollars where?

16  Q.    Your testimony is that Mr. Wells told you that Sadie

17  Houston, also known as D'Ann McGill, took $140 from him

18  before you placed her into custody?

19  A.    I'm missing the question here.  Can you ask --

20  Q.    All right.  You spoke to Mr. Wells?

21  A.    I did.

22  Q.    You asked him about the robbery?

23  A.    I asked him why he was chasing -- yeah.  I

24  eventually got around.  He told me he had been robbed.

DEPOSITION OF CHRISTOPHER HAMILTON

1    Yes.

2    Q.    And you questioned him before you put any -- you

3    questioned him before you arrested Ms. McGill, right?

4    A.    Yes.

5    Q.    And you did an investigation into his allegations,

6    right?

7    A.    I wouldn't call it an investigation.    Investigations

8    are --

9    Q.    You questioned him about his allegation?

10   A.    Can I finish my answer?

11   Q.    Sure.

12   A.    Investigations are assigned to the detective bureau.

13   Q.    So you questioned him about the robbery allegation,

14   right?

15   A.    Yes.

16   Q.    And by the way, while you were questioning

17   Mr. Wells, you asked Ms. McGill to stop, correct?

18   A.    I stopped the both of them.    Yes.

19   Q.    And did Ms. McGill cooperate?

20   A.    She did.

21   Q.    She doesn't have any history of resisting arrest

22   with you, right?

23   A.    No.

24   Q.    She's always cooperated with you in the past?

DEPOSITION OF CHRISTOPHER HAMILTON

```
 1   A.    Yes.

 2   Q.    You had no reason to believe she was going to flee,

 3   right?

 4   A.    No.

 5   Q.    And when you questioned Mr. Wells, what did he tell

 6   you specifically about how much money Ms. McGill had taken

 7   from him?

 8   A.    My recollection is that he told me $140.

 9   Q.    Okay.  He told you specifically $140?

10   A.    That's my recollection at this time.

11   Q.    Do you recall ever making any suggestions to him as

12   to whether it was maybe $100 or maybe it was $200 or any

13   of that?

14   A.    No.

15   Q.    No?

16   A.    No.

17   Q.    Okay.  Then you confronted Ms. McGill about

18   Mr. Wells' allegation; isn't that right?

19   A.    Yes.

20   Q.    Now, when you confronted Ms. McGill, you told her

21   specifically to give money back to Mr. Wells; is that

22   right?

23   A.    No.  I don't recall that.

24   Q.    You don't recall telling her to give Mr. Wells his
```

DEPOSITION OF CHRISTOPHER HAMILTON

```
 1          So Mr. Wells had told you that he was robbed about
 2   45 minutes before?
 3   A.    Yes.
 4   Q.    And so Ms. McGill was wearing -- do you remember
 5   what she was wearing that night?
 6   A.    I don't.
 7   Q.    Do you remember if she ever had her wrist in any
 8   kind of a sling before you had arrested her?
 9   A.    I didn't see her wrist in any kind of sling.
10   Q.    So you didn't see her -- strike that.
11          You recall that she was wearing a leopard print
12   blouse that night?  Do you remember that?
13   A.    No.
14   Q.    No.
15          And you didn't make an effort to call for a female
16   officer to search her before placing her under arrest; is
17   that right?
18   A.    No.
19   Q.    And you had access to a police radio; is that right?
20   A.    Yes.
21   Q.    You're relatively close to A1?
22   A.    It depends on what you determine as "close."
23   Q.    A few minutes away?
24   A.    Yes.
```

DEPOSITION OF CHRISTOPHER HAMILTON

```
 1   Q.    And a female officer could have been available to

 2   come to the scene to search her, right?

 3   A.    Yes.  However, we got involved in another incident.

 4   Q.    And that incident involved an SUV with three

 5   Hispanic males in it, correct?

 6   A.    And a firearm.

 7   Q.    A firearm, right?

 8   A.    Yes.

 9   Q.    Now, you never at any time asked Ms. McGill to give

10   any money back to Mr. Wells?

11   A.    No.

12   Q.    And you never asked her to empty out her pockets so

13   you could ascertain whether she had any money on her?

14   A.    I don't recall if I asked her to empty her pockets.

15   Q.    And do you remember what Mr. Wells looked like?

16   A.    He was a white male.  5'10", medium build.  Brown

17   hair.

18   Q.    And did you find Mr. Wells to be credible?

19   A.    I did.

20   Q.    You did?

21         And you had never met him before?

22   A.    No.

23   Q.    And he didn't have any witnesses to corroborate his

24   version of the events, did he?
```

1    told you -- oh, actually, strike that.

