

# USE OF FORCE MANUAL

## BOSTON POLICE RECRUIT CLASS 42-05



# TABLE OF CONTENTS

Preface

Introduction

Course Syllabus

Section One                    MPTC USE OF FORCE

Section Two                    BOSTON POLICE RULE 304
                               USE OF NON-LETHAL FORCE

Section Three                  BOSTON POLICE SPECIAL
                               ORDER 00-018

Section Four                   BOSTON POLICE RULE 303-A
                               USE OF LESS-LETHAL FORCE

Section Five                   BOSTON POLICE RULE 303
                               USE OF DEADLY FORCE

Section Six                    BOSTON POLICE ACADEMY
                               TRAINING BULLETIN

                               VERBAL COMMANDS
                               TRAINING BULLETIN 28-89
                               TRAINING BULLETIN 29-89
                               TRAINING BULLETIN 19-90
                               TRAINING BULLETIN 14-90
                               BOSTON POLICE FIREARMS
                               DISCHARGE REPORT 2415
                               ITS USE OF FORCE REPORT
                               USE OF FORCE-BATON
                               USE OF FORCE-OLEORESIN
                               CAPSICUM (O.C.)

USE OF FORCE-DEADLY
FORCE
BOSTON POLICE INCIDENT
REPORT-HANDCUFFING
BOSTON POLICE INCIDENT
REPORT-FIREARM CARRYING

Section Seven          MODEL PENAL CODE-3.07

Section Eight          USE OF FORCE
                       CONSTITUTIONAL STANDARD
                       MASSACHUSETTS CASES
                       CIVIL LIABILITY FOR
                       POLICE OFFICERS

Section Nine           BIBLIOGRAHY

Section Ten            APPENDIX

# PREFACE

The Use-of-Force material presented in this manual is the culmination of, Federal and State Laws, Departmental Policies and State Use of Force Model. Along with collaboration, development and years of court decisions involving Police Use of force.

The State Use of Force Model is the centerpiece of a powerful use-of-force program. The power of this program lies in the fact that it was developed to train police officers to make appropriate and reasonable use-of-force decisions, not just to evaluate an officer's actions after the fact.

What is considered appropriate and reasonable force should not be a mysterious or misunderstood concept. Department's Use-of-force policy is straightforward that it provides you with a training program that is consistent with that policy.

The Officer should have a clear understanding of the how to apply force to the when to apply force. This straightforward approach moves the ambiguity that may exist in police officer minds. A good example would be for specific types of verbal skills required throughout a subject/officer contact. Specific subject "behavioral cues" to guide officer response.

Numerous post-incident applications, such as report writing and a tool for courtroom testimony. Use-of-force model, policies, case law along with training is proper and effective to guide officers to a use-of-force decision.

There will be a "balanced tension"[1] between the police and the public contrasting the concepts of liberty and civility. Due to the significance of the problem and possible community ramifications, it is not surprising that police use of force has received considerable attention.

---

[1] Bittner, 1970; McLaughlin, 1992

# INTRODUCTION

## Use of Force

Today Law Enforcement Officers are face with the daily task of using force upon people for numerous reasons. Depending on the particular circumstances of an incident. An Officer may use force to arrest a person, prevent a person from escaping, defense of others, etc. However, the essential basic purpose for an Officer's use of force is to gain control of a person and stop any threatening action by that person.

There are many standards currently existing in the Law Enforcement world that profess to dictate how much force is justifiably use by an Officer. Yet they offer conflicting standards and seem confusing to an Officer to when and how to apply use of force in a particular incident. Is it justified or acceptable, appropriate or inappropriate?

Thus, in determining whether an Officer's use of force was justified under the 4th Amendment, objective facts must be filtered through the lens of the Officer's perceptions at the time of the incident in question. The Graham v. Connor Court has held that "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application" 1[1]

To accurately assess how much force our legal system allows an Officer to use is a more complex question, but in order for a Officer to use force upon a person, acceptable use of force on that said person. You have to look at the facts on a case-by-case basis segment and see if it is:

- Acceptable under the United States Constitution

- Acceptable under State Constitution

- Acceptable under Statutory Law

- Acceptable under any applicable Department Policies, Procedures, and Training.

---

[1] Graham, 490 U.S., at 396, citing, Bell v. Wolfish, 441 U.S. 520, at 559, 99 S.Ct. 1861, 60 L. Ed. 2d

To begin to appreciate the complexity of situations where the Police use of force, one must conceptualize force not as a static concept, but rather a continuum of responses, ranging from non-behavior cue to verbal commands to deadly force. The discretionary choices open to Officers to resolve disputes are extensive, however, they are not without limits. We will explore Federal, state, and departmental guidelines for acceptable behavior by officers. We will also understand how the impact of inherent dangers and limitations on limited time to react/respond can affect decision-making process. Understand limited abilities under stress-during tense, uncertain, and/or rapidly evolving circumstances, Officers have limited physical, mental, and emotional capabilities. Officers do not have a reliable means to instantaneously cease a person's threatening actions and limited control over the event or the threatening person.

Use of force is a topic that is on the mind of every Law Enforcement agency and Officer throughout the United States. Whenever force is used in official capacity, Officers, Supervisors, departments, and the governing bodies they represent are exposed to the risk of alleged excessive force claims. Liability exists not only to the use of deadly force but also to the multitude of less-than-lethal force options as well as Non-lethal force options.

Law Enforcement Officers must be aware of the awesome results of their actions, it is far greater than those of the private citizen. Once a Officer has deployed a force option due to the subject matter actions, there will be the aftermath for the Officer, the Use of force report. There will come for the Officer the five issues of using force:

1. Criminal

2. Civil

3. Administrate

4. Physiological

5. Psychological

Regardless of what level of force an Officer uses, nothing will be more important than the Officer's report of the incident. The key is you as the Officer on the scene knows what happen you are expected to make split second decisions based on rapidly evolving situations, incorporation of a use of force model, federal, state cases, departmental policy will provide the guidance to Officers in making force decisions.

Conclusion-Understand the noble profession that you will enter with it comes great responsibility; understand your constitutional standard, criminal law and motor vehicle laws. Good luck in your chosen field of disciple follow it with high moral, integrity, honor, and duty to the oath of office taken, to serve and protect the citizens of the Commonwealth of Massachusetts.

**Course Syllabus:**    Use of Force

**Time:**    8 Hours

**Instructors:**    Sergeant Michael A. Chapman
    Police Officer Santos Hernandez
    Police Officer Darryl Owens
    Police Officer Wilson Quiles

**Course Description:** This course is designed to introduce the Recruit Officer to the Use of Force Model, the use of lethal and non-lethal force. The course reviews Boston Police Rules 303, 303A and 304 as well as Federal and State Court decisions that have impacted the Use of Force by Police Officers. Practical Application of Use of Force Exercises, Use of Force Writing discussed with regards to BPD Rules, Court cases, Use of Model.

**Successful Completion:** Recruits will be required to pass written and practical examinations. The written examination portion of this course is subject to Rules 7-2 and 7-5 and 7-10. A Recruit **must score a 80% or better** on the Use of Force Exam. The practical examination will be graded on a pass/fail basis during Range 3000 sessions/Use of Force exercises. The practical examination will test the recruit's performance ability in the following areas: verbal commands, Use of cover, Threat assessment, OC, Baton, Empty hand skills, practical application of BPD Rules 303/303-A and 304 and reporting the Use of Force. Recruits who fail the practical examination will be offered remedial training and a make-up examination. Failure of the make-up examination will subject the Recruit Officer to dismissal for academic deficiency.

**Methodology:**    Lectures, Discussion, Role Plays and Practical Exercises.

7

# USE OF FORCE PRESENTION INSTRUCTORS:

Sergeant Michael A. Chapman

Police Officer Santos Hernandez

Police Officer Darryl Owens

Police Officer Wilson Quiles



# Section One:

## *MPTC USE OF FORCE MODEL*

# MPTC USE OF FORCE
# REFERENCE GUIDE



Perceived Circumstances

Perceived Subject Action (s)                    Reasonable Officer Response (s)

The **Totality Triangle** © depicts the three elements which must be considered in determining whether an application of force was objectively reasonable.

**Perceived Circumstances** - the officer's perspective of the severity of any crime, the existence of an immediate safety threat to the officer or others, and the degree of compliance / non-compliance from the subject; culminating in its identification on the Use of Force Model.