2        When you put both cuffs on the right and left hands,

3    did you double-lock the cuffs?

4    A.    Yes.

5    Q.    And why did you double-lock them?

6    A.    That's my normal practice.

7    Q.    And so you do that in all occasions when you arrest

8    an individual?

9    A.    Yes.

10   Q.    And what does double-locking the cuffs do?

11   A.    It prevents the individual from making claims

12   against the police officer at a later time because they

13   tightened the cuffs themselves too tight.

14   Q.    So when you double-lock handcuffs, does that --

15   obviously in this case, the handcuffs were on her wrist

16   tightly, weren't they?  They were secure?

17   A.    They were secure.

18   Q.    Were they tight?

19   A.    No.

20   Q.    Did she tell you that they were too tight?

21   A.    No.

22   Q.    Did she tell you that as a result of the cuffs being

23   put behind her back, that it was hurting her wrist?

24   A.    No.

DEPOSITION OF CHRISTOPHER HAMILTON

# EXHIBIT C

**Boston Police Department**

**Rules and Procedures**

**RULE 315**
**April 11, 1991**

## HANDCUFFS

Rule 315 is issued to establish Boston Police Department policy regarding the use of handcuffs by members of the force in the performance of their duties. Because of the variety of circumstances which may be encountered by officers, no rule can suggest definitive methods for every situation in which the use of handcuffs may be appropriate. Rather, this rule will set certain specific guidelines to provide officers with a firm basis on which to utilize sound judgment in making reasonable and prudent decisions.

**Sec. 1 GENERAL CONSIDERATIONS:** Failure to use handcuffs or the improper use of them can result in embarrassing incidents to officers, and can create potentially dangerous situations for the officers and the public. The Department issues handcuffs to all sworn personnel as standard equipment to be used as a restraining device, not a mechanism for subduing prisoners. Officers should not, however, be lulled into a false sense of security after applying handcuffs. The subject can still kick and if the handcuffs have not been properly applied, they can become a lethal weapon on the wrist of a desperate person. Handcuffs issued by the Department are double-locking handcuffs and whenever they are applied the double-locking feature should be used if possible, since they are then more difficult to pick and will also prevent violent prisoners or persons restrained for psychological purposes from injuring themselves by the handcuffs tightening during a struggle.

**Sec. 2 WHEN CARRYING HANDCUFFS:** Your handcuffs are carried in a way so that they are easily accessible by either hand and in the loaded position so they are ready for immediate use.

**Sec. 3 MAINTENANCE:** Handcuffs are a mechanical device which must be cleaned and lubricated periodically and inspected frequently to ensure their proper function when needed. Keep the ratchet and lockwork free of dirt, lint or other substances which may limit function. Periodically lubricate the ratchet with lead graphite.

**Sec. 4 HANDCUFFS ARE TO BE USED:** Whenever a person is arrested or taken into custody, regardless of age or sex, in a manner which is consistent with this Rule, unless exigent circumstances exist which make it justifiable for an officer not to do so; in which case, the officer(s) responsible shall be prepared to justify his failure to use handcuffs.

**Sec. 5 WHEN HANDCUFFING A SUSPECT:** There are various techniques and positions for controlling, handcuffing and searching suspects. Whether using the standing, kneeling or prone positions, the suspect is in an off balance position. When possible, the officer should approach a suspect from the side or rear with his/her weapon holstered and secured, gun side away from the suspect. Remain alert for any unpredictable moves. Handcuff the suspect with their hands behind their back, thumbs up, palms out. Place the jaw of the handcuffs against the prisoners right wrist about 1 inch above the wrist bone. Press the jaws firmly against the check and re-engage. The

**Boston Police Department**

**Rules and Procedures**

**RULE 315**

suspect's other hand is then cuffed in a similar manner. Now both cuffs are adjusted one (1) inch above the wrist bone to the desired size with the palms out, thumbs up. Be careful that the skin is not placed in the jaws or that the circulation is impeded. When practicable, double lock the handcuffs after both cuffs are in place.