**Perceived Subject Action (s)** - the subject action (s) as perceived by the reasonable officer that designate the subject at one or more of the Use of Force Model's compliant / non-compliant categories.

**Reasonable Officer Response (s)** - the "balanced" response (s) appropriate for the reasonable officer's selection from the Use of Force Model's identified response categories, in order to maintain or gain subject compliance and control.

## MPTC
## Use of Force Model



*The Use of Force Model was developed in 1991 by Dr. Franklin Graves, Federal Law Enforcement Training Center and Professor Gregory J. Connor, University of Illinois Police Training Institute. ™ 1998, G. Connor. All rights reserved.*

**Threat Perception Color Code** - the tactically applied and color adapted correlation of the Threat Perception Categories on the Use of Force Model.

**Control Superiority Principle** © - the understanding and visualization method utilized to reinforce the inherent principle of officer force superiority over the subject's degree of compliance / non-compliance.

**Assessment / Selection Arrows** - the mechanism utilized to indicate the dynamic nature of an officer's decision-making process of Tactical Transition © during the enforcement encounter.

10

## Threat Perception Categories

**Strategic** – the broad "mind set" of the officer, represented by the blue baseline on the Threat Perception Color Code ©. The contemporary officer must maintain this functional foundation, centered upon strategies designed to enhance the status of safety.

**Tactical** – the second level on the Use of Force Model, depicted by the color green. Here the officer perceives an increase in threat potential within the confrontational environment and tactical procedures are designated and deployed.

**Volatile** – the third level on the Use of Force Model utilizing the color yellow to indicate an activated level of alertness and threat potential. Here the officer is confronted with the presence or potential of critical dynamics, including threat intensity and severity within the enforcement encounter.

**Harmful** – at this level on the Use of Force Model the color orange denotes an accelerated perception of threat directed upon the officer or others. In this regard the officer must deploy initial defensive force in the effort toward eventual subject compliance and control.

**Lethal** – the highest level on the Use of Force Model correlates to the most intense color in the Threat Perception Color Code ©, red. Although this potentially lethal degree of threat is most infrequent, it remains most crucial for the continuation of officer safety and security.

## Perceived Subject Action (s) Categories

**Compliant** – represents the vast majority of officer / citizen confrontations in the form of cooperation and control. Such cooperation is generally established and maintained via cultural acceptance, verbalization skills, etc.

**Resistant (*Passive*)** – the preliminary level of citizen non-compliance. Here, the citizen, although non-compliant, offers no physical or mechanical energy enhancement toward the resistant effort.

**Resistant (*Active*)** – the subject's non-compliance is increased in scope and / or intensity. The subject's non-compliance now includes energy enhanced physical or mechanical defiance.

**Assaultive (*Bodily Harm*)** – the officer's attempt to gain lawful compliance has culminated in a perceived or actual attack on the officer or others. The officer makes the reasonable assessment that such actions by the subject would not result in the officer's or other's death or serious bodily harm.

**Assaultive (*Serious Bodily Harm / Death*)** – the officer's attempt to gain lawful compliance has culminated in the perception of an attack or the potential for such an attack on the officer or others. The officer makes the reasonable assessment that such actions by the subject could result in serious bodily harm or death to the officer or others.

## Officer Response (s) Categories

**Cooperative Controls** – include contemporary controls developed to preserve officer safety and security, including: communication skills, restraint applications, etc.

**Contact Controls** – includes resistant countermeasures designed to guide or direct the non-compliant subject. These "hands on" tactics would include the elbow / wrist grasp, Hand Rotation Position ©, etc.

**Compliance Techniques** – includes resistant countermeasures designed to counter the subject's enhanced degree of resistance. These tactics could include the Hand Rotation Technique ©, chemical irritants, etc.

**Defensive Tactics** – includes assaultive countermeasures designed to cease the subject's non-lethal assault on the officer or others, regain control, and assure continued compliance. These tactics could include baton strikes, kicking techniques, etc.

**Deadly Force** – includes assaultive countermeasures designed to cease an assault which is lethal or could cause great bodily harm on the officer or others. These tactics could include the use of a firearm, lethal strikes, etc.



# Section Two:

# *BOSTON POLICE RULE 304 USE OF NON-LETHAL FORCE*



SPECIAL ORDER NUMBER 95-15

TO: ALL BUREAUS, DISTRICTS-
AREAS, DIVISIONS, OFFICES,
SECTIONS AND UNITS

COPIES TO: ALL SUPERINTENDENTS
DEPUTY SUPERINTENDENTS
AND DIRECTORS

March 15, 1995

SUBJECT:   AMENDMENT TO RULE 304, USE OF NON-LETHAL FORCE

PURPOSE

To more clearly delineate what constitutes a full and complete Patrol Supervisor's investigation in cases where the use of non-lethal force is used, or alleged to have been used, on a subject.

GENERAL CONSIDERATIONS

Effective immediately, Rule 304, Section 7, paragraph 3, is hereby rescinded and replaced by the following paragraph:

Prior to the end of the tour of duty, the Patrol Supervisor shall conduct a thorough investigation on the use of such non-lethal force and submit a report to the Commanding Officer.  Such report shall include the Patrol Supervisor's findings and recommendations based upon the assessment of facts known, as to the justification for the use of force.  A complete Patrol Supervisor's investigation shall consist of the following, where appplicable:

1. Patrol Supervisor's investigative report;

2. A copy of the incident report, BPD Form 1.1;

3. Reports from the officer(s) alleged to have utilized non-lethal force;

4. Reports from all Department personnel that were present;

5. Reports on all interviews of civilian witnesses to the incident.

Paul F. Evans
Police Commissioner



MENTION AT ROLL CALLS

POST UNTIL   Indefinite

Boston Police Department

Rules and Procedures

RULE 304
October 11, 1994

## USE OF NON-LETHAL FORCE

This rule is issued to establish guidelines for the use of non-lethal force by members of this Department in the performance of their duties, and to establish appropriate training, reporting, and record keeping procedures for such use of force. Effective immediately, it supersedes all other rules, regulations, procedures, orders, bulletins, and directives issued previously regarding the use of non-lethal force by Boston police officers.

Because there are an unlimited number of possibilities, allowing for a wide variety of circumstances, no rule can offer definitive answers to every situation in which the use of non-lethal force might be appropriate. Rather, this rule will set certain specific guidelines and provide officers with a concrete basis on which to utilize sound judgment in making reasonable and prudent decisions, attending to the spirit over the letter of the rule.

Sec. 1  DEFINITIONS:  For the purpose of this Rule the following definitions will apply:

1.  **Reasonable Amount of Force** is the least amount of force that will permit officers to subdue or arrest a subject while still maintaining a high level of safety for themselves and the public.

2.  **Non-Lethal Force** is that amount of force that will generally not result in serious bodily injury or death.

3.  **Prudence** is cautious, discreet, or shrewd action having due regard for the rights of citizens while maintaining an awareness of the responsibilities of a police officer.

4.  **Reasonableness** means within reason, moderate and/or fair action suitable to the confrontation. The final decision as to the prudence and reasonableness of a police action will be determined on a case by case basis by those members of the Department called upon to judge the propriety of a fellow officer's action. Such judgments may not conflict with the expressed provisions of this or any other rule or order.

Sec. 2  GENERAL CONSIDERATIONS:  The policy of the Boston Police Department is to use only that amount of force that is reasonably necessary to overcome resistance in making an arrest or subduing an attacker.

The right to use non-lethal force is extended to police officers as an alternative in those situations where the potential for serious injury to an officer or civilian exists, but where the application of lethal force would be extreme.

The availability of a variety of non-lethal weapons is necessary to provide the police officer with a sufficient number of alternatives when presented with a physical confrontation. However, since such force will not likely result in serious injury and the close public scrutiny that accompanies the use of deadly force, this availability may also increase the possibility for overzealous and inappropriate use of force. Therefore, application of non-lethal force will generally be limited to defensive situations where (1) an

Boston Police Department

officer or other person is attacked, or (2) an officer is met with physical resistance while making an arrest.

An officer may also use non-lethal force if, in the process of making an arrest, the officer is met with passive resistance, i.e., an individual who refuses to get out of an automobile, or a protester who is illegally occupying a particular place. Such force should be limited to the absolute minimum required to move the subject. An officer who encounters resistance should be assisted by any other officers present. Two or more officers may effect an arrest, without the use of force which one officer cannot complete without resorting to the use of force.