**NOTE:** For extra security, if the suspect is wearing a sturdy belt, this may be used to more securely contain the suspect. To do so, after applying one of the handcuffs pass the free end of the second handcuff under the suspect's belt and apply to the other wrist. As described above, be sure the keyhole is facing up. After both handcuffs are in place, double lock them if practicable.



**Sec. 6 SEARCH INCIDENT TO A LAWFUL ARREST:** Thoroughly search the suspect after applying the handcuffs. Officers may search for instruments which could be used to avoid arrest or effect an escape from custody and evidence of the crime for which the arrest is made. No matter how many times a prisoner is searched or how long he has been incarcerated or if a prisoner changes custody, always do a complete and thorough search.

**BOOKING SEARCH:** A Booking Search may be made of any person being incarcerated. The purpose of a booking search is not to discover evidence. It is conducted in order to protect the owner's property, to avoid disputes over property, to avoid false claims, to assist in identification and to prevent suicides and other physical harm. Items of a sizable nature discovered during a booking search will be admissible under the plain view theory.

Periodically check the suspect's hands to see that they are in good condition and to foil any possible escape attempt.

**Boston Police Department**

**Rules and Procedures**

**RULE 315**

**Sec. 7  TWO PRISONERS WITH ONE PAIR OF HANDCUFFS:** When circumstances require, two prisoners can be secured with one pair of handcuffs provided proper safeguards are taken. The right wrist of one prisoner is handcuffed, as described above. When practicable, pass the free end under the prisoner's belt, the right wrist of prisoner number two is secured by the other handcuff. The two prisoners are handcuffed right wrist to right wrist to limit mobility and the prisoners are in an off balance position. Now do a thorough search of the prisoners.

**Sec. 8  TWO OR MORE PRISONERS:** As officers of this Department are instructed at the Police Academy, when multiple arrests have been made and several prisoners are to be transported, every precaution should be taken to reduce the likelihood of attempts be made to escape. Therefore, when two or more prisoners are being handcuffed, officers are advised to link on are of each prisoner through the arm of the first prisoner handcuffed before cuffing the second wrist of each prisoner to his first wrist



**Sec. 9  HANDCUFFED IN FRONT OF THE BODY:** If the suspect is wearing a belt, turn the buckle to the rear and after cuffing one hand, pass the free end of the cuff under

Boston Police Department

Rules and Procedures

**RULE 315**

---

the belt before cuffing the second hand. Remember, only handcuff in the front if the person is suffering from a physical deformity, disability or if she is pregnant.

**Sec. 10 WHEN REMOVING HANDCUFFS:** Keep the suspect off balance to discourage an escape attempt or attack. Having other officers present is highly recommended.

Under no circumstances are handcuffs to be removed while a prisoner is being transported or while in police headquarters or in any other place to which the prisoner is transported except for the purpose of fingerprinting, writing on forms as may be required or when absolutely necessary. Never let go of the handcuffs when one is still on the prisoner's wrist. The open cuff is an excellent weapon.

**Sec. 11 SAFE CUSTODY OF PRISONERS:** Officers having prisoners in their custody shall be held strictly responsible for the safe custody of the prisoners under their care and this responsibility is theirs at all times.

**Sec. 12 WHEN PRACTICABLE, AVOID:**

    A.) Handcuffing a prisoner with his hands in front, except as noted in Section 9 of this rule.

    B.) Searching a prisoner before handcuffing.

    C.) Handcuffing a prisoner to a police officer.

    D.) Handcuffing a mentally disturbed person except as a temporary measure to allow him to be secured with proper restraining devices with which he cannot injure himself.

**Sec. 13 FLEXCUFFS:** Flexcuffs may be used during demonstrations or when multiple arrests are to be made. They are applied as handcuffs, behind the back, palms out, thumbs up.

**NOTE:** Once the flexcuffs have been applied they must be cut off. It is very easy to apply flexcuffs too tightly.

**Sec. 14 EXTRA HANDCUFFS:** Officers are authorized to carry an extra pair of handcuffs if they wish to do so provided they are Department issue or approved. To date, the only Department issue/approved handcuffs are the Smith & Wesson Model #100, Nickel Chain Handcuffs. However, the Department has now also approved the Peerless Standard Nickel Chain Handcuffs and the Peerless Standard Hinged Chain Handcuffs.