**Sec. 3 TRAINING AND QUALIFICATION:** Police officers in the Department will be held accountable for proficiency, as well as compliance with Department policy in the use of non-lethal force. Specifically, sworn members shall qualify by successfully completing the course of instruction on non-lethal force approved by the Training and Education Division. This course will be conducted as part of in-service training and will include a practical application segment and a written test component. Whenever the Department adopts new non-lethal force implements, officers will qualify in their use **prior to carrying** or using them on duty.

In the event that an officer fails to complete the required certification, the officer will be temporarily reassigned to the Academy. The Academy will then provide a remedial training program in order to ensure such certification. Officers who still fail to qualify will be subject to reevaluation as to their fitness to continue to perform the duties of a police officer.

**Sec. 4 INCAPACITATING AGENT:** Officers will carry only the type of incapacitating agent issued by the Department.

In electing to use an incapacitating agent against an armed subject, officers should understand that its effects are not uniformly predictable and certain individuals may remain undeterred by its application. Any such use should be accompanied by a realization that officers may need to take further action to ensure their safety. Conversely, all officers should be aware of the potential, however limited, for serious injury arising from the use of an incapacitating agent.

For this reason, officers should generally confine the use of incapacitating agents against armed or unarmed persons to the following situations:

1. In self defense or to defend another person against a violent physical assault.

2. When an officer, while making an arrest is met with vigorous physical resistance and is in danger of either being injured or of losing custody of the suspect.

Officers should be aware of the increased potential for serious injury to the suspect when incapacitating agents are used under the following circumstances:

1. When the subject is less than two feet away.

15

2. When the subject is in an enclosed area without ventilation.

3. When the subject lacks normal reflexes, such as the ability to blink, or is otherwise incapacitated.

When an incapacitating agent has been applied to a subject, officers should, upon securing the suspect, provide for the thorough dousing of the exposed areas with water as soon as is practicable. This should be done as soon as possible since the seriousness of any injury or burn is directly related to the length of time the exposed area remains untreated.

Sec. 5 **SERVICE BATON AND SAPSTICK:** The Department currently authorizes several baton-type implements for use as non-lethal weapons against assailants. Upon issuance to and qualification by an officer, the only baton-type implements authorized for that officer's use shall be their Department issued baton or, in the case of detectives and plain clothes officers who are in the performance of those specific duties, the lead-weighted flat sapstick.

The Department issued baton shall be the standard issue for all uniformed personnel and is to be worn on the equipment belt. The lead weighted flat sapstick will be allowed in place of the Department issued baton only for detectives and plainclothes officers, when they are performing those specific duties. In such case, only the flat sapstick is to be used, not the round billy.

The primary purpose of these weapons is to provide officers with an advantage when fending off and subduing an UNARMED assailant. Officers should not rely on these weapons to overcome an ARMED attack, since they are not intended for such use.

All officers should bear in mind the essentially defensive nature of the use of non-lethal force, as outlined above in General Considerations, Section 2, when using these weapons. Officers should use the defense oriented Pressure Point Control Tactic (PPCT) whenever possible in subduing a subject. This places primary emphasis on striking motor function controlling nerve points in the body. Except in extreme situations, where the officer is in imminent danger of serious injury, no blows should be struck above the thigh, other than to the arms. Additionally, officers should be aware of the potential for permanent disability arising from a blow to the groin, and should limit such blows to extreme situations.

Sec. 6 **INJURY TO SUSPECTS:** The process of booking and jailing a suspect is often time consuming and confusing, allowing for the possibility of overlooking an injury that might have been brought about by police use of force. Indeed, many injuries may not be obvious even to the injured party. Such injuries, if left untreated, could result in serious problems for both the victim and the Department.

Therefore, this Department will have Emergency Medical Technicians examine all suspects who fall under either of these categories:

1. The suspect has an obvious injury, which in the opinion of the Duty Supervisor, requires treatment.

2. The suspect requests medical treatment for any injury, whether obvious or not.

**Sec. 7 INVESTIGATION OF USE OF FORCE:** This Department will thoroughly investigate every incident in which an officer strikes someone with any object or an incapacitating agent is used on a subject, or when a visible injury has occurred in the course of an arrest.

All such applications of force shall be immediately reported verbally to the involved member's patrol supervisor. By the end of the tour of duty, an officer who has used non-lethal force shall make out a written report describing the incident including the names of the officer and other persons concerned, the circumstances under which such force was used, the nature of any injury inflicted and the care given afterwards to the injured party.

Prior to the end of the tour of duty, the Patrol Supervisor shall conduct a thorough investigation on the use of such non-lethal force and submit a report to the Commanding Officer. Such report shall include the Patrol Supervisor's findings and recommendations based upon the assessment of facts known, as to the justification for the use of force. A complete Patrol Supervisor's investigation shall consist of the following, where applicable:

1. Patrol Supervisor's investigative report;

2. A copy of the incident report, BPD Form 1.1;

3. Reports from the officer(s) alleged to have utilized non-lethal force;

4. Reports from all Department personnel that were present;

5. Reports on all interviews of civilian witnesses to the incident.

At the discretion of the involved member's Commanding Officer, further investigation of the incident may be undertaken. Once all the facts have been compiled and substantiated, the Commanding Officer shall submit a report of the incident through channels to the Police Commissioner within seven (7) days.

Once the Police Commissioner indicates that the report and the associated investigation is satisfactory, copies of every such report shall be forwarded to the Office of Internal Investigations, the Human Resources Division and the Training and Education Division.

The Office of Internal Investigations and the Training & Education Division shall maintain a comprehensive file of all use of force reports. Further, the Office of Internal Investigations, acting on its own authority may, or at the request of the Police Commissioner shall, investigate all incidents involving the use of non-lethal force that, based on the information at hand, indicate non-compliance with Department policy.

The Office of Internal Investigations shall forward the results of all investigations undertaken to the Police Commissioner, who may accept it and act upon its recommendations, in total or in part, or return the report with a request for further information or clarification. In every case, the authority and responsibility for final departmental disposition of a Use of Non-Lethal Force incident rests solely with the Police Commissioner.

Note: Rule 304, issued by Special Order 94-37 on October 11, 1994, was amended by the issuance of Special Order 95-16, which made clear what constitutes a proper Patrol Supervisor's report (see section 7, para 3).



# **Section Three:**

*BOSTON POLICE SPECIAL ORDER 00-018 USE OF LESS-LETHAL FORCE*

 **Boston Police**
DEPARTMENT

**Special Order Number:** 00–018

: ALL BUREAUS, DISTRICTS
AREAS, DIVISIONS, OFFICES,
SECTIONS AND UNITS
——————————— June 23, 2000

**Copies To:** ALL SUPERINTENDENTS,
DEPUTY SUPERINTENDENTS,
AND DIRECTORS

SUBJECT: Rule 303 – A, Use of Less – Lethal Force

Effective immediately, the attached Rule, **Rule 303-A, Use of Less – Lethal Force,** is hereby promulgated.

Commanding Officers shall ensure that this order and the attached Rule are posted on Department bulletin boards until **Rule 303-A, Use of Less – Lethal Force,** has been issued to each member of the Department in their command.

Paul F. Evans
Police Commissioner



# Section Four:

*BOSTON POLICE RULE 303-A USE OF LESS-LETHAL FORCE*

Boston Police Department

Rules and Procedures

Rule 303-A
June 22, 2000

## USE OF LESS - LETHAL FORCE

This rule is issued to establish guidelines for the use of less-lethal force by members of this Department in the performance of their duties, and to establish appropriate training, reporting, and documentation for such use of force.

### Sec. 1  DEFINITIONS:

1.1     **Less-Lethal Force Philosophy** is a concept of planning and force application that meets operational objectives, with *less potential* for causing death or serious physical injury than the use of deadly force.

1.2     **Reasonableness** is moderate and/or fair action within reason, suitable to the confrontation.

1.3     **Super Sock Round**, also known as a flexible projectile, is fired through a 12 gauge shotgun.

### Sec. 2  GENERAL CONSIDERATIONS:

The Department has adopted the less-lethal force philosophy to assist in the de-escalation of potentially violent situations. The less-lethal force philosophy shall not preclude the use of deadly force.

### Sec. 3  TRAINING AND QUALIFICATION:

Training shall consist of a Department approved training and qualification program in the use of a 12 gauge shotgun. Supervisors shall be trained and qualify four times per year in the proper use of a less lethal shotgun. Supervisors trained in the use of this weapon will be held accountable for proficiency as well as compliance with Department policy in the use of such weapon.

### Sec. 4  SECURING OF LESS LETHAL SHOTGUN AND AMMUNITION:

Each less lethal shotgun shall be stored in a District gun locker in a safe condition (i.e. safety on, action open, chamber and magazine empty). Flexible projectile rounds shall be stored and secured along with the weapon in the District gun locker. The less lethal shotgun will have an <u>orange colored stock</u>. The words "less lethal" will be noted on the stock to identify that the less lethal shotgun is used strictly for flexible projectile rounds. Every Thursday the day tour Duty Supervisor shall perform a visual inspection to verify that the shotgun is stored in a safe condition, as well as insure that the requisite number of flexible projectile rounds are accounted for. This information shall be recorded in a District Control Log.

During the Patrol Supervisor's tour of duty, the less lethal shotgun shall be loaded with four flexible projectile rounds in the magazine, with an empty chamber, with safety lock on, and secured in the locking device located in the trunk of the Patrol Supervisor's vehicle.

Boston Police Department                              Rules and Procedures

Rule 303-A
June 22, 2000

---

### Sec. 5  AUTHORIZATION AND USE OF LESS LETHAL WEAPONS:

Only supervisors who have completed the Department training and qualification program shall be authorized to use a 12 gauge less lethal shotgun.

If the possibility of the use of less lethal force is determined to be an option the Patrol Supervisor shall be notified and respond to the scene.  If the possibility of the use of less-lethal force is determined to be a reasonable option by the Patrol Supervisor, then the Patrol Supervisor shall notify the Boston Emergency Medical Services to respond.

The Patrol Supervisor shall designate an on-scene officer to provide lethal force coverage and, if deemed appropriate shall designate two or more officers for suspect take down.

Upon discharge of the shotgun the District Commander and Duty Supervisor shall be notified.  Subjects who are struck by a flexible projectile round shall be transported to a medical facility for examination.

### Sec. 6  REPORTING AND INVESTIGATION:

Any discharge of a less lethal shotgun other than training shall be investigated pursuant to Rule 303.



# Section Five:

## *BOSTON POLICE RULE 303USE OF DEADLY FORCE*


**BostonPolice**
D E P A R T M E N T

*Special Order Number:* 03–012

**To:** ALL BUREAUS, DISTRICTS
AREAS, DIVISIONS, OFFICES,
SECTIONS AND UNITS

April 11, 2003

*Copies To:* ALL SUPERINTENDENTS,
DEPUTY SUPERINTENDENTS,
AND DIRECTORS

SUBJECT:    RULE 303, USE OF DEADLY FORCE

The attached Rule 303, Use of Deadly Force, is issued to provide guidelines and regulations governing the use of deadly Force by members of the Department, to ensure the safety of our police officers and the public, and to establish procedures for the orderly investigation of firearm discharges. Its provisions are effective immediately, superseding all preciously issues rules, regulations, orders, bulletins and directives regarding the use of deadly force by Boston Police Officers.

The principal change included in this re-issuance of Rule 303 is the establishment of the Firearm Discharge Investigation Team. Related changes have been made in Sections 1, 10, 11, and 12 (Section 12 "Transfer of Investigative Responsibility" has been removed and replaced with "Disposition" which was formerly Section 13). The Firearm Discharge Investigation Team will be solely responsible for conducting all Rule 303 deadly force investigations. The intent behind the formation of the Firearm Discharge Investigation Team is to provide an investigative process that is both comprehensive in scope and timely in its completion.

Commanding Officers shall ensure that this order and the attached rule are posted on Department bulletin boards until Rule 303 has been issued to each member of the Department.

Paul F. Evans
Police Commissioner

MENTION AT ROLL CALLS • POST UNTIL: Indefinite

24

Boston Police Department

Rules and Procedures

RULE 303
April 11, 2003

## USE OF DEADLY FORCE

---

### INTRODUCTION

This rule is issued to provide guidelines and regulations governing the use of deadly force by members of the Department, to ensure the safety of our police officers and the public, and to establish procedures for the orderly investigation of firearm discharges. Its provisions are effective immediately, superseding all previously issued rules, regulations, orders, bulletins and directives regarding the use of deadly force by Boston police officers.

In the establishing of these regulations it is understood that they will not likely cover every conceivable situation which may arise. In such situations officers are expected to act with intelligence and sound judgment, attending to the spirit of the rule. Any deviations from the provisions of Sections 5, 6, 7, or 8 of this rule shall be examined on a case by case basis.

Note: Weapons and ammunition coming into the custody of Police Department personnel shall be handled in accordance with the provisions of Rule No. 311, **Procedures for the Ballistics Unit.**

Sec. 1  Definitions: For the purpose of this rule, the following definitions will apply:

**Deadly Force** is that degree of force likely to result in death or great bodily injury. The discharge of a firearm toward a person constitutes the use of deadly force even if there is no express intent to kill or cause great bodily injury.

**Great bodily injury** means bodily injury which creates a substantial risk of death or which is likely to cause serious injury, permanent disfigurement or loss, or extended impairment of the function of any bodily member or organ.

**Immediate danger of death or great bodily injury** includes circumstances under which (1) such a danger exists in reality, or (2) such a danger is apparent, and the officer is unable to affirm or disaffirm its actual existence.

**Prudence** means using cautious, discreet or shrewd action and having due regard for the rights of citizens while maintaining an awareness of the responsibilities of acting as a police officer.

**Reasonableness** is moderate and/or fair action within reason, suitable to the confrontation.

The **Investigating Officer in Charge (IOIC)** is the Detective Superior Officer of the Firearm Discharge Investigation Team so designated by the Commander of the Homicide Unit and assigned to investigate the facts of the incident and to determine the justification for the use of deadly force.

**Sec. 2  General Considerations:** The primary purpose for which a sworn member of the Department is issued a firearm and trained in its use is the protection of life and limb, both theirs and that of every other person needing such protection. Although the firearm is a necessary weapon for present-day policing, its potential to inflict death or great bodily injury mandates that it be used with discrimination and within clearly-defined limits. This rule establishes those limits.

In the interests of personal safety, police officers must seek to gain and maintain an advantage over persons known or suspected to be armed. Such an "edge" may take the form of numerical superiority in manpower and firepower or of an officer staying "one jump ahead" of a subject likely to produce a weapon. Officers seeking to maintain the advantage over a subject suspected of being armed are in a difficult position; they must be prepared to use a firearm should it be necessary, yet show the restraint required to ensure the propriety of their actions. The situation demands the utmost ability to think clearly, quickly and decisively and to use the firearm in a safe and effective manner.

The Boston Police Department recognizes its legal duty to protect the rights of all individuals to due process of law and a fair trial. Its members are thereby bound to refrain from any use of force that unnecessarily tends to administer punishment at the hands of a police officer. The responsibility for punishment of criminal offenders rests solely with duly constituted courts of law and penal institutions and is by no means extended to the police.

**Sec. 3  Training and Qualification:** Police officers in this Department will be held accountable for proficiency as well as compliance with Department policy in the use of firearms. All sworn members of the Department are responsible for maintaining a degree of expertise in the use and handling of all firearms approved for their carrying. Specifically, sworn members authorized to carry a firearm shall qualify with their issued firearm(s) on a course of instruction approved by the Massachusetts Criminal Justice Training Council at least twice each year – once during the period from January 1st - June 30th and once during the period from July 1st - December 31st. A qualifying score of 80% or higher is required. When members of the Department are issued a new weapon, they shall qualify at the Department range in the use of that weapon prior to resuming street duties. This shall not apply to the emergency use of a comparable spare weapon issued on a temporary basis.

In the event an officer fails to qualify, the officer will be temporarily re-assigned to the Department Range. It will be the responsibility of the Commanding Officer of the Department Range to ensure that the officer's firearm is taken from them until such qualification is achieved. Any officer who, after such intensive training as determined by the Commanding Officer of the Department Range, has still failed to qualify will be subject to reevaluation as to their fitness to continue to perform the duties of a police officer. Under no conditions shall an officer who fails to qualify be allowed to perform any street police duties.

Frequently, officers have activated themselves during off-duty situations where there is a need to draw a personal firearm and the possibility exists to use such weapon. On self activation, the officer's actions are guided by all Departmental rules and regulations, hence there is a need to show familiarization with any personal weapon which is carried while off-duty.

Members of the Department who are licensed to carry firearms pursuant to M.G.L. c. 140, § 131 and who own and carry a personal firearm while off-duty shall fire a familiarization course as designed by the Commanding Officer of the Department Range. This course will be fired during regular qualification times and police officers shall provide their own ammunition.

Officers complying with this portion of the rule will notify their Commanding Officer of their intent to do so and shall be authorized to carry more than one weapon while on duty for the sole purpose of attending the familiarization course at the Department Range. This authorization shall be temporary and will only allow the officer to carry the off-duty weapon to and from the range. The off-duty weapon shall be secured in the District gun locker prior and subsequent to completion of the familiarization course.

**Sec. 4  Security and Maintenance of Department Firearms:**  Members of the force shall take all reasonable precautions to insure that weapons issued to them by the Department are protected from loss, misuse or theft.

Members are responsible for keeping their issued weapons clean and in good working order. A weapon which malfunctions shall be returned to the Boston Police Range forthwith.

**Sec. 5  Pointing Firearms:**  Officers shall not point firearms at persons except when reasonably justified under the circumstances. In situations involving the strong possibility of great danger (e.g. searching a building pursuant to a burglar alarm or approaching a business establishment on a report of a robbery in progress, etc.) officers should carry their weapon in a position that will facilitate its speedy and safe use. While officers should not point a weapon unless they are prepared to use it, the fact that they have done so must not be interpreted as an obligation to fire.

**Sec. 6  Discharge of Firearms:**  The law permits police officers to use reasonable force in the performance of their duties but only to the degree required to overcome unlawful resistance. This doctrine of "reasonable use of force" applies to the use of firearms as well as to non-lethal force. Also, because of their destructive potential, the use of firearms must be further restricted to the purpose for which they are issued, that of protecting life and limb. The discharge of a firearm by a member of the Department is permissible only when:

A.  There is no less drastic means available to defend oneself or another from unlawful attack which an officer has reasonable cause to believe could result in death or great bodily injury, or

B.  There is no less drastic means available to apprehend a fleeing felon when the officer has probable cause to believe that: (1) the subject has committed a felony during the commission of which they inflicted or threatened to inflict deadly force upon the victim, or (2) that there is substantial risk that the felon in question will cause death or great bodily injury if their apprehension is delayed, or

C.  There is no less drastic means available to kill a dangerous animal or one so badly injured that humanity requires its removal from further suffering.

Officers who find it necessary, under the provisions of this rule, to discharge firearms shall exercise due care for the safety of persons and property in the area and shall fire only when reasonably certain that there is no substantial risk to bystanders.

**Sec. 7 Warning Shots and Signals:** Firearms shall not be used as a signaling device. A firearm shall not be used to summon assistance or to give signals or to warn a fleeing felon to stop. This does not mean that officers may not discharge their firearm without the intent to kill or disable if in their best judgment there is no alternate method of convincing a would-be attacker that they are ready and able to defend themselves or others if the potential threat is not discontinued.

**Sec. 8 Moving/Fleeing Vehicles:** Firearms shall not be discharged from a moving vehicle. Firearms shall not be discharged at a moving or fleeing vehicle unless the officer or another person is currently being threatened with deadly force by means other than the moving vehicle. For the purposes of this section, the moving vehicle itself **shall not** constitute the threatened use of deadly force. Therefore, officers shall move out of the path of any oncoming vehicle instead of discharging a firearm at it or any of its occupants. Moving to cover, repositioning and/or waiting for additional responding units to gain and maintain a tactically superior police advantage maximizes officer safety and minimizes the necessity for using deadly force.

The above prohibitions exist for three reasons:

1. Bullets fired at moving motor vehicles are extremely unlikely to stop or disable the motor vehicle,

2. Bullets fired may miss the intended target or ricochet and cause injury to officers or other innocent persons, and

3. The vehicle may crash and cause injury to officers or other innocent persons if the bullets disable the operator.

**Sec. 9 Permissible Weapons and Ammunition:** Officers shall carry on duty only weapons and ammunition authorized and issued by the Department. Whenever an officer is carrying a currently issued semi-automatic pistol (.40 cal. Glock), the pistol shall be carried with a fully loaded magazine (13 rounds in the large capacity magazine; 9 rounds in the small capacity magazine), in addition to having one round in the chamber. Spare magazines shall be kept fully loaded.

Regardless of whether an officer is on duty or off duty, Department issued weapons may only be carried on one's person in Department issued or Department authorized holsters.

It is the responsibility of a police officer not to accept a Department issued weapon unless the officer has qualified in its use. Prior to issue, the issuing Superior Officer shall inquire of any officer to whom a Department weapon is to be issued whether or not that officer is qualified in its use.

Other weapons authorized by the Department for special operations may be selectively issued to qualified personnel by a Superior Officer, if they are deemed necessary to ensure the safety and effectiveness of police operations. Officers armed with such weapons shall use those weapons in accordance with the provisions of this rule as well as any additional guidelines issued at the time.

All necessary repairs or modifications to Department issued firearms and other weapons must be performed by a Department armorer or a Department approved gunsmith at the direction of the Commanding Officer of the Boston Police Range.

**Sec. 10  Reporting Firearms Discharges:** All firearm discharges, except discharges which occur during Department authorized or approved firearms training, while lawfully engaged in target practice or while hunting (unless a discharge occurring during one of these three exceptions results in death, personal injury or property damage), require the submission of an incident report (1.1) which includes information relative to injuries and damage to property.

- An officer who discharges his firearm during the course of his duties shall immediately notify the Operations Division that they have been involved in a "Code 303" and request that a Patrol Supervisor respond to the scene. The officer shall make a verbal report of the discharge to the responding Patrol Supervisor. In the event that someone has been injured, officers will request medical assistance. The supervisor shall request that Operations make all appropriate notifications including the Firearm Discharge Investigation Team. A full written report of the discharge must then be made prior to the termination of the officer's tour of duty, unless medical reasons dictate that the report be made at a later date.

- An off-duty officer discharging a firearm in the City of Boston shall immediately notify an Operations Division Supervisor. The Operations Division shall notify the Officer in Charge of the District in which the discharge took place and the Firearm Discharge Investigation Team. The officer involved in the firearm discharge shall submit the necessary reports without delay to a Superior Officer assigned to the Firearm Discharge Investigation Team. The Officer in Charge of the District in which the discharge took place shall notify the off-duty officer's Commanding Officer.

- An officer who discharges a weapon outside of the City of Boston shall immediately notify and make a report of the discharge to the Police Department which has jurisdiction where the discharge occurred, identify themself as being a Boston police officer and notify an Operations Division Supervisor as soon as possible. The Operations Division shall immediately notify the officer's Commanding Officer and the Firearm Discharge Investigation Team.

Officers who have discharged a firearm shall complete a BPD Form 2415 (Firearms Discharge Report) in its entirety.

**Sec. 11  Investigation of Firearm Discharges:** The manner in which police officers use firearms is an extremely critical issue to the Department, one in which the community and the courts allow little margin for error. To insure that proper control in this area is maintained, all reported discharges of firearms by officers of this Department will be thoroughly investigated by the Firearm Discharge Investigation Team.

The Firearm Discharge Investigation Team has sole responsibility for investigating firearm discharges involving a member of the Department. Failure to cooperate with the investigation shall be grounds for disciplinary action. The foregoing does not prevent an officer from exercising their constitutionally protected rights to remain silent or to speak with legal counsel.

The District Commander of the District wherein a police officer discharges a firearm shall be responsible for assigning a Superior Officer to assist the Firearm Discharge Investigation Team in their investigation into the discharge.

In those incidents where the use of deadly force results in death, the District Attorney's Office, pursuant to the terms of M.G.L. c. 38, § 4, will assume control of the investigation. The statute reads, in part, "The District Attorney or his law enforcement representative shall direct and control the investigation of the death and shall coordinate the investigation with the office of the chief medical examiner and the police department within whose jurisdiction the death occurred."

In all instances where a Boston police officer discharges a firearm resulting in injury, the District Attorney's Office will be notified and his designees from the Boston Police Department will conduct an independent investigation to determine the facts of the case.

## Responsibilities:  Patrol Supervisor

Shall respond immediately to a reported use of deadly force, **Code 303**, within his District and assume command of the investigation pending the arrival the District Commander and/or the Firearm Discharge Investigation Team.

Shall notify the Operations Division of the firearm discharge.  In turn, the Operations Division shall be responsible for making all necessary notifications.

Shall initiate such preliminary steps as are necessary to conduct a thorough investigation and hold himself in readiness to assist the District Commander and the Firearm Discharge Investigation Team upon their arrival.  In this respect, the Patrol Supervisor shall have the authority to order as many units to the scene of the firearms discharge as is deemed necessary or to take any other appropriate action to complete the task.

Shall establish an outside perimeter around the area of the incident.

Shall ensure that the scene is preserved pending the arrival of the Firearm Discharge Investigation Team in a manner pursuant to Rule 309, **Procedures for Handling Physical Evidence and Other Property Coming into Police Custody.**

Shall take possession of the firearm which has been discharged and ensure that it is turned over to the Department Ballistician as soon as possible.  **In so doing, the Patrol Supervisor shall preserve all firearms in the condition in which they are found.**  The Patrol Supervisor must use extraordinary care in this respect as the firearm may still be loaded.

In the event that more than one officer is present at a shooting incident, the Patrol Supervisor, as soon as circumstances allow, shall collect all firearms which belong to the officers who were at the scene and store them until a Department Ballistician can ascertain which have been fired. Firearms determined not to have been discharged will then be returned to the police officers to whom they were issued as soon as possible.

## Responsibilities:  District Commander

The District Commander will respond to the scene and assume overall command of the situation pending the arrival of the Firearm Discharge Investigation Team. Additionally, the District Commander will:

Assign a Superior Officer to assist the Firearm Discharge Investigation Team and ensure that any and all District resources are made available to complete the investigation. The District Commander will have the flexibility to assign any Superior Officer to fulfill this task.

Ensure that full cooperation is extended to the Firearm Discharge Investigation Team and any designated investigators from the District Attorney's Office.

30

Responsibilities:  Commander, Homicide Unit

Shall be responsible for ensuring that a Firearm Discharge Investigation Team is assigned to investigate all reported firearm discharges by Department personnel except discharges which occur during Department authorized or approved firearms training, while lawfully engaged in target practice or while hunting (unless a discharge occurring during one of these three exceptions results in death, personal injury or property damage).

The Commander, Homicide Unit shall have the flexibility and discretion to assign any investigators deemed appropriate as being members of the Firearm Discharge Investigation Team.

The Commander, Homicide Unit, shall have ultimate responsibility for ensuring the thoroughness of any investigation regarding a firearm discharge or the use of deadly force by Department personnel.

Responsibilities: Firearm Discharge Investigation Team

The Firearm Discharge Investigation Team shall respond to the scene as expeditiously as possible and immediately meet with the Patrol Supervisor and be briefed relative to the known facts surrounding the incident.

Shall notify the Operations Division that they are taking control of the scene and the investigation.  Notifications must be done "on-air."

Shall be allowed any resources they deem necessary to conduct a complete investigation.

Shall conduct an investigation to determine the facts of the incident.

Shall ensure that a thorough search is conducted at the scene.

Shall ensure that witnesses are identified, separated and interviewed.

Shall coordinate with any other simultaneous investigations.

Shall submit a preliminary report within five (5) days to the Commander, Homicide Unit, to the Commander of the District or Unit where the officer is assigned and to the Commander of the District or Unit where the discharge occurred, to the Bureau Chief of the appropriate command and to the Superintendent-In-Chief. The Superior Officer in Charge of the Firearm Discharge Investigation Team shall make a recommendation in the preliminary report, based upon an assessment of the facts known, as to the justification for the use of deadly force, whether or not the firearms discharge was accidental and whether or not it involved personal injury, death or damage to personal property.

Pending this report, the Officer involved will be assigned to administrative duties in their unit of assignment.  However, if the preliminary investigation indicates that the firearm discharge was justified, the Officer may be restored to regular duties, with the approval of their Commanding Officer, the Bureau Chief of the appropriate command, the Superintendent-in-Chief and the concurrence of the Police Commissioner.

The Firearm Discharge Investigation Team shall submit a comprehensive, detailed report, with recommendations, within thirty (30) days to the Commander of the Homicide Unit and to the Superintendent-in-Chief. An extension may be granted to the thirty (30) day time frame with the permission of the Superintendent-In-Chief.

**Sec. 12 Disposition:** Upon receiving a report pertaining to a firearms discharge and investigation by the Firearm Discharge Investigation Team, the Superintendent-in-Chief may accept it or return the report with a request for further information or clarification. In every case, the authority and responsibility for final Departmental disposition of a firearms discharge incident rests solely with the Police Commissioner. Upon accepting a report and making a final disposition in a firearm discharge case, copies of the Police Commissioner's decision shall be sent to the appropriate District, Unit and Bureau Commanders.

Paul F. Evans
Police Commissioner

# RED TEAM
## Firearm Discharge Scene Organizational Chart



Firearm Discharge Investigation Team





# FDIT Notification Flowchart

Firearm Discharge Investigation Team



# Section Six:

*BOSTON POLICE ACADEMY*
*TRAINING BULLETINS*



## *VERBAL COMANDS:*

Verbal Commands are a vital part of an Officer's available options in handling situations they face on a daily basis. They serve to identify the Officer, inform the subject of a lawful order, protect both the public and the Officer and may defuse an incident and successfully resolve a potentially violent situation.

The three parts to a verbal Command:

1. **IDENTIFICATION-**A simple one or two word statement establishing your identity and authority.

   Example:
   - Boston Police!
   - State Police!
   - FBI!

Even if the Police Officer is in uniform, with the proliferation of Security Agencies, witnesses and Subject may not readily identify you as Police Officer. This is critically important for detectives and plainclothes Officers who are not readily recognizable.

2. **LAWFUL COMMAND-**Use of a lawful command to prevent injury, stop illegal action or prevent escape.

   Example:
   - Halt!
   - Stop!
   - Drop the Weapon!
   - Don't Move!

An Officer's commands should be simple and direct. A positive order, "Stop!" is more effective than a negative order, "Don't Do It!"

3. <u>**EXTENSION OF THE LAWFUL COMMAND**</u>-A command designed to get the subject into a controlled and safe position. This will not be the last command the Officer will give a subject, but is used to establish that the Officer, not the subject matter, is in control of the situation.

Example:
- Put Your Hands Up!
- Turn The Engine Off!
- Place The Keys On The Roof!
- Get Down On The Ground

If the Subject Matter does not respond to your verbal commands, repeat the order and add *"DO IT NOW!"* until the Subject responds. If the Subject is slow to respond or continues to ignore you, maintain your distance from him/her. Call for back up and continue to repeat your command. If he/her is armed with an Edge Weapon at least 21 feet away (Minimum) take cover/concealment. Remember, the advantage is yours (Officer Advantage) if you maintain *Presence* and utilize **Good Tactics.**

Do not threaten a subject when issuing a verbal command. A threat may escalate a situation and any witnesses present will hear the Officer threaten the Subject.

When more than one Officer is present the "Contact Officer" is usually the driver while the observer acts as the "Cover Officer". When one Officer unit is assigned the Officer making the initial stop will issue all verbal commands and act as "Contact Officer".

The United States Supreme Court in *Garner vs. Tennessee* clearly states that a Police Officer must give verbal commands whenever practical. It falls upon the Officer to show that he/she was unable to give a verbal command because of the suddenness or violence of the incident.

If it is possible, by using verbal commands to stop a situation from escalating into one in which force, non-lethal or less lethal or lethal, is necessary, then an Officer is obligated to do so.

37

Training Bulletin 28 - 89

# Boston Police **Academy** 

Captain Robert P. Dunford

## USE OF FORCE OPTIONS – PART II

# Tactics: A Practical Approach

Part 1 of this series (TB 5–89) addressed the officer's response to the behavior of other people. This training bulletin will be concerned with the issue of tactics. For the purpose of our discussion, tactics is defined as, "The actions taken by an officer for the creation of an advantage for himself and a recognizable disadvantage for the officer's opponent(s)".

How does an officer create the advantage for himself? The answer is first, tactical thinking and second, the application of a properly developed and executed tactical plan designed to diminish the possibility of resistance by the suspect.

Tactical Thinking

Tactical thinking means constantly evaluating the situation and the people involved and adjusting your actions and communications to the suspect(s) accordingly. Ah, you say, more classroom rhetoric.. But is it?

About ten years ago an officer without wearing body armor was wounded as he stood in front of a door behind which an armed and barricaded suspect hid. As officers stood on the porch with their backs to the door, one officer on the porch tried to direct traffic. Never! Not me, you say. When in reality similar tactical errors occur daily because officers fail to think tactically.

In the above incident the officers failed to ask, "What if" and "What are the potential hazards present". Answering these simple questions would have allowed the officers to think ahead, properly evaluate both the situation and the suspect, and avoid lag time. Thinking tactically now prevents you from having to play catch–up once the incident starts.

The Tactical Plan

The best plans are simple and employ the following elements:

* surprise
* movement
* distance
* making them come to you
* knowledge of the area
* an awareness that if you can see them, they can see you

Surprise and movement are the keys to silent deployment, placing your opponent at a disadvantage and diminishing the possibility of resistance. Noise/light discipline,

surveillance, cover and back–up are the active ingredients of silent deployment. The silent movement to the scene and the ability to surprise the suspect(s) with a police presence are critical to your tactical plan. Major violations of this principle are over use of the blue lights and sirens, failure to stop–look–and listen and attempting to "John Wayne" the situation.

Distance allows the officer the time to plan and act. The closer you are to the suspect the greater the threat he is to you. The officer utilizing cover, voice commands and back–up is able to control the situation and the suspect(s). Distance forces the suspect to comply without the officer giving up his position or closing the distance until the suspect is controlled.

The major control factor in your tactical plan is making the suspect come to you. This element is an integral part of "surprise" and "movement". The goal of your plan is control of the suspect. If resistance occurs, it will be the police officer who is ready and waiting.

The next element of your tactical plan is knowledge of the area. How can you silently deploy if you don't know the area. There is more to knowing the area than knowing just the terrain. Know the people, their movements and their habits. Know the hows and operations of the businesses in the area. Obtain a visual layout of the businesses and any other "intelligence" that will provide you with the advantage.

Finally, "if you can see them, they can see you". Too many officers fail to grasp this concept and a related principle, that he who occupies the high ground has the advantage. A suspect who has the high ground advantage may be able to see you before you can see him. In order to maintain the element of surprise, your movements must be undetected, noise/light discipline, concealment and stop–look–and listen are key factors in your moving undetected. Remember, if you are detected, the suspect has now taken control of the situation.

The officer who thinks tactically and plans rather than waits to react to circumstances will be more flexible when confronted with a threat and in a better position to control the situation. You are responsible for your safety and the safety of others. You may disregard your own safety but you have no right to jeopardize others because you failed to think ahead and plan.

---

Reference
Training Bulletin 5–89
Police Marksman, Vol. XII, No. 4, July/August, 1987
Police Marksman, Vol. XIII, No. 6, November/December, 1988

Training Bulletin 29 – 89

# Boston Police Academy



Captain Robert P. Dunford

## USE OF FORCE OPTIONS – PART III

# Communication With Suspect(s)

*"Use of force is a system of verbalization skills coupled with physical alternatives"*
Sergeant Gary Klugiewicz

Communication to control a person(s) an officer encounters is the least serious and most effective force option available to him. Additionally, communicating to reduce or prevent resistance to an officer's lawful control of a suspect is a critical preclusionary step in protecting the officer and his lawful actions from civil liability claims.

Communication consists of verbal (what you say), non-verbal (your appearance and body language) and vocal (how you speak). The effectiveness of your message to the suspect will depend on two objectives:

a. Move from passive messages to more active messages (escalating to control)
b. Send clear messages to the suspect(s) by being consistent

Types of communication used to control the suspect, moving from passive to active are:

- search talk
- persuasion
- light control talk
- heavy control talk

### Search Talk

Search talk is unthreatening, general conversation used to determine a suspect's state of mind, find information and inform the suspect. It is intended to be conversational. The voice is normal and steady and the words are spoken at a normal pace.

### Persuasion

Utilizing persuasion you are escalating the message you are sending the suspect. You are trying to persuade the suspect to follow your directions or to answer questions. At this stage the voice is louder but the tone is unvarying and steady. You should keep directions and questions simple, allowing the suspect to respond before proceeding.

### Light Control Talk

If it becomes necessary for you to escalate to physical control of a suspect, light control talk should be used (see TB 27-88, Contact/Cover). The purpose is to gain control of a suspect by identifying clear limits and enforceable consequences. You should speak loudly with an unvarying tone and a steady pace.

40

Heavy Control Talk

If you must escalate to unarmed counter-measures or the use of mace, baton or deadly force, heavy control talk is used. The three components of heavy control talk are identification, a lawful command and an extension of the lawful command (see TB 7-88, Verbal Commands). Speak with short commands in a loud, unvarying tone and at a steady pace. Direct the suspect with clear, specific commands with definite consequences for failing to comply with your lawful commands.

Finally, when communicating with a person avoid trigger words, connotations and slang. They will normally heat up a situation but they are also commonly misunderstood and unprofessional. Be aware of the vocal cues and body language you are using. In an emotional situation it is sometimes more important how you say something than what you say. Short commands, given in a steady tone with words spoken at a normal pace will be far more effective and less threatening than the "Dirty Harry" approach. It is critical that you verbalize your intent to the suspect(s) so that he completely understands what you want him to do.

Reference
Training Bulletin 7-88
Training Bulletin 27-88
Sergeant Gary T. Klugiewicz, Milwaukee County Sheriff's Department
Risk Management
Police Marksman, November/December, 1989

Training Bulletin 19 – 90

# Boston Police **Academy**



Captain Robert P. Dunford

## Use Of Force Options - Part IV
# Non-Verbal Communication: "The Eyes"

In Part III of this series we discussed the types of verbal communications used to control a suspect. This bulletin will discuss non-verbal communications, particularly the "Eyes".

Non-verbal communication or body language refers to any part of a person's appearance or behavior that sends information about them. There are different kinds of non-verbal messages that can be sent by specific parts of the body (for example, hands, arms, legs, facial expressions, and the eyes). Being able to "read" the non-verbal messages from others is a vital officer safety skill.

As police officers we come into contact every day with people who are experiencing varying degrees of emotional distress and/or aggression caused by the situation they find themselves in. By adapting to the situation and demonstrating the appropriate response (concern, supportiveness, confidence and authority) we are able to control and manage the incident.

In any threat situation, real or perceived, the often heard tactical axiom, "Watch The Hands" is sound tactical advice. But, if the officer is only looking at the suspects hands, he/she may miss important signals of the suspect's intentions. The officer must not only scan the area, but scan the suspect also.

The following are some important factors to consider in regards to "Eye Contact".

- Constant eye contact while you speak can be interpreted as trying to dominate the other person. Reducing eye contact reduces the power role and increases the concerned role.
- Maintaining eye contact while the suspect speaks decreases the power role and shows supportiveness. When the officer speaks, he/she should shift his/her eyes and scan the suspect occasionally, paying particular attention to the suspect's hands.
- When the officer is taller than the suspect and the officer maintains constant eye contact while speaking, the suspect may interpret this as an attempt at dominance.
- When the officer is shorter than the suspect and maintains constant eye contact, it may be perceived as a sign of overconfidence or a challenge.

Warning Signals
- Eyes alternating from eyes to chest to hands - the suspect may be sizing you up.
- Eyes jerking - the suspect may be hallucinating.
- Eyes darting side to side and up and down - suspect may be agitated.
- Eyes looking around - suspect may believe you have cornered him/her, and are now looking for a weapon or an escape route.

42

- The target glance - most suspects will look where they intend to strike. They will glance at the target before they strike.
- The glazed state/empty stare/look through you stare/and the thousand yard stare - warns the officer that there exists a higher potential for aggressiveness. The suspect may become inflamed with little or no warning. "Give Them Space". The tactical principal of time and distance must be obeyed.

   Although this bulletin has stressed contact between an officer and a potentially hostile suspect, the basic principles of eye contact are the same for any police/citizen contact.

Training Bulletin 14 – 90

# Boston Police Academy



Lieutenant Mary Evans

# Use Of Force Reports

## Check List And Format

    Whenever an officer must respond to the actions of a suspect by using either Non–Lethal Force (Rule 304) or Deadly Force (Rule 303) there must be an accurate, complete report made. The circumstances involved when these reports must be written are always stressful. This Check List and Form 26 Format will assist you in ensuring that your report is complete and correctly formatted.

1. 1.1 Incident Report Completed.
2. If Deadly Force, Form 2415, Firearms Discharge Report completed, **every** applicable item checked or filled in.
3. Form 26 Narrative Report: Includes all of the following when applicable:
       Opening sentence form format.
       The day, date, time, weather conditions of the incident.
       Your duty status and unit number.
       Source and nature of call as given initially.
       Description of initial scene, **your observations.**
       Descriptions of all suspects.
       **Suspect's words, actions, behaviors.**
       Statements of victims, witnesses where applicable.
       Your actions, verbal, warnings, commands.
       Actions of your partner, other officers where relevant.
       Your state of mind.
       Weapon brand, model and serial number, date of last qualification.
       Method and manner of discharge, use categories from Form 2415.
       Number of rounds fired by you.
       Your actions after using reasonable and necessary force.
       Notification of your supervisor.
       Injury, to yourself or others including suspect: medical ambulance response, etc..
       Broadcasts made, if any.
       Full description of suspect's weapon, its custody.
       Other evidence gathered, custody.
       Complete list of responding units, assisting, supervisory, investigating.
4. Ask yourself, is there anything that occurred that will help explain my reasonable and necessary use of force that is not included?
5. **Review for completeness, check grammar and spelling.** Ask someone not involved to read over and provide feedback.
6. Type whenever possible, sign the final report <u>only.</u>
7. Keep your notes and copies of all final submitted reports; 1.1, 2415, Form 26, complaints, citations, etc.. **Do not** sign or keep draft copies.

**Note:**
    This list is designed as a writing aid. It cannot cover every circumstance. You are responsible for the completeness and accuracy of your report.

# Boston Police

DISTRICT/UNIT_____

Page_____ of_____
Date_____
CC# _____

**#2**
To:   Rank - Name
From:   Rank - Name
Subject:   Nature of occurance, day, date
Sir or Ma'am:

**#3**   I respectfully submit, I, Police Officer Jane J. Doe, WN/F, ID #XXXXX, Badge
#XXXX, D.O.B. XX/XX/XX, date of appointment XX/XX/XX, on
Day – Date – Time – Weather & Lighting
Assignment – Source Of Call – Nature Of Call

**#4**   What You Found – Description Of Scene
Statements Of Witnesess, Victims If Applicable
Suspect's words, actions, behaviors.

**#5**   What Actions You Took
(Remember, your chronology. As it occured to you.)

Include Injuries To Yourself – Suspects – Victims
(Include how transported, Amb. #, EMTS/Paramedic names, where to,
treated or examined, by whom, diagnosis:
for yourself any prescriptions/treatments prescribed.)

**#6**   Investigations And Statements
(Where applicable)

**#7**   Notifications/Other Responding Units

(List Unit #, Agency or Department, Rank or Position,
Name, I.D.# – if available)

**#8**   Summary
(Relieved from duty? By whom? Time? or continued on tour?)

**#9**   Respectfully submitted,


(Signature) _____
Name (printed) & I.D. #

BPO Form 26                                                          45   Rev 8-74

# Boston Police Department    Firearms Discharge Report

Officer's Name: _____ I.D.#: _____ Date of Report: _____

_____ Years of Service: _____ CC# : _____

Date of Incident: _____ Time of Incident: _____ Duty Status at time of incident: ☐On Duty ☐Off Duty

Location of Incident: _____ ☐Indoors ☐Outdoors
(Include Street, Number, Area)

Nature of Incident:_____

Weather Conditions: _____

Lighting Conditions:   ☐Natural    ☐Artificial    ☐Night    ☐Day:    ☐Uniformed    ☐Plain Clothes

Weapon Used:  ☐Department Weapon  ☐Privately Owned

Make: _____ Model: _____ Serial #: _____

Barrel length: _____ Number of Shots Fired (by the officer): _____

Firearms I.D.#: _____ License to Carry #: _____ Expiration Date: _____

If Privately Owned, Name of Owner _____

1.  Distance between the officer and the antagonist:_____# of Suspects_____
2.  At what point was the weapon taken from the holster?: _____

3.  Who fired the **first** shot?:   ☐Officer    ☐Antagonist
4.  Officer used: ☐Aimed Fire          ☐Point Shooting          ☐One-Handed Grip
                 ☐Two-Handed Grip      ☐Strong Hand Grip        ☐Weak Hand Grip
                 ☐Right Hand           ☐Left Hand               ☐Barricaded Position
                 ☐Crouch Position      ☐Single Action           ☐Double Action
5.  Weapon used by Antagonist _____
6.  Number of rounds fired by the antagonist: _____
7.  Number of suspects faced by officer _____
8.  Reason for Use of Force:  ☐Necessary to defend self   ☐Necessary to defend other
                 ☐Fleeing felon   ☐Dangerous/Injured animal   ☐Accidental discharge
9.  Was suspect injured?   ☐YES  ☐NO
10. Was officer injured?   ☐YES  ☐NO
11. Injuries/Property damage due to discharge?   ☐YES  ☐NO
                 ☐Officer   ☐Assailant  ☐Property damage

*Upon completion of this report, the officer will submit it to the Patrol Supervisor for review and for-*
*warding to the Duty Supervisor.*

Submitted by:                                    Reviewed by:

_____                          _____
Officer's Signature                              Patrol Supervisor's Signature

BPD Form 2415  (rev. 5/88)                        _____
                                                 Duty Supervisor's Signature

# Use Of Force Report

is currently logged in. *LOGOUT HERE*

This report pertains to Officer ██████████ (ID █████, CC # ███████, 0; Booking # ███████; [This UOF Report ID is 449]

## Level of Resistance / Force used by Suspect

- [ ] None, complete compliance
- [x] Unarmed suspect offered passive resistance
- [ ] Unarmed suspect violently resisted, struck or kicked officer(s) or others.
- [ ] Suspect used club or blunt instrument to assault officer(s) or others.
- [ ] Suspect used knife or sharp instrument to assault officer(s) or others.
- [ ] Suspect used some type of weapon to assault officer (s) or others.
- [ ] Suspect used M\V to assault officer(s) or others.
- [ ] Suspect used firearm to assault officer(s) or others.
- [ ] Suspect discharged firearm at officer(s) or others.
- [x] Suspect resisted and escaped.

## Level of Force used to Gain Compliance

- [ ] Suspect physically handled with minimal force, no handcuffs
- [ ] Suspect handcuffed, no other physical force used.
- [x] Struggled with suspect to accomplish handcuffing.
- [x] Pain compliance techniques employed, i.e., joint locks, application of pressure point control techniques.
- [ ] Weaponless striking techniques employed, i.e., hands, elbow etc.
- [ ] Incapacitating spray employed.
- [ ] Baton or other authorized impact weapon employed.
- [ ] Other object employed, i.e., flashlight or other object in exigent circumstances.
- [ ] Firearm pointed at suspect.
- [ ] Firearm discharged at suspect.
- [ ] Other authorized special weapon employed, i.e., distraction device, tear gas cannister, shotgun, etc.
- [ ] Threat of police canine employed.
- [ ] Suspect bitten by police canine.

## Extent of Injury (*check one in suspect column and one in officer column*)

| Suspect | Officer | |
|---------|---------|---|
| [x] | [x] | No visible injury, no complaint of injury. |
| [ ] | [ ] | No visible injury, complaint of injury requiring medical attention, i.e., EMT's. |
| [ ] | [ ] | Minor visible injury (swelling, abrasion), medical attention requested, i.e., EMT's. |
| [ ] | [ ] | Visible injury requiring medical attention, i.e., EMT's. |
| [ ] | [ ] | Visible injury requiring hospital treatment and/or admission. |
| [ ] | [ ] | Fatality. |

## How Injury was Received

| Suspect | Officer | |
|---------|---------|---|
| [ ] | [ ] | During commission of crime, injury inflicted by victim/witness. |
| [ ] | [ ] | During attempt to escape with no police contact, i.e., M\V accident, accidental fall. |
| [ ] | [ ] | During threshold inquiry or while arrest was being made. |
| [ ] | [ ] | Self-inflicted injury. |
| [ ] | [ ] | Unknown, injury occurred prior to arrival of police. |

[ BACK ]   [ BACK TO MAIN ]   **[ PRINT ]**