

Boston Police
DEPARTMENT

Schroeder Plaza, Boston, MA 02120-2014

To:         Captain ▓▓▓▓▓▓
            Commander, Area C-11

From:       P.O. ▓▓▓▓▓▓▓

Date:       January 5, 2001

Subject:    Use of Force - Baton
            RE:  CC#010008500

Sir:
            I respectfully submit on January 5, 2001 about 4:23 PM myself and Officer ▓▓▓▓▓▓ responded to a radio call to assist EMS at 79 Florida Street.

On arrival victim ▓▓▓▓ opened her door then sat inside her dark apartment. Officer ▓▓▓▓▓ approached her using his flashlight. Officer ▓▓▓▓▓ observed ▓▓▓▓ with a ten-inch knife cutting her right wrist with a sawing motion.

▓▓▓▓▓ was ordered to drop the knife but she continued to cut at herself. Officer ▓▓▓▓▓ had to strike ▓▓▓▓ with his department issued baton once to the outside of the hand forcing her to release her grip on the knife. ▓▓▓▓ was treated and transported to Boston Medical Center by Boston EMS A-10 ▓▓▓▓▓▓▓ ▓▓▓▓▓ for a psychiatric evaluation.

Respectfully submitted,

P.O. ▓▓▓▓▓▓▓

48                                          52

# Boston Police

### DEPARTMENT

Schroeder Plaza, Boston, MA 02120-2014

To:          Captain ▓▓▓▓▓▓▓▓
             Commander, Area c-11

From:        P.O. ▓▓▓▓▓▓▓
             ▓▓▓▓▓▓▓

Date:        January 5, 2001

Subject:     Use of Force – Baton
             RE: CC#010008500

Sir:

    I respectfully submit on January 5, 2001 about 4:23 PM myself and Officer ▓▓▓▓▓▓ responded to a radio call to assist EMS at 79 Florida Street.

On arrival victim ▓▓▓ opened her door and went back inside her dark apartment. Officer ▓▓▓▓▓▓ entered first and then myself, a few moments later. As I was entering, I heard Officer ▓▓▓▓▓ order ▓▓▓ to, "Drop the knife."

Once inside the apartment, a lamp was turned on and I observed a knife, approximately 10 inches, between the legs of ▓▓▓, on the ground. ▓▓▓ kept stating she wanted the knife back. ▓▓▓ was then transported to Boston Medical Center by H & H, A-10 ▓▓▓▓▓▓▓ for a psychiatric evaluation.

Respectfully submitted,



P.O. ▓▓▓▓▓▓

# BostonPolice

D E P A R T M E N T

1 Schroeder Plaza, Boston, MA 02120-2014

Page   1 of
Date   1/9/01
CC

DISTRICT/UNIT:   11

TO:        CAPTAIN ▨▨▨▨▨▨,COMMANDER AREA C11

FROM:      SERGEANT ▨▨▨▨▨▨,PATROL SUPERVISOR

SUBJECT:   USE OF NON-LETHAL FORCE

Sir:

I RESPECTFULLY REPORT THAT ON JANUARY 5,2001 .I WAS
ASSIGNED AS THE PATROL SUPERVISOR ON A FIRST HALF TOUR OF DUTY ,
AT AREA C 11.

AT APPROXIMATLEY 500pm.I WAS INFORMED BY POLICE OFFICER
▨▨▨▨▨▨ THAT HE HAD USED HIS DEPATMENTAL SERVICE
BATON TO DISPLACE A KNIFE THAT WAS IN THE HAND OF A SUICIDAL
PERSON.

AS A RESULT OF THIS INFORMATION I CONDUCTED THE FOLLOWING
INVESTIGATION ON THE USE OF NON-LETHAL FORCE.

ON FRIDAY 01-05-01 DURING A FIRST HALF TOUR OF DUTY. POLICE
OFFICER ▨▨▨▨▨▨ & POLICE OFFICER ▨▨▨▨▨▨
WERE ASSIGNED THE H104f. AT APPROXIMATLEY 423pm THEY WERE
ASSIGNED A RADIO CALL VIA OPERATIONS TO ASSIST HEALTH &
HOSPITALS AT 79 FLORIDA ST. APT 2A.

UPON ARRIVAL POLICE OFFICE ▨▨▨▨▨▨ WAS MET AT THE DOOR
BY A ▨▨▨▨▨▨ WHO SAID NOTHING AND RETREATED INTO HER DARKEN
APARTMENT.

POLICE OFFICER ▨▨▨▨▨▨ ILLUMINATED THE APARTMENT WITH
HIS FLASHLIGHT AND OBSERVED ▨▨▨▨▨▨ SITTING IN A CHAIR WITH
KNIFE IN HER HAND CUTTING HER WRIST.

PO ▨▨▨▨▨▨ ORDERED ▨▨▨▨▨▨ TO CEASE HER ACTIONS
SEVERAL TIMES BY TELLING HER TO DROP THE THE KNIFE. ▨▨▨▨▨▨
FAILED TO HEED SAID WARNINGS AND CONTINUED TO INJURE HERSELF.

IN ORDER TO PREVENT ▨▨▨▨▨▨ FROM INFLICTING FURTHER
SERIOUS INJURY TO HERSELF.PO ▨▨▨▨▨▨ DREW HIS DEPARTMENTAL
SERVICE BATON AND QUICKLY STRUCK HER ON THE ARM IN WHICH SHE

WAS HOLDING THE KNIFE. SAID ACTION CAUSED ▓▓▓▓▓ TO DROP THE KNIFE,PREVENTING FURTHER INJURY TO  HERSELF.

NOW THAT ▓▓▓▓▓E WAS NO LONGER A THREAT TO HERSELF AND OTHERS . HEALTH # HOSPITALS A 10 EMTS ▓▓▓▓▓▓▓▓▓▓▓▓WERE ABLE  TO SAFELY TREAT AND TRANSPORT MS WADE TO BOSTON MEDICAL CENTRE.

AS A RESULT OF MY INVESTIGATION INTO PO I▓▓▓▓▓▓'S USE OF NON-LETHAL FORCE.I CONCLUED THAT SAID ACTIONS WERE REEASONABLE AND PRUDENT.

PO I▓▓▓▓▓O USED THE LEASE AMOUNT OF FORCE NECESSARY TO MAINTAIN A HIGH LEVEL OF SAFETY FOR HIMSELF AND M▓▓▓▓▓.

PO I▓▓▓▓▓S USE OF NON-LETHAL FORCE FALLS WITHIN THE GUIDELINES  SET FORTH IN B.P.D. RULE 304.(NON-LETHAL FORCE) THEREFORE  I RECOMMEND NO FURTHER ACTION TO BE TAKEN.

Respectfully submitted,



**Boston Police**
**INCIDENT REPORT**

HANDPRINT

Original ☐ Supplementary ☐

1. KEY SITUATIONS ☐ DRUGS ☐ LICENSED PREMISES ☐ ELDERLY   02. COMPLAINT NO. 010008500   03. REPORT DIST. C-11   CLEARANCE DIST. C-11   PAGE 1 OF 1
☐ JUVENILE ☐ COMMUNITY DISORDERS ☐ DOMESTIC ☐ OTHER

04. TYPE OF INCIDENT: Attempted Suicide   05. CRIME CODE   06. STATUS ☐ INACTIVE ☐ UNFOUNDED ☐ ARREST ☐ UNDER 18   07. DATE OF OCCUR. 11/05/00
☐ ARREST ☐ UNDER 18   STATUS CL. ☐ UNDER 18

08. LOCATION OF INCIDENT (NO. STREET) (INTERSECTION - ALPHA ORDER): 79 FLORIDA ST   APT. 2A   09. DISPATCH TIME 4:73   10. TIME OF OCCUR. 4:23

12. PHONE   13. SEX ☐M ☐F   14. RACE B/N   15. MARITAL STATUS ☐ MARRIED ☐ UNMARRIED

1. VICTIM-COMP. (LAST, FIRST, MI)

8. ADDRESS (NO. STREET, CITY AND STATE IF OTHER THAN BOSTON OR MASS.): 79 FLORIDA ST   APT. 2A   OCCUPATION   17. AGE 42   18. D.O.B. 4/16/58

9. PERSON REPORTING (IF DIFFERENT THAN ABOVE): PO   20. ADDRESS: 40 Gibson St   21. PHONE 343-4330

22. WAS THERE A WITNESS TO THIS CRIME   PERSON INTERVIEWED: N/A

32. NUMBER OF PERPETRATORS   25. NAME (LAST, FIRST, MI): N/A

42. CAN SUSPECT VEHICLE BE DESCRIBED: N/A

56. CAN PROPERTY BE IDENTIFIED   57. TYPE OF PROPERTY: N/A

65. TYPE OF WEAPON-TOOL   66. NEIGHBORHOOD: REST   67. TYPE OF BUILDING: APT B/N   72. VICTIM'S ACTIVITY: ATT. Suicide
69. WEATHER: Cool   70. LIGHTING: Apt   RELATIONSHIP TO VICTIM

76. NARRATIVE AND ADDITIONAL INFORMATION

About 4:23p officers _____ in the above unit responded to a R/C to assist EMS at 79 Florida St #2A. On arrival victim _____ opened door then sat inside her dark apartment. Officer _____ approached victim using a flashlight. Officer observed victim with a ten inch knife cutting her wrist with a sawing motion. Victim was ordered to drop the knife + she continued to cut her wrist. Officer _____ had to strike victim with his Dept issued baton once to the outside of hand forcing her to release her grip on the knife. H.H. A-10 _____ transported victim to B.M.C. for psych eval.

52

# Boston Police

Page 1 of 1
Date 1/16/01
CC # 010027127

DISTRICT/UNIT **District 13**

To:             Captain ▓▓▓▓▓▓▓, Commander

From:           Police Officer ▓▓▓▓▓▓▓▓ID#1▓▓▓

Subject:        Use of Force, Oleoresin Capsicum, on January 1/16/01

Sir:

    I respectfully report that on January 16, 2001, I used my department issued spray, to effect an arrest, located at the commuter train tracks directly above South St and Bussey st. Roslindale. .

    A radio call was dispatched to the E101D unit for family trouble located at 39 Archdale st. The dispatcher also stated that the suspect claimed that he had a gun, and had five warrants on him. I also recalled that on 1/15/01 the same suspect was wanted for similar matters but had fled from police. On arrival, the E101D, broadcasted that they were in foot pursuit of the suspect who was fleeing them on Washington st. Roslindale. I, J673D, then went to assist the E-5 units by relocating near the Arnold Arboretum, by South St. The E-5 units then broadcasted that the suspect was located on the train tracks still on foot and fleeing them. I then, exited my vehicle and ran to the train tracks at South st. Once I reached the tracks I observed the suspect running away from me on the tracks going outbound. While the suspect was running I did not observe any weapon, specifically a gun in the suspect's hands. I ordered the suspect to stop and to get down on the ground repeatedly, which the suspect ignored and continued to run. I then closed the distance between him and I. Once I was in arms reach I attempted to grab the suspect, the suspect pulled free and began to struggle and continued to run. I ordered the suspect again to stop, and get down on the ground or he would be sprayed. I again attempted to grab the suspect and place him in custody, at which point he struggled again and began to run. I then determined that he was using vigorous physical resistance, and I stated once again to stop or he will be sprayed. He did not comply, I then deployed my department issued spray, using two, one second bursts. He still continued to run away from me, also at which point I received residual spray from the air as I continued to run behind the suspect, and began to feel some effects of the Oleoresin Capsicum. The suspect then began to slow down, stopped and sat down in the snow beside the tracks. I then ordered him to place his hands behind his back and handcuffed him behind his back. Also at the the scene was the E907 (Sgt. ▓▓▓▓), E101D(▓▓▓▓▓▓▓, E201D(▓▓▓▓▓Downing), E411(Sullivan). Officer▓▓▓ then approached the suspect and myself and assisted in walking him down to the E201's unit, for a transport back to E-18 for booking. While at E-18 the suspect was treated for Oleoresin Capsicum spray by Boston EMS. I suffered minor effects from the spray such as tearing eyes and a burning sensation to my face but sought no medical treatment.

Respectfully Submitted,

▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓. Police Officer.

ID=▓▓▓▓

# Boston Police

Page 1 of 1

Date 1/19/01

CC # ▓▓▓▓▓▓▓▓

DISTRICT/UNIT <u>Area , District</u>

To:                CAPTAIN ▓▓▓▓▓▓▓▓▓▓

From:            P.O. ▓▓▓▓▓▓▓ s, ID# ▓▓▓▓

Subject:        Observations of Non-Lethal force on 01-16-01

Sir:

I respctfully submit that while working overtime in the E101D car responded to 39 Archdale Rd. for family trouble. While enroute to that address my partner and I were notified of a foot pursuit of the suspect from 39 Archdale Rd. We were diverted towards the Amtrack train tracks where while on the arboretum side of the tracks I observed the a black male fitting the description of the suspect running down the tracks with an unidentified officer chasing behind and another P/O further behind. I observed the suspect who appeared tp be tiring considerably with the first officer coming up behind him and ordering the suspect to stop and show his hands. I did not observe the suspect follow any of the commands from the P/O and attempt to pull away from him several times and attempted to resist arrest. A short time later the suspect was handcuffed by several officers and was removed from the tracks. Due to my distance from the arrest scene I was not aware the OC spray had been used until I went to Dist. 18 to do my reports.

Respectfully submitted

P.O. ▓▓▓▓▓▓▓ , ID# ▓▓▓▓

58

54

cent History for #PD010027127   Xref #PD010027145   #PD010160104

```
ceived    01/16/01  09:43:56  BY PCT18  11199
tered     01/16/01  09:44:23  BY PCT18  11199
patched   01/16/01  09:45:44  BY PDT04  6401
route     01/16/01  09:45:44
scene     01/16/01  09:50:54
ised      01/16/01  13:35:38
```

tial Type: FAMTRB      Final Type: FAMTRB (FAMILY TROUBLE)
tial Priority: 1      Final Priority: 1
position: RPT    Source: 9   Primary Unit: E101D
lice BLK: 0566400  Fire BLK: 2618  EMS BLK: 1101606
oup: 05      Beat: 1    Map Page: 0713
c: 39 ARCHDALE RD ,RS  btwn WASHINGTON ST & DELFORD ST (V)
me: ▓▓▓▓▓▓▓▓▓▓▓      Addr:                    Phone: ▓▓▓▓▓▓▓

```
:4423  (11199 )  ENTRY       CLR STS ▓▓▓▓▓▓▓▓▓▓▓ HAS FIVE WARRANTS .
                          IS ATTACKING HER FATHER
:4510        SUPP          TXT: BLK KHAKI PANTS WHT SHRT DK BRO LEATHER J
                          KT HE CLAIMS HE HAS A GUN
:4544  (6401 )  DISPER  E101D  #10395  ▓▓▓▓▓▓▓▓▓
                          #8831   ▓▓▓▓▓▓▓▓▓
:4544        ASSTER  E201D  #11296  ▓▓▓▓▓▓▓▓
                          #11311  ▓▓▓▓▓▓▓▓▓
:4653  (10395 ) *OPERS  E101D  T/E101D
                          ,NAME:▓▓▓▓▓▓▓            D0B:090
                          975  SEX:  RAC:  SOC:     OLN:
                                      STATE:MA  REF#:

                          NIC#:
35054        *ONSCNE  E101D
35436  (6401 )  $CROSS       #PD010027145
35436        DUP          #PD010027145
35436        DUP          NAM: ▓▓▓▓▓▓▓▓
                          PHO: 5223251
00154        ASST    E411D  [39 ARCHDALE RD ,RS]
                          #11643  ▓▓▓▓▓▓▓
00207        MISC    E411D  ,L20
00252  (11643 ) *ONSCNE  E411D
01356  (10395 ) *CLEAR  E101D
01711  (6401 )  $CROSS       #EDO10160104
05216        ASSTOS  E101D  [39 ARCHDALE RD ,RS]
                          #10395  ▓▓▓▓▓▓▓▓
                          #8831   ▓▓▓▓▓▓▓▓
05222        CLEAR   E411D
05230        MISC    E101D  ,L20
```

P.O. ▓▓▓▓▓▓▓ #▓▓▓▓▓
5673 D UNIT

# Boston Police

Page _1_ of _1_
Date __1/17/01__
CC# __010027127__

District/Unit ___Area E-5___

To:        Captain ████████

From:      Police Officer ████████████, ID# 1█396█

Subject:   Family trouble call on 1/16/01 at 37 Archdale Rd.

Sir;

     I respectfully submit on 1/16/01 responding to a family trouble call at 37 Archdale Rd, I was involved in a foot pursuit of suspect ██████e. The suspect was eventually taken into custody by unknown Boston Police Officer and P.O. ████████, E414D unit. I drove the wagon to the immediate area, joined my partner P.O. ████████ ID# ████ to transport suspect who appeared to be overcome by pepper spray. Suspect transported to District 18 for booking and was assisted by EMTs from Area E-18 to decontaminate suspect. I was later advised by P.O.s ████████████, E101D unit that suspect was taken into custody by P.O. ████████, ID# ██5, J673D unit and utilized his pepper spray to effect the arrest.

Respectfully submitted,

P.O. ████████, ID# ████

Area E-5

60

56

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☐  SUPPLEMENTARY ☒

| KEY SITUATION | | COMPLAINT NO 10027127 | REPORT DIST. E5 | CLEARANCE DIST |
|---|---|---|---|---|
| Drugs Domestic Violence | | | | |

| TYPE OF INCIDENT | CRIME CODE | STATUS | DATE OF OCCUR. | |
|---|---|---|---|---|
| WARRANT ARREST | 0 | | A.01/16/01 | B. |
| | | APT. DISPATCH TIME 09:44 AM | TIME OF OCCUR. A.09:40 AM | B. |

| LOCATION OF INCIDENT | MARITAL STATUS |
|---|---|
| 37 ARCHDALE RD | Unmarried |

| VICTIM-COMP. (LAST, FIRST, MI) | PHONE (617)-522-9747 | SEX FEMALE | RACE BLACK NON-HISPANIC | |
|---|---|---|---|---|

| ADDRESS 37 ARCHDALE RD,,MA | APT. | OCCUPATION | AGE 16 | D.O.B. 3/26/84 |
|---|---|---|---|---|

| PERSON REPORTING | ADDRESS E-18,,MA | APT. | PHONE (617)-343-5600 |
|---|---|---|---|
| P/O'S | | | |

A ☒ YES ☐ NO

| | WAS THERE A WITNESS TO THE CRIME | | | APT. NO. | HOME ADDRESS | APT. | TELEPHONE |
|---|---|---|---|---|---|---|---|
| | PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | | | | |
| | | 19 | RESIDENCE | | 115 BROOKWAY RD,,MA | | (617)-         RES (000)-000-0000 BUS |
| | | 47 | RESIDENCE | | 39 ARCHDALE RD,,MA | 1 | (617)-         RES (000)-000-0000 BUS |
| | | | | | | | RES |
| | | | | | | | BUS |

B ☒ YES ☐ NO

| NUMBER OF PERPETRATORS 1 | CAN SUSPECT BE IDENTIFIED AT THIS TIME | | PHOTO NO. N/A | ALIAS |
|---|---|---|---|---|

P E R S O N S

| ARRESTED SUSPECT WARRANT | NAME (LAST, FIRST, MI) M. . | S.S. NO. 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 | BOOKING NO. 20000610000 | | |
|---|---|---|---|---|---|
| WARRANT NO. | ADDRESS 569 SOUTH ST,ROSLINDALE,MA | SEX MALE | RACE BLACK NON-HISPANIC | AGE 19 | HEIGHT 5-08 | DOB |

| SPECIAL CHARACTERISTICS (INCLUDING CLOTHING) DK BLUE PANTS, WHT T-SHIRT | WEIGHT 140 | BUILD SLIM | HAIR BLACK | EYES BROWN |
|---|---|---|---|---|

C ☒ YES ☐ NO

V E H I C L E S

| CAN SUSPECT VEHICLE BE DESCRIBED | | | | | |
|---|---|---|---|---|---|
| REG. STATE | REG. NO. | PLATE TYPE | | YEAR(EXP) | MODEL |
| VEHICLE MAKE YEAR | VEHICLE NO. | | STYLE | COLOR(TOP-BOTTOM) | |
| OPERATOR'S NAME | | LICENSE NO. | | OPERATOR'S ADDRESS | |
| OWNERS'S NAME | | OWNERS'S ADDRESS | | | |

D ☒ YES ☐ NO

P R O P E R T Y

| CAN PROPERTY BE IDENTIFIED | | | | | | | |
|---|---|---|---|---|---|---|---|
| STATUS | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR | |
| | | | | | | | |

| TYPE OF WEAPON-TOOL | NEIGHBORHOOD | TYPE OF BUILDING | PLACE OF ENTRY | YES | NO |
|---|---|---|---|---|---|
| UNKOWN | RESIDENCE/HOME | TWO FAMILY | REAR DOOR | X | |

| M O | WEATHER | LIGHTING | TRANSPORTATION OF SUSPECT(CAR, FOOT, MBTA, ETC) | VICTIM'S ACTIVITY |
|---|---|---|---|---|
| | CLOUDY | ART/NATURAL | FOOT | SLEEPING |

| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | RELATIONSHIP TO VICTIM | F | |
|---|---|---|---|
| SEE NARRATIVE | FATHER OF CHILD | | X |
| | | YES | NO |

**IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)**

G | | X |
YES | NO

**IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)** □ □ YES NO

BLOCK NO.

NARRATIVE AND ADDITIONAL INFORMATION ▓▓▓▓▓▓▓▓▓ IN THE E101D CAR RESPONDED TO ABOUT 9:44AM TO 39 ARCHDALE RD FOR FAMILY TROUBLE/ VIOLATION OF RESTRAINING A R/C TO 39 ARCHDALE RD. P/O'S WERE ENROUTE TO 39 ARCHDALE RD. P/O'S WERE INFORMED BY OPERATIONS THAT THE SUSPECT WAS A COREY LITTLE DESCRIBED AS A BLACK MALE, BLACK KHAKI PANTS, WHITE SHIRT AND BROWN LEATHER JACKET AND THE SUSPECT REPORTEDLY HAD A GUN. ON ARRIVAL J673D P/O ▓▓▓▓▓▓▓▓ R & ▓▓▓▓▓▓G, E101D P/O'S ▓▓▓▓▓▓ , E201D P/O'S ▓▓▓▓▓▓▓▓ G OBSERVED SUSPECT & ▓▓▓▓▓ E. P/O'S ▓▓▓▓▓ EO, ▓▓▓▓R & ▓▓▓▓G NUMEROUS ORDERS BY P/O'S TO STOP. AT FLEEING THE SCENE AND REFUSED NUMEROUS ORDERS BY P/O'S TO STOP. AT THE SAME TIME P/O'S WERE INFORMED BY OPERATIONS THAT THE SUSECT WAS WANTED ON NUMEROUS WARRANTS AND ALSO WANTED FOR VIOLATIONS OF RESTRAINING ORDER ON 1-15-01. P/O'S JOINED BY NUMEROUS UNITS FROM DIST 18.,DIST 13 AND BHA POLICE CONTINUED FOOT CHASE THROUGH ROSLINDALE AREA. SUSPECT EVENTUALLY RAN INTO AMTRACK TRAIN TRACKS, ▓▓▓▓▓▓▓ (DIST 18) P/O ▓▓▓▓▓▓ PURSUED BY P/O CUTRONEO AND P/O ▓▓▓▓R (DIST 18) P/O ▓▓▓▓▓ EVENTUALLY CAUGHT UP TO SUSPECT ON THE TRAIN TRACKS AT WHICH TIME T

S O L V A B I L I T Y F A C T O R

| UNIT ASSIGNED | TOUR OF DUTY | REPORTING OFFICER'S SIGNATURE | REPORTING OFFICER'S ID | PARTNER'S ID | FI |
|---|---|---|---|---|---|
| E101D | 2 | | ▓▓▓▓ | ▓▓▓▓ | NO |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | | | TELETYPE NO. |
|---|---|---|---|---|
| 01/16/01 | | | | |

| TIME COMPLETED | SIGNATURE OF PATROL SUPERVISOR | PAT. SUP. ID | SIGNATURE OF DUTY SUPERVISOR | DUTY. SUP. ID |
|---|---|---|---|---|
| 01:05 AM | | | ▓▓▓▓▓▓ | ▓▓ |

| REPORT DIST. | COMPLAINT NO. | BOSTON POLICE | PAGE | OF |
|---|---|---|---|---|
| E5 | 10027127 | CONTINUATION SHEET | 1 | 1 |

| DATE / TIME OF OCCURENCE A. | INCIDENT TYPE | REMARKS |
|---|---|---|
| 01/16/01 09:40 AM | WARRANT ARREST | |

HE SUSPECT REFUSED TO COMPLY WITH P/O CUTRONEO'S ORDERS TO SHOW HIS HANDS AND THEN REFUSING TO BE HANDCUFFED. DUE TO THE SUSPECTS REFUSAL TO COMPLY WITH P/O ▓▓▓▓▓▓'S ODERS AND DUE TO CONCERNS OF ALL PARTIES INVOLVED FOR THEIR SAFETY DUE TO THE LOCATION (TRAINTRACKS) P/O ▓▓▓▓▓ WAS FORCED TO DISCHARGE HIS OC SPRAY AT THE SUSPECT ALLOWING FOR THE SUSPECT TO BE HANCUFFED AND SAFELY REMOVED FROM THE TRACKS. VICTIM STATED THAT WHILE SLEEPING SHE AWOKE TO FIND THE SUSPECT IN HER BEDROOM. VICTIM TOLD THE SUSPECT TO LEAVE WHICH HE REFUSED TO DO. VICTIM THEN ATTEMPTED TO CALL POLICE WHEN THE SUSPECT GRABBED THE TELEPHONE FROM HER HAND. AT THAT TIME THE VICTIM KEPT TELLING THE SUSPECT TO LEAVE WITH THE SUSPECT REFUSING. EVENTUALLY THE VICTIM HEARD A KNOCK AT HER FRONT DOOR. WHEN SHE OPENED THE

58

62

FRONT DOOR SHE FOUND HER FRIEND, TRAVIA CRAIG (#22), VICTIM WHISPERED TO MS.
████ "HELP ME, HELP ME, PLEASE HELP ME" AT WHICH TIME M██████ ASKED WHATS "
WRONG, IS O████ HERE" TO WHICH THE VICTIM STATED "YES" MS. TRAVIA THEN
KNOCKED ON THE DOOR OF 39 ARCHDALE RD (37-39 ARCHDALE RD IS A DUPLEX) AND
INFORMED THE VICTIMS FATHER, ██████████████ (#22), THAT THE SUSPECT WAS
INSIDE THE VICTIMS APARTMENT. MR ████████ THEN WENT INTO THE VICTIMS
APARTMENT AND TOLD THE SUSPECT TO LEAVE TO WHICH THE SUSPECT STATED "I'M
GOING TO BUST YOU UP". AS P/O'S ARRIVED SUSPECT FLED THROUGH A REAR DOOR. P/O
CETRONE ALONG WITH THE VICTIMS FATHER FOUND THE REAR BASEMENT DOOR KICKED
IN. MR. ████████ SAID THAT THE DOOR WAS NOT DAMAGED BEFORE THE INCIDENT.
SUSPECT TRANSPORTED TO E-18 FOR BOOKING TO THE E201D WHERE EMS- AMB- 18
RESPONDED AND TREATED SUSPECT DUE TO OC SPRAY. SUSPECT REMAINED IN CUSTODY
OF E-18 (BPD) SUSPECT IN VIOLATION OF WEST ROXBURY RESTRAINING ORDER
#0006RO0830 ISSUED 12/07/00 VALID THROUGH 12/07/01. SUSPECT CHARGED WITH
VIOLATION OF R/O BREAKING & ENTERING (DWELLING) DAYTIME. RESISTING ARREST
THREATS SUSPECT ALSO FOUND TO HAVE FOUR OUTSTANDING WARRANTS REF. CC#010-
004776, 000-636160, 990-446574 000-673899

# Boston Police

Page 1 of 1

Date 1/27/01

CC # 010047294

DISTRICT/UNIT A431A

To:         Captain ▮▮▮▮▮▮▮▮▮

From:       Police Officer ▮▮▮▮▮▮▮▮▮s ID# ▮▮▮▮▮

Subject:    Use of none lethal force

Sir:

I observed a fight in front of 255 Tremont ST at about 230AM involving 10-12 combatants. I called for backup and attempted to break up the fight by using numerous verbal commands, which had no affect. I then attempted to separate the combatants by hand, which failed. The fight became more aggressive and I then was forced to use non-lethal force to end the assault. I utilized my department issued O/C spray, spraying into the area of the combatants. I was then pulled from behind by my right arm causing myself to fall off balance and land on my right knee. All combatants disbursed quickly in all directions No further information.

Respectfully Submitted,



64

60

# Boston Police

Page 1 of 1
Date 1/27/01
CC # 10047294

DISTRICT/UNIT **Area . District**

To:          Cpt ████████████████

From:        Sgt S████████ ID# █████

Subject:     Use of none lethal force by Officer ████████ ID # ████████

Sir:

    I respectfully submit the following for review, as it relates to the above-mentioned incident. On 1/27/01 at about 2:00 AM, I was on patrol near the Roxy nightclub when I observed Officer █████ summoned for assistance. He notified the dispatcher that he was near the Roxy nightclub and he was actively attempting to suppress a large affray where several combatants were involved.

    I exited my cruiser forthwith and attempted to locate the officer. I then observed officer ██████ surrounded by several combatants, probably eight or ten combatants who were all involved in a violent fistfight. I notified the dispatcher to send more officers to the scene as I attempted to assist the officer in controlling the crowed that was out of control. At this time, I observed officer █████ discharged his departmental issued pepper spray and the crowed quickly disburse and fled in all directions.

    Officer █████ use of pepper spray was warranted. It immediately put an end to this violent struggle that was getting out control. By disbursing his pepper spray officer Hayes prevented several violent combatants from causing serious harm to themselves and perhaps other pedestrians who were just walking by. All combatants quickly fled the scene as other officers arrived. Health and Hospital also responded. Officers Hayes suffered shoulder injuries do to this incident, his report is attached.

Respectfully Submitted,

Sgt. ████████ in ID# ████████

Boston Police
INCIDENT REPORT

☑ ORIGINAL   ☐ SUPPLEMENTARY

| 01. KEY SITUATIONS | | | | 32. COMPLAINT NO. 010047294 | 03. REPORT DIST. A1 | CLEARANCE DIST. N/V |
|---|---|---|---|---|---|---|

| 04. TYPE OF INCIDENT A&B | 05. CRIME CODE | 06 STATUS | | | 07. DATE/TIME OF OCCUR. A. A. 01/27/2001 02:39 AM |
|---|---|---|---|---|---|

| 08. LOCATION OF INCIDENT 255 TREMONT ST, | | APT. | 09. DISPATCH TIME 01:42 AM | 10. DATE/TIME OF OCCUR. B. B. |
|---|---|---|---|---|

| 11. VICTIM/COMP (LAST, FIRST, MI) | 12. PHONE (617) | 13. SEX MALE | 14. RACE BLACK HISPANIC | 15. MARITAL STATUS UNMARRIED |
|---|---|---|---|---|

| 16. ADDRESS (NO. STREET, CITY AND STATE IF OTHER THAN BOSTON OR MA.) 40 ANNUNCIATION RD,BOSTON,MA 02120-0000 | APT. | OCCUPATION DOORMAN | 17. AGE 42 | 18. D.O.B. |
|---|---|---|---|---|

| 19. PERSON REPORTING (IF DIFFERENT THAN ABOVE) | 20. ADDRESS 40 SUDBURY ST,BOSTON,MA 02114-0000 | APT. | 21. PHONE (617)-343-4240 |
|---|---|---|---|

**22. WAS THERE A WITNESS TO THE CRIME** ☑YES ☐NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TEL | RES BUS |
|---|---|---|---|---|---|---|---|
| | 24 | ON-SCENE | | 255 TREMONT ST,BOSTON,MA 02114-0000 | | (617) (000)-000-0000 | RES BUS |
| | 22 | ON-SCENE | | 125 AMORY ST,BOSTON,MA 02119-0000 | | (617) | RES BUS |
| | | | | | | | RES BUS |

| 23. NUMBER OF PERPETRATORS 5 | CAN SUSPECT BE IDENTIFIED AT THIS TIME | | | ☑YES ☐NO |
|---|---|---|---|---|

| 24. PERSON TYPE SUSPECT | 25. NAME (LAST, FIRST, MI) UNK | 26. S.S. NO. 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 | 27. BOOKING NO. 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 | 28. PHOTO NO | 29. ALIAS |
|---|---|---|---|---|---|

| 30. WARRANT NO. | 31. ADDRESS | 32. SEX MALE | 33. RACE BLACK NON-HISPANIC | 34. AGE 0 | 35. HEIGHT | 36. D.O.B. |
|---|---|---|---|---|---|---|

| 37. SPECIAL CHARACTERISTICS (INCLUDING CLOTHING) | 38. WEIGHT | 39. BUILD N/A | 40. HAIR | 41. EYES |
|---|---|---|---|---|

**42. CAN SUSPECT VEHICLE BE DESCRIBED** ☑YES ☐NO

| 43. VEHICLE TYPE | | 44. REG. STATE NO. | 45. PLATE TYPE | YEAR (EXP.) | 46. MODEL |
|---|---|---|---|---|---|

| 47. VEHICLE MAKE-YEAR | 48. VEHICLE NO. | 49. STYLE | 50. COLOR (TOP-BOTTOM) |
|---|---|---|---|

| 51. OPERATOR'S NAME | 52. LICENSE NO. | 53. OPERATOR'S ADDRESS |
|---|---|---|

| 54. OWNERS NAME | 55. OWNER'S ADDRESS |
|---|---|

**56. CAN PROPERTY BE IDENTIFIED** ☑YES ☐NO

| STATUS | 57. TYPE OF PROPERTY | 58. SERIAL OR IDENTIT-GUARD NO. | 59. BRAND NAME-DESCRIPTION | 60. MODEL | 61. VALUE | 62. UCR |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

**64. WAS THERE A SIGNIFICANT M.O.** ☑YES ☐NO

| 65. TYPE OF WEAPON-TOOL N/A | 66. NEIGHBORHOOD COMMERCIAL RESIDENTIAL | 67. TYPE OF BUILDING N/A | 68. PLACE OF ENTRY N/A |
|---|---|---|---|

| 69. WEATHER CLOUDY | 70. LIGHTING ARTIFICIAL | 71. TRANSPORTATION OF SUSPECT (CAR, FOOT, MBTA, ETC.) FOOT | 72. VICTIM'S ACTIVITY |
|---|---|---|---|

| 73. UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATORS | RELATIONSHIP TO VICTIM |
|---|---|

**74. IS THERE ANY PHYSICAL EVIDENCE** ☑YES ☐NO

**75. IS THERE ANY OTHER REASON FOR FURTHER INVESTIGATION** ☑YES ☐NO

76. NARRATIVE AND ADDITIONAL INFORMATION
ABOUT 0230AM OFFICER        SS,WHILE PATROLLING THE TREMONT ST AREA ON FOOT OBSERVED A LARGE FIGHT INVOLVING 10-12 MALE COMBATANTS IN FRONT OF 255 TREMONT ST. OFFICER         CALLED FOR BACKUP AND ATTEMPTED TO BREAK UP THE FIGHT. AFTER NUMEROUS VERBAL COMMANDS, WITH NO RESULTS OFFICER        UTILIZED HIS O/C SPRAY AND SPRAYED THE COMBATANTS IN AN ATTEMPT TO STOP THIS PHYSICAL ASSAULT ON EACH OTHER. OFFICER        WAS PULLED FROM BEHIND BY HIS RIGHT ARM AND CAUSING HIM TO FALL TO THE GROUND LANDING ON HIS RIGHT KNEE. AL THE COMBATANTS FLED THE SCENE ON FOOT. NO FURTHER INFORMATION.

SOLVABILITY FACTOR

| 77. UNIT ASSIGNED A-91A | 78. TOUR | REPORTING OFFICER | SIGNATURE | 80. REPORTING ID | 81. PARTNER'S ID | ☑ F.I. |
|---|---|---|---|---|---|---|

| 82. DATE OF REPORT 01/27/2001 | 83. SPECIAL UNITS NOTIFIED (REPORTING) AREA 1 | | | | LIEUTENANT ID |
|---|---|---|---|---|---|

62

```
31/01  10:46:55 PRINT REQUESTED BY TERMINAL PHQ41
        INCIDENT HISTORY REQUESTED BY TERMINAL: PHQ41   ON: 01/31/01 10:46:53

ncident History for: #PD010047294

ntered       01/27/01  01:42:28  BY PDT02  8030
ispatched    01/27/01  01:42:28  BY PDT02  8030
nroute       01/27/01  01:42:28
nscene       01/27/01  01:42:28
losed        01/27/01  05:25:51

nitial Type: ASSTPO     Final Type: ASSTPO (ASSIST POLICE OFFICER)
nitial Priority: 3      Final Priority: 3
isposition: 14P     Source: R    Primary Unit: A431A
olice BLK: 0111800   Fire BLK: 1511   EMS BLK: 0702315
roup: 01       Beat: 3       Map Page: 1224
oc: STUART ST/TREMONT ST ,BB   <100,000>  (V)
ame:                            Addr:                         Phone:

4228  (8030 )  $OUTSRV              ,NO MORE INFORMATION
4228           DISPOS   A202A      #11899 ███████████████████
                                   #12121 ██████████████████
                                   ,NO MORE INFORMATION
4342           ASSTOS   B911       [STUART/TREMONT]
                                   -#9278 ████████████████████
4647           CHANGE              LOC: STUART/TREMONT -->  STUART ST/TREMONT ST
                                   ,BB,
                                   BLK: -->  0111800
5331  (11899 )  *CLEAR   A202A
1210  (8030 )  $PREMPT   B911
1238           HOLDU     A202A
2338           HOLDC
2344           HOLDU     A431A
3954           DISPOS    A431A      #11418 ████████████████
2836           CHANGE               TXT: A431A PO INJURED
2551  (12198 )  CLEAR    A431A      DSP: 14P   - POLICE SERVICES RENDERED
2551           CLOSE     A431A
```

Page 1 of 1
Date 03/25/96
CC# 60139335

# Boston Police

## DISTRICT/UNIT  B 3

To:   Captain ▮▮▮▮▮▮, Commander Area B-3

From: Sergeant ▮▮▮▮▮▮▮▮n, ID#▮▮▮▮

Subject: Use of Non-Lethal Force (Pepper Spray) by Police Officer ▮▮▮▮▮▮▮▮▮

Sir,

   I respectfully report that about 6:40a.m. on Sunday, March 24, 1996, Officer ▮▮▮▮▮▮▮ ▮▮▮▮ assigned to the C421A unit was returning from assisting a lost motorist to Northeastern University. Officer ▮▮▮▮▮▮ observed a 1984 Chevrolet, MA 642ZOF operating at a high rate of speed on Terrace Street. This vehicle also had expired registration plates.

   Officer ▮▮▮▮▮ driving a marked police vehicle activated the emergency lights in an attempt to conduct a motor vehicle stop. The operator refused to stop for the officer and lost control of his vehicle at Heath St. and Walden St.. At this point both occupants exited the vehicle and began to flee from the scene on foot. Officer ▮▮▮▮▮▮, having reasonable suspicion that the suspects were of unlawful design, began foot pursuit.

   Upon apprehending the passenger ▮▮▮▮▮▮▮▮▮▮▮▮▮ Officer ▮▮▮▮▮ was met with violent and vigorous resistance as he ignored the officer's verbal commands to stop. Officer ▮▮▮▮▮ called for assistance via Operations. The suspect continued to struggle and struck Officer ▮▮▮▮▮ several times. Fearing for his safety, Officer ▮▮▮▮▮ drew his department issued pepper spray and administered a short burst to facial area of the suspect. The suspect broke free and continued his attempt to flee from the area on foot. Officer ▮▮▮▮▮ apprehended the suspect at 49 Horan Way where the suspect continued to assault and strike the officer. At this point the officer heard several residents of the Bromley Heath housing development shout "hold on ▮▮▮▮". again fearing for his safety Officer ▮▮▮▮▮ administered another short burst of pepper spray to the facial area of the suspect. Control of the suspect was achieved with the help of assisting units as the suspect was placed under arrest and transported to district 3 for booking.

   The suspect ▮▮▮▮▮▮▮ was treated at Area B-3 by Health & Hospital personnel. The suspect was subsequently transported to Boston City Hospital for treatment of difficulty breathing and high blood pressure. The suspect was later released and taken back to B-3 for housing pending his court appearance. Officer ▮▮▮▮▮▮ was treated at the scene by H&H personnel for exposure to pepper spray and minor cuts received during the violent struggle with the suspect.

   I was unable to interview any witnesses of this incident as all vacated the area prior to my arrival on scene and none came forward subsequent to my arrival. As a result of my interview with the officer and observations of hearing the officer's repeated calls for assistance, it is my opinion that the police action taken by Officer ▮▮▮▮▮ was reasonable given the violent, assaultive actions of the suspect directed towards the officer and was consistent with rule # 304 of the department's rules and regulations. No further action regarding this incident is warranted nor recommended.

Respectfully submitted,

▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮

64

Boston Police

Date 7-18-91

CC# _____

DISTRICT/UNIT  Anti-Gang Violence Unit

TO:   Deputy ▓▓▓▓▓▓▓, Commanding
      Anti-Gang Violence Unit

FROM: P.O. ▓▓▓▓▓▓▓, ID.# ▓▓▓▓▓▓

SUBJECT: Report of Firearm Discharge

SIR;

    I, respectfully submit, on Monday July 1, 1991 at about 10:00 pm myself and Officer ▓▓ of the GAK03F unit were responding to a radio call given to the EK01 unit for two Hispanic males walking down Round Hill St. with T.V. sets taken from a house.  While still responding to the radio call, myself and Officer ▓▓▓ heard over the radio the EK01 unit transmit that they were in a shootout at Academy Homes.  Upon trans-mission again by the EK01 unit that they were in a foot chase inside Academy Homes, in the rear, and were still chasing the suspect.  My-self and Officer ▓▓ proceeded up Ritchie St. in our unmarked cruiser; plate number 631-TKI, unit ID # 1313, assigned to the Anit-Gang Violence Unit.  We turned right into Slayton Way.where myself and Officer ▓▓▓▓▓ removed ourselves from the departmental vehicle and proceeded on foot up Slayton Way thru Academy Court into Academy Road where I observed Officer ▓▓▓▓▓ to the right hand side of me on the ground and stating "stop, Police, stop".  At this time I observed a ▓▓ suspect operate a station wagon down Academy Road into Columbus Ave. facing traffic the wrong way. The suspect's vehicle came to a halt upon crashing into the divided median strip on Columbus Ave.  At this time I followed the suspects' vehicle down Academy Road into Columbus Ave. cautionously and defensive of any hostility towards myself, partner or any of the officers on scene by the suspect.  Upon observing the vehicle come to a complete halt myself and Officer ▓▓ approached the motor vehicle from the left rear side of the driver side at which time I yelled a verbal command "stop, Boston Police" with my badge displayed over my outer most grament.  At this point I observed the suspect point a silver in color handgun at Officer ▓▓▓▓,

Boston Police

Date 7-18-91

CC# _____

DISTRICT/UNIT  Anti-Gang Violence Unit

then the suspect turned around in a complete 180 degree turn with the silver handgun in his strong right hand extend in full arm extension out the driver side window and point the weapon at me directly with right index finger on the trigger, pulling the trigger. At this time I moved to my right side and fell on my left knee with my right leg as support, with my left arm extended over my chest area to protect it from any harm. With my strong right hand grip at about a distance between five to ten feet away and with a clear field of fire in the background I fired my departmental issue weapon, the Glock 19 model, serial #FV294 at the suspect for fear of serious bodily injury or death towards myself, partner and any other officers in the area.

I surrendered my weapon to Sgt. ████ of the Anti-Gang Violence Unit who noted my clip on the ground by the cruiser. I was transported along with Officer ████ by Health and Hospital to the Boston City Hospital for substained leg injuries. The following units were notified and responded; Deputy ████, Area Commander of Area E, Deputy ████ of the Anti-Gang Violence Unit, Superintendent ████, Police Commisioner ████ ID Unit, Internal Affairs, Homicide Unit.

Respectfully Submitted

████████████

P.O. ████████, ID # ████

70

66

# ston Police Department    Firearms Discharge Report

er's Name: _____    I.D.#: _____ Date of Report: __7-17-91__

27 _____ Years of Service: _____ 2 _____ CC#: __11543849__

e of Incident: __7-1-91__ Time of Incident: __10:00pm__ Duty Status at time of incident: ☒On Duty  ☐Off Duty

ation of Incident:: __Academy Road & Columbus Ave. Jamacia Plain__     ☐Indoors  ☒Outdoors
(Include Street, Number, Area)

ure of Incident: __Shots fired. Armed robbery__

ather Conditions: __Clear, warm night__

iting Conditions:  ☐Natural  ☒Artificial  ☒Night  ☐Day:    ☐Uniformed  ☒Plain Clothes

---

apon Used: ☒Department Weapon  ☐Privately Owned

e: __Glock 19__     Model: __9 mm__     Serial #: __FV294__

el length: __4 in.__     Number of Shots Fired (by the officer): __10 to 12__

arms I.D.#: _____ License to Carry #: _____ Expiration Date: _____

rivately Owned, Name of Owner _____

---

Distance between the officer and the antagonist: __5 to 10 ft.__ # of Suspects __1__

t what point was the weapon taken from the holster?: __15 to 20 feet away__

---

Who fired the first shot?:  ☐Officer  ☒Antagonist

Officer used: ☒Aimed Fire        ☐Point Shooting        ☐One-Handed Grip
　　　　　　 ☐Two-Handed Grip     ☒Strong Hand Grip      ☐Weak Hand Grip
　　　　　　 ☐Right Hand          ☐Left Hand             ☐Barricaded Position
　　　　　　 ☒Crouch Position     ☐Single Action         ☐Double Action

Weapon used by Antagonist __.380 Davis Industries__

Number of rounds fired by the antagonist: __unknown__

Number of suspects faced by officer __one__

Reason for Use of Force:  ☒Necessary to defend self  ☒Necessary to defend other
　　　☐Fleeing felon  ☐Dangerous/Injured animal  ☐Accidental discharge

Was suspect injured?  ☒YES  ☐NO

Was officer injured?  ☒YES  ☐NO

njuries/Property damage due to discharge?  ☒YES  ☐NO

　　☐Officer  ☒Assailant  ☐Property damage
completion of this report, the officer will submit it to the Patrol Supervisor for review and for-
ing to the Duty Supervisor.

Submitted by: _____        Reviewed by: _____

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☑  SUPPLEMENTARY ☐

| | | | |
|---|---|---|---|
| KEY SITUATION | COMPLAINT NO 000571654 | REPORT DIST C5 | CLEAR/HIDE DIST |
| | CRIME CODE 0 | STATUS | DATE OF OCCUR A.10/14/00 | 8.10/14/00 |
| TYPE OF INCIDENT A&B | APT | DISPATCH TIME 02:52 AM | TIME OF OCCUR A.02:52 AM | 8.02:52 AM |
| LOCATION OF INCIDENT 405 W BROADWAY | | | |
| | PHONE (000)-343-2367 | SEX MALE | RACE BLACK NON-HISPANIC | MARITAL STATUS |
| VICTIM-COMP. (LAST, FIRST, MI) R | APT | OCCUPATION | AGE 36 | DOB 7/30/64 |
| ADDRESS | ADDRESS | | APT | PHONE |
| PERSON REPORTING | | | |

| | | | |
|---|---|---|---|
| WAS THERE A WITNESS TO THE CRIME | | HOME ADDRESS | APT WAY | TELEPHONE (000)-343-1400 | RES BUS |
| PERSON INTERVIEWED L | AGE 0 | LOCATION OF INTERVIEW ON-SCENE | | |

NUMBER OF PERPETRATORS  0   CAN SUSPECT BE IDENTIFIED AT THIS TIME

| | | | |
|---|---|---|---|
| NAME (LAST, FIRST, MI) | S.S. NO | BOOKING NO | PHOTO NO | PCR |
| WARRANT NO | ADDRESS 39 ASHMONT.MELROSE.MA | SEX MALE | RACE WHITE NON-HISPANIC | AGE 34 | HEIGHT | DOB 5/25/66 |
| SPECIAL CHARACTERISTICS (INCLUDING CLOTHING) | | EYES/HF | BUILD | HAIR | EYES |

| | | | |
|---|---|---|---|
| CAN SUSPECT VEHICLE BE DESCRIBED | REG NO. | PLATE TYPE | YEAR EXP. | MAKE/MODEL |
| REG. STATE | VEHICLE NO | STYLE | COLOR (TOP/BOTTOM) |
| VEHICLE MAKE YEAR | LICENSE NO | OPERATOR'S ADDRESS | |
| OPERATOR'S NAME | OWNERS'S ADDRESS | | |
| OWNER'S NAME | | | |

| | | | |
|---|---|---|---|
| CAN PROPERTY BE IDENTIFIED | TYPE OF PROPERTY | SERIAL OR I-DENTI-GUARD NO | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
| STATUS | CLOTHES / FURS | | | |

| | | | |
|---|---|---|---|
| IS THERE A SIGNIFICANT M.O. | | TYPE OF BUILDING | PLACE OF ENTRY |
| TYPE OF WEAPON-TOOL | NEIGHBORHOOD COMMERCIAL & RESIDENTIAL | VICTIM'S ACTIVITY ATTENDING TO VICTIM |
| WEATHER CLEAR | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT (CAR, FOOT, MBTA, ETC.) | RELATIONSHIP TO VICTIM STRANGER |
| UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR | | | |

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION
ABOUT 0252AM, OFFICER _____ AND _____, IN THE F101A RESPONDED TO A R/C TO AN ONSIGHT BY
F902 AT 405 W BROADWAY. ON ARRIVAL WE OBSERVED SEVERAL HH UNITS AT ABOVE LOCATION. AFTER
LEARNING FROM BPD OPERATIONS THAT HH NEEDED ASSISTANCE IN FRONT OF MT WASHINGTON BANK, AT
THAT POINT, ALONG WITH F612LILLY, AND F901A _____ MADE OUR WAY TO ASSIST BOSTON HH. AT THIS
TIME I ASSISTED IN HANDCUFFING OF A NON COMPLIANT S/P _____, AFTER SEVERAL MOMENTS OF VIOLENT
STRUGGLING, A PRESSURE POINT TECHNIQUE WAS UTILIZED, AS INSTRUCTED IN THE BOSTON POLICE
ACADEMY, TO FINALLY PLACE HANDCUFFS ON S/P _____. ONCE S/P GOT TO HIS FEET HE BEGAN TO ACT IN A
VIOLENT MANNER AGAIN UNTIL HE WAS ESCORTED TO A MARKED BPD CRUISER. S/P MADE

| | | | |
|---|---|---|---|
| | | REPORTING OFFICER'S ID | PARTNERS 2 | NO |
| UNIT ASSIGNED F101A | TOUR OF DUTY 1 | REPORTING OFFICER'S SIGNATURE | | TELETYPE NO |
| DATE OF REPORT 10/14/00 | | SPECIAL UNITS NOTIFIED (REPORTING) | | |
| TIME COMPLETED 04:30 A.M. | | SIGNATURE OF PATROL SUPERVISOR | PAT SUP. ID | SIGNATURE OF DUTY SUPERVISOR |

| REPORT | COMPLAINT NO | | BOSTON POLICE | PAGE | OF |
| DIST | 000571544 | | CONTINUATION SHEET | 2 | |
| C6 | | | | | |
| DATE / TIME OF OCCURENCE A | | INCIDENT TYPE | | REMARKS | |
| 10/14/00 02:52 AM | | A&B | | | |

[CONT.]
STATEMENTS THAT HE WAS HIT BY ONE OF US. INITIALLY HH WERE ASSISTING A SEIZURE VICTIM AT 405 W BROADWAY . AT THAT POINT A DRUNK AND BELLIGERENT S/P CAME OVER AND BEGAN TO ANTAGONIZE EMT BEATTIE. EMT BEATTIE ASKED HIM TO STEP AWAY. EVENTUALLY A6 WAS ABLE TO PLACE VICTIM INTO REAR OF AMBULANCE. AT THAT POINT S/P HIGGINS CAME TO DRIVERS SIDE DOOR AND YELLED AT EMT BEATTIE LEAVE HIM THE FUCK ALONE. THEN S/P SPIT DIRECTLY INTO EMT BEATTIE FACE. S/P HIGGINS FLED AREA ON FOOT TO FRONT OF MT WASHINGTON BANK . VICTIM WAS AIDED BY FELLOW EMTS INCLUDING WITNESSES OBRIEN/DURFEE. DURING THIS STRUGGLE VICTIM BEATTIE SUSTAINED A TEAR TO HIS WORK JACKET. APPROXIMATE COST $65.00. S/P WAS TRANSPORTED TO C6 AND GIVEN MIRANDA AND BOOKED IN THE USUAL MANNER. DURING BOOKING HE MADE COMMENTS THAT HE HAD A FAMILY MEMBER WHO WAS A BPD OFFICER. LIEUTENANT UNK. S/P ALSO STATED ILL GET MINE.

# BOSTON POLICE
## INCIDENT REPORT

ORIGINAL ☒   SUPPLEMENTARY ☐

| | | |
|---|---|---|
| KEY SITUATIONS<br>DRUGS | COMPLAINT NO<br>050263125 | REPORT DIST.<br>C11 | CLEARANCE DIST |
| TYPE OF INCIDENT<br>FIREARM, CARRYING | CRIME CODE<br>0 | STATUS | DATE OF OCCUR.<br>A,05/23/05 | B. |
| LOCATION OF INCIDENT<br>SOUTHERN AV , MILLET ST | | APT. | DISPATCH TIME<br>02:30 AM | TIME OF OCCUR.<br>A,02:30 AM | B. |

| VICTIM-COMP. (LAST, FIRST, MI)<br>PO ~~████████████~~ | PHONE<br>(617)-343-4700 | SEX<br>MALE | RACE<br>WHITE NON-HISPANIC | MARITAL STATUS<br>N/A |
|---|---|---|---|---|
| ADDRESS<br>1165 BLUE HILL<br>AVE,DORCHESTER,MA,02124-0000 | APT. | OCCUPATION<br>POLICE OFFICER | AGE<br>0 | D.O.B. |

| VICTIM-COMP. (LAST, FIRST, MI)<br>PO ~~████████████~~ | PHONE<br>(617)-343-4700 | SEX<br>MALE | RACE<br>WHITE NON-HISPANIC | MARITAL STATUS<br>N/A |
|---|---|---|---|---|
| ADDRESS<br>1165 BLUE HILL<br>AVE,DORCHESTER,MA,02124-0000 | APT. | OCCUPATION<br>POLICE OFFICER | AGE<br>0 | D.O.B. |

| VICTIM-COMP. (LAST, FIRST, MI)<br>PO ~~████████████~~ | PHONE<br>(000)-000-0000 | SEX<br>MALE | RACE<br>WHITE NON-HISPANIC | MARITAL STATUS<br>N/A |
|---|---|---|---|---|
| ADDRESS<br>40 GIBSON<br>ST,DORCHESTER,MA,00000-0000 | APT. | OCCUPATION<br>POLICE OFFICER | AGE<br>0 | D.O.B. |

| VICTIM-COMP. (LAST, FIRST, MI)<br>PO ~~████████████~~ | PHONE | SEX<br>MALE | RACE<br>WHITE NON-HISPANIC | MARITAL STATUS<br>N/A |
|---|---|---|---|---|
| ADDRESS<br>40 GIBSON<br>ST,DORCHESTER,MA,00000-0000 | APT. | OCCUPATION<br>POLICE OFFICER | AGE<br>0 | D.O.B. |

| PERSON REPORTING<br>PO ~~████████████~~ | ADDRESS<br>1165 BLUE HILL AVE,DORCHESTER,MA,02124-0000 | APT. | PHONE<br>(617)-343-4700 |
|---|---|---|---|

WAS THERE A WITNESS TO THE CRIME   ☒ YES  ☐ NO

| PERSON INTERVIEWED | AGE | LOCATION OF INTERVIEW | APT. | HOME ADDRESS | APT. | TELEPHONE | |
|---|---|---|---|---|---|---|---|
| PO ~~████~~ | 0 | ON-SCENE | | C-11 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | C-11 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | HQ ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-2 ,MA, | | | RES<br>BUS |
| SGT ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | B-3 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | C-11 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | C-11 ,MA, | | | RES<br>BUS |
| SGT ~~████~~ | 0 | ON-SCENE | | C-11 ,MA, | | | RES<br>BUS |
| PO ~~████~~ | 0 | ON-SCENE | | C-11 ,MA, | | | RES<br>BUS |

NUMBER OF PERPETRATORS  3 — CAN SUSPECT BE IDENTIFIED AT THIS TIME   ☒ YES  ☐ NO

| PERSON 3 | STATUS<br>ARRESTED | NAME (LAST, FIRST, MI)<br>~~████████████~~5 | | S.S. NO | BOOKING NO.<br>20050151803 | PHOTO NO. | ALIAS | |
|---|---|---|---|---|---|---|---|---|
| | WARRANT NO. | ADDRESS<br>10 HABOR POINT BLVD | | SEX<br>MALE | RACE<br>BLACK NON-HISPANIC | AGE<br>31 | HEIGHT<br>6-04 | DOB<br>4/18/1974 |

| | | | WEIGHT 215 | BUILD MEDIUM | HAIR BLACK | EYES BROWN |

PL,DORCHESTER,MA,02125-0000

SPECIAL CHARACTERISTICS (INCLUDING CLOTHING)

| | | | | S.S. NO. | BOOKING NO. | PHOTO NO. | ALIAS |

**PERSONS**

| STATUS SUMMONS | NAME (LAST, FIRST, MI) | | | | | | |
| WARRANT NO. | ADDRESS 15 BELAIR ST,BROCKTON,MA,02301-0000 | SEX FEMALE | RACE BLACK NON-HISPANIC | AGE 28 | HEIGHT 5-04 | DOB 1/31/1977 |
| | | | WEIGHT 210 | BUILD FAT | HAIR BLACK | EYES BROWN |

SPECIAL CHARACTERISTICS (INCLUDING CLOTHING)
BLUE JEANS,BLUE SHIRT

| | | | | S.S. NO. 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 | BOOKING NO. 000000000 | PHOTO NO. | ALIAS |

**PERSONS**

| STATUS N/A | NAME (LAST, FIRST, MI) | | | | | | |
| WARRANT NO. | ADDRESS 22 GROVE ST,BROCKTON,MA,02134-0000 | SEX FEMALE | RACE BLACK NON-HISPANIC | AGE 33 | HEIGHT 5-02 | DOB 10/27/1971 |
| | | | WEIGHT | BUILD MEDIUM | HAIR BLACK | EYES BROWN |

SPECIAL CHARACTERISTICS (INCLUDING CLOTHING)

CAN SUSPECT VEHICLE BE DESCRIBED          YES ☒ NO

**VEHICLES**

| STATUS TOWED SUSPECT VEHICLE | REG. STATE MA | REG. NO. 41CL49 | PLATE TYPE PAN | YEAR(EXP) 2006 | MODEL MOUNTAINEER |
| VEHICLE MAKE YEAR MERCURY - 1998 | VEHICLE NO. 4M2ZU55P9WUJ49629 | | STYLE UTILITY | COLOR(TOP-BOTTOM) BLACK - BLACK | |
| OPERATOR'S NAME | | | LICENSE NO. UNK | STATE MA | OPERATOR'S ADDRESS 15 BELAIR ST,BROCKTON,MA,02301-0000 |
| | | | OWNER'S ADDRESS | | |

OWNER'S NAME
SAME

CAN PROPERTY BE IDENTIFIED          YES ☒ NO

| STATUS | TYPE OF PROPERTY | SERIAL OR IDENTI-GUARD NO. | BRAND NAME-DESCRIPTION | MODEL | VALUE | UCR |
|---|---|---|---|---|---|---|
| RECOVERED SEIZED TURNED IN AS EVIDENCE | FIREARMS | R3713 | SMITH & WESSON - HANDGUN | .38 SPL | | |
| RECOVERED SEIZED TURNED IN AS EVIDENCE | AMMUNITION | .38 SPL | R & P - AMMUNITION | .38 SPL (5 RDS) | | |
| RECOVERED SEIZED TURNED IN AS EVIDENCE | DRUG / NARCOTICS | | MARIJUANA - MARIJUANA | 3 P/B | | |
| RECOVERED SEIZED TURNED IN AS EVIDENCE | DRUG / NARCOTICS | 93-3109 | UNK - PILLS | 4 PILLS | | |

IS THERE A SIGNIFICANT M.O.          YES ☒ NO

| TYPE OF WEAPON-TOOL HANDGUN | NEIGHBORHOOD COMMERCIAL & RESIDENTIAL | | TYPE OF BUILDING N/A | PLACE OF ENTRY N/A |
| WEATHER CLOUDY | LIGHTING ARTIFICIAL | TRANSPORTATION OF SUSPECT CAR | VICTIM'S ACTIVITY DRUG INVEST | |
| | | | RELATIONSHIP TO VICTIM NONE | |

UNUSUAL ACTIONS AND STATEMENTS OF PERPETRATOR
SEE NARATIVE

IS THERE ANY PHYSICAL EVIDENCE (DESCRIPTION AND DISPOSITION IN NARRATIVE)          YES ☒ NO

IS THERE ANY OTHER REASON FOR INVESTIGATION (REASON BELOW)          YES ☒ NO

BLOCK NO. NARRATIVE AND ADDITIONAL INFORMATION

ABOUT 0230, ON MONDAY MAY 23, 2005 OFFICERS ███████N AND ██████ ASSIGNED THE CK01A UNIT WERE CONDUCTING A DRUG INVESTIGATION OPPOSITE 50 SOUTHERN AVE. THIS AREA HAS BEEN PLAGUED WITH NUMEROUS DRUG AND FIREARM ARRESTS AND THESE OFFICERS HAVE RESPONDED TO SHOOTINGS IN THIS AREA. THE OFFICERS OBSERVED A BLACK MERCURY MOUNTAINEER BEARING MA REG 41CL49 OPPOSITE 50 SOUTHERN AVE. THE OFFICERS OBSERVING FROM A DISTANCE THE M/V STOP AND A RIGHT REAR PASSENGER EXIT THE M/V GO TO THE FRONT DOOR OF THE HOUSE THEN QUICKLY RE-ENTER THE RIGHT REAR PASSENGER SEAT OF THE M/V. THE OFFICERS OBSERVED THE M/V MAKE A QUICK RIGHT ONTO MILLET ST. THE OFFICERS ATTEMPTED TO CATCH UP TO THE M/V BUT LOST IT ON WASHINGTON ST. THE OFFICERS CHECKING THE AREA OF WASHINGTON ST OBSERVED THE M/V NOW ON ASHMONT ST. THE OFFICERS MADE THE LEFT ONTO ASHMONT ST WHEN THE SUSPECT M/V AGAIN BEGAN MAKING TURNS OFF OF ASHMONT ST AND AGAIN THE OFFICERS LOST SIGHT OF THE M/V. AS THE OFFICERS APPROACHED DORCHESTER AVE AND ASHMONT ST THE M/V AGAIN RE-APPEARED IN FRONT OF THE OFFICERS. THE OFFICERS QUERY OF THE MA REG REVEALED THAT THE SUSPECT M/V WAS REVOKED/INSURANCE PURPOSES. STATUS DATE 5/14/05. THE OFFICERS ACTIVATED THEIR EMERGENCY LIGHTS AND SIREN AND CONDUCTED A ███████████████ LICENSE TRAFFIC STOP AT THAT LOCATION. THE OFFICERS REQUESTED THE OPERATOR, ██████████████████

AND REGISTRATION. MS. ███████ SUPPLIED THE REG BUT STATED SHE DID NOT HAVE HER LIC ON HER PERSON. THE OFFICERS OBTAINED ALL THREE OCCUPANTS INFORMATION DUE TO NONE OF THE OCCUPANTS WEARING ANY SEATBELTS (C90-13A). AS THE OFFICERS WERE SPEAKING TO THE OCCUPANTS THEY COULD DISTINCTLY SMELL MARIJUANA FROM WITHIN THE M/V. PO ███████ REALIZING THAT THE M/V WAS REVOKED HAD MS. ███████ EXIT THE M/V DUE TO THE M/V GOING TO BE TOWED FOR ITS REVOKED STATUS. AS MS. ███████ STEPPED FROM THE M/V OFFICERS COULD SEE A "BLUNT" AND MARIJUANA SHAVINGS ON THE FLOOR BOARD OF THE M/V. PO ███████ BEGAN SPEAKING WITH MS. ███████ AND ASKED HER WHY SHE WAS ON SOUTHERN AVE AT THAT HOUSE. MS ███████ STATED TO PO ███████, "I DON'T KNOW WHO THAT GUY IS. HE'S A FRIEND OF MY FRIEND (FRONT SEAT PASSENGER, SAMIA HICKS) HE JUST ASKED ME TO STOP BY THAT HOUSE ON THE WAY HOME" AND "I DON'T KNOW WHAT HE DID, HE JUST RAN IN THEN BACK OUT". DUE TO THE OFFICERS PRIOR OBSERVATIONS, DRUG ARRESTS, SMELL OF MARIJUANA AND ITS REVOKED STATUS THE OCCUPANTS WERE REMOVED FROM THE M/V. AS THE REAR SEAT PASSENGER/SUSPECT, ███████ EXITED THE M/V HE STATED TO THE OFFICERS "I GOT SOME WEED ON ME, LET ME GET IT". PO ███████ OBSERVED THE SUSPECT (███████) IMMEDIATELY REACH FOR HIS WAIST AREA. PO ███████ REMOVED HIS HANDS FROM THE WAIST AREA AND OBSERVED THE SUSPECT (███████) TO NOW BE SWEATING, SHAKING AND MOVING FROM LEFT TO RIGHT. PO ███████ REALIZING THAT THIS SUSPECT (███████) WAS EXTREMELY NERVOUS AND CONTINUED TO REFUSE PO ███████ ORDERS TO STAY WITHIN THE REAR SEAT PASSENGER DOOR FRAME. THE SUSPECT ███████ AFTER BEING TOLD TO STAY THERE DUE TO HIS OWN ADMISSION OF HAVING MARIJUANA ON HIS PERSON CONTINUED TO REFUSE THE ORDERS OF THE OFFICERS AS PO ███████ WENT TO RETRIEVE THE MARIJUANA. THE OFFICER REACHED FOR THE SUSPECT (███████) BLACK HOODIE POCKET. PO ███████ AND ███████ OBSERVED A SILVER COLORED FIREARM WITH BLACK TAPE ON THE HANDLE PROTRUDING FROM THE SUSPECT (███████) WAIST. PO ███████ ANNOUNCED THE PRESENCE OF THE FIREARM TO PO ███████ AND ATTEMPTED TO RETRIEVE IT FROM THE SUSPECT (███████) WAIST. WHEN THE SUSPECT (███████) IMMEDIATELY RETRIEVED THE FIREARM WITH HIS LEFT HAND THE SUSPECT (███████) RAISED THE FIREARM IN HIS LEFT HAND AND IN THE DIRECTION OF THE OFFICERS. PO ███████ IMMEDIATELY LUNGED ONTO THE FIREARM WITH BOTH HANDS ON IT AND A VIOLENT STRUGGLE ENSUED. THE OFFICERS ENGAGED SUSPECT (███████) WHILE STANDING WITHIN THE REAR RIGHT DOOR FRAME WHILE STANDING AND AGAINST THE M/V. AS THE OFFICERS FOUGHT WITH THE SUSPECT (███████) MS ███████ RAN ACROSS THE STREET AND MS. ███████ LAID DOWN ON THE FRONT SEAT. THE SUSPECT (███████), WITH FIREARM IN THE LEFT HAND BEGAN YELLING AT THE OFFICERS "I'M GOING TO SHOOT YOU MOTHER FUCKERS", "I AIN'T GOING BACK TO JAIL, YOU'LL ARE GOING TO HAVE TO KILL ME", "GO AHEAD SHOOT ME, KILL ME". PO ███████ WITH BOTH HANDS CLUTCHED ON THE FIREARM WAS UNABLE TO CALL FOR HELP IN FEAR THAT THE SUSPECT (███████) WHO HAD STATED THAT HE WAS GOING TO SHOOT US, WOULD SHOOT IF THIS OFFICER LET HIS HAND GO. PO ███████ WAS FORCED TO WITHDRAW HIS DEPT ISSUE FIREARM FEARFUL THAT THIS VIOLENT STRUGGLE WOULD NOT END AND THE REPEATED STATEMENTS OF THE SUSPECT (███████) "TO SHOOT THE OFFICERS". PO ███████ SCREAMED OVER HIS DEPT ISSUE RADIO SEVERAL TIMES FOR HELP AND THAT THIS ARMED SUSPECT ███████ WAS FIGHTING THE OFFICERS WITH THE FIREARM IN HAND. THE STRUGGLE NOW LASTING FOR AN EXTENDED PERIOD OF TIME AND THE OFFICERS TIRING AS THE ARMED SUSPECT (███████) CONTINUED TO FIGHT WITH THE FIREARM. PO ███████ FEARING THAT DISENGAGING THE SUSPECT WOULD RESULT IN THE SUSPECT SHOOTING THE OFFICERS OR OTHER BYSTANDERS WAS FORCED TO STRIKE THE SUSPECT (███████) WITH THE BUTT END OF HIS DEPT ISSUE FIREARM ON TOP OF THE HEAD. THIS ACTION BY PO ███████ DID NOT HAVE ANY EFFECT ON THE SUSPECT (███████) WHO CONTINUED TO FIGHT.STILL.ARMED WITH THE FIREARM. PO ███████ WAS FORCED TO REPEAT THIS ACTION 2-3 TIMES IN AN EFFORT TO GET THE SUSPECT (███████) TO DROP THE FIREARM, WHICH STILL HAD NO EFFECT ON THE SUSPECT (███████). THE SUSPECT (███████) STILL NOT SURRENDERING CONTINUED TO YELL AT THE OFFICERS. "I'M GOING TO SHOOT YOU'LL" AND "SHOOT ME, I AIN'T GOT SHIT TO LIVE FOR". THE OFFICERS STILL ENGAGED IN THE FIGHT WHILE STANDING WITH THE SUSPECT ███████ WERE NOW JOINED BY THE HK01A (███████) WHO ASSISTED IN TAKING HIM TO THE GROUND. ONCE ON THE GROUND PO ███████ SUSPECT (███████) STILL FOUGHT ALL FOUR OFFICERS. AFTER A BRIEF STRUGGLE ON THE GROUND PO ███████ WAS ABLE TO REMOVE THE FIREARM FROM HIS HAND AND MAKE IT SAFE. THE FIREARM WAS A .38 CALIBRE SMITH & WESSON (SER #83713) AND WAS FULLY LOADED AND CONTAINED 5 LIVE ROUNDS OF .38 CALIBRE AMMUNITION THE SUSPECT (███████) WAS EVENTUALLY CUFFED BY PO ███████. PO'S ███████ AND ███████ RECOVERED A CLEAR PLASTIC BAG CONTAINING A GREEN LEAFY SUBSTANCE BELIEVED TO BE MARIJUANA AND TWO YELLOWISH PILLS FROM THE SUSPECTS PANTS POCKET. THE SUSPECT (███████) WAS IMMEDIATELY PLACED INTO THE C202A (███████) AND TRANSPORTED TO B-3 SO THAT EMS COULD EVALUATE INJURIES RECEIVED. THE OTHER OCCUPANTS ███████ WERE ISSUED CITATIONS AND RELEASED AND THE M/V WAS TOWED DURING THE STRUGGLE PO ███████ RECEIVED INJURIES TO THE LEFT SIDE OF THE JAW (BLEEDING), BACK, LEFT SHOULDER AND FINGER NAILS WERE BLEEDING. PO ███████ IN FEAR OF ANYONE BEING SHOT PLACED SUCH A TIGHT GRASP ON THE FIREARM THAT IT CAUSED HIS NAILS TO BLEED PO CONWAY RECEIVED INJURIES TO HIS RIGHT HAND. BOTH OFFICERS WILL SEEK TREATMENT ON THEIR OWN FOR THE INJURIES IF THE PAIN PERSISTS. PO ███████ DROPPED HIS DEPT ISSUE RADIO IN THE STRUGGLE WHICH RESULTED IN IT BEING BROKEN (RADIO #5372). THE SUSPECT (███████) WAS TRANSPORTED TO THE CARNEY HOSPITAL BY A-3 FOR INJURIES TO THE HEAD AND GUARDED BY THE C202A. THE SUSPECT WAS TREATED WITH STAPLES TO THE HEAD AND RELEASED. WHILE AT THE HOSPITAL PO'S ███████ AND ███████ OBSERVED TWO ADDITIONAL CLEAR PLASTIC BAGS CONTAINING A GREEN LEAFY SUBSTANCE BELIEVED TO BE MARIJUANA DROP FROM THE SUSPECT (███████) PANTS POCKETS. THE SUSPECT (███████) WAS THEN TRANSPORTED BACK TO B-3 BY THE C202A AND BOOKED PO ███████ READ THE SUSPECT (███████) HIS MIRANDA RIGHTS, HE UNDERSTANDS THE SUSPECT (███████) MONEY AND CELL PHONE WERE SEIZED. DURING THE BOOKING IT WAS REVEALED THAT THE SUSPECT (███████) HAS TWO PRIOR FIREARM CONVICTIONS (DCKT #9107JC0290A, DCKT #9107CR7967A) AND PRIOR DRUG MANUFACTURING CONVICTION (DCKT #9607CR3289B) AND WILL BE CHARGED WITH SUBSEQUENT OFFENSES. ALSO DURING BOOKING PO ███████ RECOVERED A FOLDED $20 USC BILL AND TWO ADDITIONAL YELLOWISH PILLS FROM THE SUSPECT (███████) RIGHT COAT POCKET. ALL THE SUSPECT (███████) MONEY WAS FOLDED INDIVIDUALLY, $60 (3 $20 BILLS) TOTAL WAS SEIZED FROM THE SUSPECT (███████) AND A NEXTEL 1750 CELL PHONE. THE SUSPECT ███████ CHARGED WITH POSS FIREARM, POSS AMMO, ADW (FIREARM) PO, THREATS TO KILL PO, AB PO (X4), RESISTING ARREST, POSS CL-D, POSS W/INT CL-D, POSS CL-E, AND POSS CL-E W/INT. THE DRUGS LOGGED INTO BOOK #47 PAGE#009 AND WILL BE DEPOSITED INTO THE DRUG SAFE. THE $60 SEIZED, SEIZED MONEY FORM COMPLETED, DUTY SUPERVISOR NOTIFIED, AND WILL BE DEPOSITED INTO HQ SEIZED MONEY SAFE. MS. ███████ ISSUED MA UNIFORM CITATION # M2398S03 FOR C90-34J OP UNINSURED M/V, C90-09 OP UNREG M/V AND C90-13A SEAT BELT VIOL AND SUMMONSED. ███████ ISSUED MA UNIFORM CITATION # M2398S02

FOR C90-13A SEAT BELT VIOL. THE SUSPECT (▓▓▓▓▓) ISSUED MA UNIFORM CITATION # M2398801 FOR C90-13A SEAT BELT VIOL AND C94C-32C POSS W/INT CL-D. THE FIREARM AND AMMO LOGGED INTO FIREARM BOOK AND WILL BE SECURED BY THE DUTY SUPERVISOR. THE M/V TOWED BY JANS. TAG #5274, PLATES REMOVED. TOW LINE NOTIFIED AND MINOR DAMAGE NOTED TO M/V. CHECK OF THE FIREARMS DATA BASE REVEALED THE SUSPECT DID NOT HAVE A LICENSE TO CARRY A FIREARM. NUMEROUS UNITS RESPONDED FROM DIST 11, AND DIST 3, THEY ARE LISTED IN THE WITNESS FIELD. ADA FRANK NOTIFIED AND FAXED COPY OF REPORT.

| REPORTING OFFICER'S NAME | REPORTING OFFICERS ID | PARTNER'S ID | FI |
|---|---|---|---|
| ▓▓▓▓▓▓▓▓▓▓▓ | 86199 | 86128 | NO |

| UNIT ASSIGNED | TOUR OF DUTY | | | | | TELETYPE NO |
|---|---|---|---|---|---|---|
| CK01A | 1 | | | | | |

| DATE OF REPORT | SPECIAL UNITS NOTIFIED(REPORTING) | PAT SUP. ID | DUTY SUP. NAME | DUTY SUP. ID |
|---|---|---|---|---|
| 05/23/05 | | | ▓▓▓▓▓▓▓▓▓▓ | 9030 |

| TIME COMPLETED | PATROL SUPERVISOR NAME |
|---|---|
| 03.54 AM | |



# Section Seven:

## MODEL PENAL CODE-3.07

## MODEL PENAL CODE - 3.07

Section 3.07.  Use of Force in Law Enforcement.

(1) Use of Force Justifiable to Effect an Arrest.  Subject to the provisions of this Section and of Section 3.09, the use of force upon or toward the person of another is justifiable when the actor is making or assisting in making an arrest and the actor believes that such force is immediately necessary to effect a lawful arrest.

(2)  Limitations on the Use of Force.

    (a) The use of force is not justifiable under this Section unless:

      (i)  the actor makes known the purpose of the arrest or believes that it is otherwise known by or cannot reasonably be made known to the person to be arrested; and

      (ii)  when the arrest is made under a warrant, the warrant is valid or believed by the actor to be valid.

    (b)  The use of deadly force (emphasis supplied) is not justifiable under this Section unless:

      (i)  the arrest is for a felony; and

      (ii)  the person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a peace officer; and

      (iii)  the actor believes that the force employed creates no substantial risk of injury to innocent persons; and

      (iv)  the actor believes that:

        (1)  the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

        (2)  there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.

-----------------------------------------

(In Commonwealth v. Klein, 372 Mass. 823, 363 N.E.2d 1313 (1977), the Massachusetts Supreme Judicial Court stated that a private citizen's use of deadly force to effect an arrest is justified only if exercised in accordance with S. 3.07 of the Model Penal Code.  The holding of this case, however, was limited to the use of deadly force by private citizens.)



# **Section Eight:**

## *USE OF FORCE CONSITIUTIONAL STANDARD*

(I)  CONSTITUTIONAL STANDARD FOR USE OF DEADLY FORCE

A.  TENNESSEE v. GARNER, 471 U.S. 1 (1985)

At 10:45 p.m., on October 3, 1974, two Memphis, Tennessee Police Officers responded to a burglary in progress call. Upon arrival, a neighbor told the officers that she heard glass breaking in the house next door. One officer went to the rear of the house, heard a door slam and saw a suspect run across the backyard. The suspect, a 15 year old black male, stopped at a six foot high chain link fence at the rear of the yard. The officer used a flashlight to enable him to see the suspect's face and hands. He saw no weapon and later testified that the was reasonably sure that the suspect was not armed. The officer called out to the suspect to halt and identified himself as a police officer. When the suspect ignored the officer's command to halt and began to climb over the fence, the officer shot the suspect in the back of the head. He died shortly thereafter in a nearby hospital.

The father of the deceased suspect filed a lawsuit in the United States District Court (USDC) pursuant to Title 42 U.S.C. Section 1983, against the officer who fired the fatal shot, the director of the police department, the mayor and the City of Memphis. The lawsuit alleged that the shooting violated the Fourth Amendment to the United States Constitution inasmuch as it amounted to an unreasonable seizure in violation of the Fourth Amendment. After a three day bench trial, the USDC Judge entered a judgment in favor of all defendants. Claims against the mayor and the director of the police department were dismissed for lack of evidence and the Court ruled that the officer who fired the shot was authorized to do so by a Tennessee state statute which permitted police officers to use deadly force when they have probable cause to believe that the person to be shot has committed a felony and no alternative means of apprehension are available. The District Court Judge ruled that the State of Tennessee "fleeing felon statute" was constitutional and justified the shooting.

The United States Court of Appeals for the Sixth Circuit reversed the judgement of the District Court and the United States Supreme Court affirmed the judgement of the Court of Appeals.

In a 6-3 decision written by Justice WHITE, the Court agreed with the Court of Appeals that the use of deadly force to make an arrest is a "seizure" under the Fourth Amendment and, therefore, must be reasonable in order to be constitutional.

In deciding whether it is reasonable in Fourth Amendment terms to permit deadly force to be used against all fleeing felons, the Court examined both the underlying justification for fleeing felon statutes and whether individual jurisdictions have continued their unrestricted use. With respect to the former, the Court observed that fleeing felon statutes, which authorize use of deadly force upon any fleeing felon when necessary to prevent escape, are based upon the English common law rule. The Court noted that at common law virtually all felonies were punishable by death and therefore the use of deadly force to prevent a felon from escaping, imposed no greater punishment upon the felon than he had already brought upon himself. The Court observed that it is no longer true that all felonies are punishable by death. In fact, the great majority of felonies are punishable by penalties far short of death.

With respect to whether individual jurisdictions have continued unrestricted use of fleeing felon statutes, the Court observed that although almost half of the states retained common law based fleeing felon statutes, twenty states have restricted use of deadly force to situations wherein the escaping felon used or threatened deadly force or was armed or was likely to endanger life if not quickly apprehended. Moreover, the Court observed that most police departments had placed policy restrictions upon their officers with respect to use of deadly force. The Court explained that most big city American police departments permitted deadly force only when a felon presented a threat of death or great bodily harm. The Court noted that no evidence had been presented to indicate that law enforcement had been severely hampered in those jurisdictions adopting more restrictive deadly force policies by regulation or statute.

In light of the foregoing, the Court ruled that the Tennessee fleeing felon statute was unconstitutionally broad because it permitted use of deadly force against unarmed and non-dangerous fleeing felons. The Court explained that the police may not seize unarmed or non-dangerous fleeing felons by shooting them dead. Indeed, the Court concluded that such seizures are unreasonable in Fourth Amendment terms.

The Court then set forth the constitutional standard which would justify the use of deadly force by police officers. This constitutional standard had four components which are set forth below:

1.  The officer must possess probable cause to believe that the suspect has committed a felony.

2.  The officer must give the suspect a warning, if feasible.

3.  The officer must have probable cause to believe that the suspect poses a threat of serious physical harm to the officer or other people.

4.  The use of deadly force must be necessary to prevent escape.

With respect to number 3 as set forth above, the Court explained, "Thus, if the suspect threatens the officer with a weapon, or there is probable cause to believe that he has committed a crime involving the <u>infliction or threatened infliction of serious physical harm</u>, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Basically, <u>GARNER</u> imposes three requirements upon the police before deadly force can be used. First, the suspect must be <u>dangerous</u> as indicated above. Second, deadly force must be <u>necessary</u> to prevent escape or according to FBI policy, deadly force must be <u>necessary</u> to achieve <u>safe control</u> of a dangerous suspect. Third, a <u>warning</u> must be given, if feasible, <u>prior</u> to using deadly force. The federal cases set forth in this handout provide some examples of these principles, as examined by various federal circuit courts of appeal.

B.  <u>GRAHAM v. CONNOR</u>, 490 U.S. 386 (1989)

GRAHAM was a diabetic and he believed that he was in the early stages of a diabetic insulin reaction. He asked his friend BERRY to drive him to a local market so he could purchase orange juice. Upon arrival at the market, GRAHAM entered and saw that it was to crowded. He quickly left the market and entered BERRY's car. A Charlotte, North Carolina Police Officer observed GRAHAM enter and leave the market. He stopped BERRY's car after it left the market. BERRY told the officer that GRAHAM was suffering from an insulin reaction. Meanwhile, GRAHAM exited the car and ran around it twice. He then passed out and fell to the ground. Back-up officers arrived and one handcuffed GRAHAM tightly behind his back. The officers then carried GRAHAM to the hood of a police car and laid him face down on the hood. Later, four officers removed him from the hood and threw him head first inside the police car. GRAHAM suffered a broken foot, cut wrist, bruised forehead and an injured shoulder.

Later, GRAHAM filed a lawsuit under Title 42 U.S.C. Section 1983 in which he alleged excessive force. The United States District Court dismissed the suit and analyzed it under a Fourteenth Amendment due process standard. The Court decided that the due process standard requires proof that officers acted with malicious purpose or sadistic intent. Since plaintiff offered no proof of malice, the Court ruled that no due process violation occurred.

Eventually, the case was accepted for review by the U.S. Supreme Court and the ruling of the District Court was reversed.

The Supreme Court ruled that excessive force claims arising out of arrest or detention situations should not be reviewed under a due process standard and that proof of malice in these cases is not required. Instead, the Court ruled that these claims must be brought and examined under a Fourth Amendment "objective reasonableness" standard. The Court explained that "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of arrest, investigatory stop or other 'seizure'...should be analyzed under the Fourth Amendment and its 'reasonableness standard' rather than the 'due process' approach."

In deciding whether excessive force was used, the Court stated that the following factors should be examined:

1. The severity of the crime.

2. The degree of danger to the police and others.

3. Whether the suspect actively resisted.

4. Whether the suspect attempted flight.

The Court also observed that the use of force by police must be judged from the perspective of a reasonable police officer on the scene rather than with 20/20 hindsight. The Court explained that reasonableness must embody allowance for the fact that police are often forced to make split-second judgements in circumstances that are tense, uncertain and rapidly evolving. The Court remanded the case back to the lower court for further proceedings. The principles articulated in CONNOR apply in deadly and non-deadly force situations.

## II) FEDERAL CASE REGARDING NON-DEADLY FORCE

### A) DEAN v. CITY OF WORCESTER, ET AL, (No. 90-1093) (1st Cir. 1991)

On September 3, 1985, an officer assigned to the Violent Fugitive Arrest Squad of the Massachusetts State Police, received information from a reliable informant that RICHARD BURBO, an escapee from the Massachusetts Correctional System, was staying with an unknown female at a Worcester apartment. The informant stated that BURBO was armed with a revolver and that he had expressed the intention to shoot any officer that attempted to arrest him. At the time of his escape, BURBO was serving sentences for Armed Assault, Armed Robbery and Rape.

The next day, Massachusetts State Police Officers and Officers of the Worcester Police Department located a male suspect, resembling BURBO, who was seated on a rock at a city bus stop near the apartment at which BURBO was reportedly staying. The officers decided to apprehend the subject at the bus stop rather than risk endangering the woman and her child who supposedly resided in the apartment with BURBO. The officers decided that BURBO would have to be apprehended quickly so as to avoid endangering innocent bystanders and the officers themselves. Unbeknown to the police, the person they were about to seize was not BURBO but, instead, was Mr. DEAN.

The police drove a car onto the sidewalk directly in front of DEAN. As DEAN got to his feet, two officers jumped from the police car and pushed DEAN down causing his face to hit the sidewalk. One of the officers placed a gun to DEAN's ear and threatened to blow his head off if he moved. DEAN felt a knee in his back and a slight kicking to his feet. He was lifted to his feet, tightly handcuffed and pushed against the wall and in the process he suffered a cut to his scalp. DEAN told the police that he was not BURBO and that they had arrested the wrong person. After arresting DEAN, the officers noticed that DEAN appeared to be taller than BURBO. They decided to place DEAN in a cruiser while they executed a search warrant for the nearby apartment where BURBO was staying. BURBO was subsequently arrested inside the apartment and a .38 caliber pistol was seized from under a cushion on the couch where BURBO had been sitting. The police explained their mistake to DEAN and released him. DEAN had been detained for about 30 minutes and suffered minor physical injuries including a cut nose and scalp, a scratch on his neck and welts on his back. He also alleged that he later suffered from severe emotional trauma as well.

Case 1:04-cv-11836-RCL   Document 86   Filed 02/16/2007   Page 35 of 44

Two years later, DEAN filed a suit in the United States
District Court pursuant to Title 42 U.S.C. Section 1983 and
claimed that the police officers used excessive force in
effecting this arrest. The District Court dismissed the lawsuit
against the police officers and DEAN appealed.

On appeal to the First Circuit, DEAN argued that the
actions of the police officers in this case were unreasonable in
Fourth Amendment terms for two reasons. First, DEAN argued that
the police lacked probable cause to arrest him because he was
taller than BURBO. The Court rejected this claim by noting that
the record reflected that both DEAN and BURBO were of similar
physical appearance and that DEAN was arrested near the apartment
house at which BURBO was believed to be staying. Moreover,
although DEAN may have been somewhat taller than BURBO, DEAN was
seated on a rock when first observed by the police. When the
police approached him in the automobile for the purpose of
arrest, the fact that the officers failed to notice, as they
jumped from the police car, that DEAN was somewhat taller than
BURBO could not be considered unreasonable, particularly in light
of the tension and urgency that prevailed at the moment of the
arrest.

Secondly, DEAN argued that the police used excessive
force in apprehending him. Because the police had probable cause
to arrest DEAN thinking he was BURBO, they had the right to use
whatever force would have been appropriate if, in fact, they were
arresting BURBO and not DEAN. The First Circuit observed that
the use of force in connection with an arrest or an investigative
detention is controlled by the standard of "objective
reasonableness" as set forth in the recent United States Supreme
Court case of GRAHAM v. CONNOR, 109 S. Ct. 1865 (1989). The
"objective reasonableness" standard of CONNOR requires the lower
Federal courts to analyze excessive force claims in light of all
the circumstances confronting the arresting officers at the time
of the arrest. Therefore, the First Circuit, in considering the
facts surrounding the arrest of DEAN, observed that the police
possessed information from a reliable informant that BURBO was
believed to be armed and had made a verbal threat to shoot police
officers who might arrest him. Moreover, he had an extensive
record of violent crimes. Furthermore, the police were required
to make the arrest in a public place which subjected innocent
bystanders to the possibility of being harmed. The First Circuit
also looked to the manner in which the arrest was actually
carried out and observed that DEAN suffered only minor injuries
and did not seek medical attention until the next day. In
rejecting DEAN's second argument that the police used excessive
force in arresting him, the First Circuit concluded its opinion
with the following comment: "These minor physical injuries

simply are insufficient to support an inference that the officers used inordinate force to effect the intended arrest in the tense, uncertain and rapidly evolving circumstances surrounding the reasonably perceived need to subdue an armed felon on a busy street."

Finally, the Court observed that DEAN likewise alleged psychic injury as a consequence of the police threat against him to use a gun if he moved. The Court rejected this claim on the ground that, since the officers, after the warning, could have employed violent force to prevent the escape of a person with BURBO's record for violent assaults and threats against the police, their advance warning that violent force would be used was a reasonable precaution against the need to use it.

## (III)   FEDERAL CASES ON DEADLY FORCE

### A)   ROY v. INHABITANTS OF THE CITY OF LEWISTON, ET AL, 42 F.3d 691 (1st Cir. 1994)

On August 13, 1991, Officers WHALEN and MERCER of the Lewiston, Maine Police Department were sent to investigate a domestic violence report at MICHAEL ROY's home. Upon arrival, they were told by Mrs. ROY that her husband was armed with two knives and had threatened to use them upon any officer that approached him. The officers found ROY in the back yard on the ground and when they roused him, they learned he had been drinking. They allowed ROY to enter his home and he returned carrying a steak knife in each hand. Both officers drew their handguns and ordered him to drop the knives. He advanced, flailing his arms while continuing to hold the knives. The officers retreated back to a sharp downward incline and repeated their warnings without success. ROY made a kicking-lunging motion toward the officers and Officer WHALEN shot him twice. ROY was seriously injured but later recovered and sued the officers, the City and the Police Chief. The suit against the officers was filed pursuant to 42 U.S.C. 1983 and it alleged that the police used unreasonable deadly force against him. The suit against the City and the Chief alleged inadequate training because the officers had not been properly trained in the use of non-lethal alternatives for subduing dangerous but intoxicated persons.

The District Court ruled in favor of all defendants and ROY appealed. The First Circuit affirmed and analyzed the police conduct in light of recent Supreme Court decisions dealing with the use of force by police officers and the defense to constitutionally based lawsuits, which is known as "Qualified Immunity." In GRAHAM v. CONNOR, 490 U.S. 386 (1989), the Supreme

Court stated that excessive force claims against police officers are to be measured by an "objective reasonableness" standard under the Fourth Amendment. Moreover, the Court said that in deciding whether reasonable force was used, the lower courts must make allowance for the need of police officers to make split-second judgements in circumstances that are tense, uncertain and rapidly evolving. In ANDERSON v. CREIGHTON, 483 U.S. 635 (1987), the Supreme Court ruled that police officers are entitled to qualified immunity from civil suit unless they are plainly incompetent or knowingly violate the law. The Court pointed out that its standard for determining whether an officer is entitled to immunity was whether the officer had acted with objective reasonableness under the circumstances. The First Circuit pointed out that the standard of judgement in excessive force cases and qualified immunity defense cases was essentially identical. The Court of Appeals stated that the Supreme Court has decided to surround the police who make on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. The Court explained that in close cases, a jury does not automatically get to second-guess life and death decisions even though the plaintiff has a plausible claim that the situation could have been handled differently.

The First Circuit ruled that the officers in this case were entitled to qualified immunity because their conduct was not objectively unreasonable given the fact that they were facing tense, uncertain and rapidly evolving circumstances. The Court was not enthusiastic about endorsing the use of deadly force in these circumstances but felt constrained by Supreme Court precedent to rule in favor of the police. The Court's lack of enthusiasm can be observed in the following comment, "[I]n our view a jury could not find that his conduct was so deficient that no reasonable officer could have made the same choice as WHALEN—in circumstances that were assuredly tense, uncertain and rapidly evolving. Put differently, WHALEN's actions, even if mistaken, were not unconstitutional." The Court observed that apart from the suggestion that mace should be carried by all officers, the plaintiff's expert did not explain in his affidavit how the police could have subdued ROY any other way. The Court also stated that it was not obvious that it would have been better for the police to retreat and leave an armed suspect on the premises—one who had just committed an apparent felony in the presence of the police. The Court was obviously not persuaded that the expert's suggestion regarding mace or the idea that the police should have left the premises were reasonable alternatives.

With respect to the City and the Chief, the Court stated that there was nothing in the plaintiff's expert's affidavit which would make anyone conclude that the "failure to

provide mace was so unusual or patently improper as to reflect deliberate indifference" on the part of these defendants. It should be noted that the plaintiff's expert claimed that ROY could have been arrested without using firearms. He stated that the officers should have been equipped with red pepper mace. The First Circuit did not seem impressed with this line of argument for any of the defendants.

1.   <u>Commonwealth v. Klein</u>, 372 Mass. 823, 363 N.E. 2d 1313 (1977).  On 8/1/73, the defendant, a local dentist, shot and wounded two men after they had broken into a drug store located across the street from his home.  The burglary occurred at night and the defendant called the police and then went outside with a pistol to confront the suspects.  The defendant told police that he intercepted the burglars as they left the store and told them to stop or be shot.  He said one suspect threw cigarettes at him and he fired, hitting one of them.  The suspects ran back into the store and emerged again seconds later.  The defendant fired several shots at them as they were running away along side the drug store.

The defendant was later indicted for assault and battery with a dangerous weapon.  Defendant was found guilty after a jury trial.  The Supreme Judicial Court reversed the conviction because it expanded the use of deadly force rules for the Commonwealth for the first time and did not believe it fair to find the defendant guilty for violating newly expanded rules.  The Court approved of the trial judge's jury charge and believed that the jury returned the correct verdict in response to that charge.  The Court stated that the central issue was whether the defendant was justified in using deadly force and defined deadly force as force intended or likely to cause death or great bodily harm.

The defendant argued before the Court that he was entitled to a directed verdict of acquittal on <u>self defense grounds</u>.  The Supreme Judicial Court disagreed and approved of the trial judge's jury charge which informed the jury that <u>self defense with a dangerous weapon</u> is permissible when the person using the weapon had a <u>reasonable apprehension (fear) of great bodily harm</u> and <u>a reasonable belief that no other means would suffice to prevent such harm</u>.  The Court approved the jury's rejection of self-defense claims on the basis of the evidence which disclosed that the defendant shot the men as they were running away from him.

The defendant next argued that deadly force was justified <u>to prevent the escape</u> of the two suspects.  In responding to this claim, the Court first observed that it had never before clearly set limits of <u>an arresting citizen's</u> right to use deadly force.  The Court decided to apply all relevant provisions of the <u>Model Penal Code</u> in reaching it's decision on whether deadly force is appropriate when a private citizen attempts to apprehend a fleeing felon.  The Court adopted <u>Section 3.07</u> (Use of Force in Law Enforcement) of the Model Penal Code as the law in Massachusetts on this issue.

The court set forth the relevant language of Section 3.07 as follows:

"The use of deadly force is not justifiable under this Section unless:

(1) the arrest is for a felony; and

(2) the actor believes the force employed creates no substantial risk of injury to innocent persons; and

(3) the actor believes that:

(a) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(b) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.

The Court ruled that the defendant's shooting of persons fleeing from a felony property crime was inappropriate under the Model Penal Code which the Court adopted for the Commonwealth in fleeing felon cases.

2.        Julian v. Randazzo, 403 N.E. 2d 931 (1980).

On July 5, 1976 two Medford Police officers received a radio report of a hold-up. A short time later they began pursuit of three suspects in the get-a-way car. A high speed chase followed in which shots were fired from the fleeing car. Eventually, the suspect vehicle spun out and stopped. Officer suspects ran and the officers chased them on foot. Officer RANDAZZO fired twice and the plaintiff, JULIAN, an innocent bystander, was hit by one of these bullets in the elbow. The victim sued Officer RANDAZZO for assault and battery. The jury returned a verdict for RANDAZZO and the plaintiff appealed.

The Supreme Judicial Court reversed because the jury was allowed to consider a police report which the Court ruled had been improperly admitted as evidence. The Court approved the trial judge's charge to the jury on the use of deadly force by a police officer. The Court adopted the same standard regarding use of deadly force in the fleeing felon context that it had articulated in Commonwealth v. Klein, 372 Mass. 823 (1977). Therefore, the deadly force for fleeing felons standard which appears in Section 120.7 of the Model Penal Code (identical to Section 3.07 set forth in Klein) was adopted by the Court for sworn police personnel. The Court set forth the appropriate provisions of Section 120.7 as follows:

"...The officer may use deadly force...only if (a) the arrest is for a felony; and (b) the officer reasonably believes that the force employed creates no substantial risk to innocent persons; and

(c) the officer reasonably believes that:

(1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or

(2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed.

Since the Court approved the trial judge's jury charge on use of deadly force on an escaping felon, absent the admission of the improper police report, the Court would have approved of the jury verdict in favor of RANDAZZO and would have approved of his use of force in the circumstances of this case.

SUMMARY OF DEADLY FORCE IN MASSACHUSETTS

Use of deadly force in Massachusetts is governed by the principles articulated in both Klein and Randazzo. These principles can be broken down into two distinct categories which involve self defense situations and escape prevention.

A.  SELF DEFENSE: Person using weapon must have:

(1) a reasonable apprehension (fear) of great bodily harm and

(2) a reasonable belief that no other means would suffice to prevent such harm.

B.  ESCAPE PREVENTION: Person using weapon may use deadly force to prevent escape if:

(1) the arrest is for a felony; and

(2) the office reasonably believes that the force used creates no substantial risk to innocent persons; and

(3) the officer reasonably believes that:

(a) the crime for which the arrest is made included the use or threatened use of deadly force; or

(b) there is a substantial risk that the arrestee will cause death or serious bodily harm if his arrest is delayed.

## CIVIL LIABILITY FOR POLICE OFFICERS

### Civil Court v. Criminal Court

1. Identity of the parties

   <u>Criminal</u> - Always the Commonwealth vs the Defendant.

   <u>Civil</u> - Always the Plaintiff vs the Defendant. The Commonwealth may very well be the plaintiff in a civil case.

2. Nature of the wrong complained

   <u>Criminal</u> - A crime is an offense against society. A crime <u>cannot</u>, generally, be forgiven by the victim.

   <u>Civil</u> - A civil case involves a personal affront, personal to the injured plaintiff. The plaintiff/victim of the wrong <u>may</u> forgive the defendant.

3. Burden of Proof

   <u>Criminal</u> - The Commonwealth must prove its case <u>beyond a reasonable doubt</u>.

   <u>Civil</u> - A plaintiff proves his case through a preponderance of evidence. Less proof is required.

4. Nature of Penalties Imposed

   <u>Criminal</u> - A defendant is:

   A.  found not guilty or
   B.  found guilty and is imprisoned, fined, put on probation, or other alternative action taken by the court.

   <u>Civil</u> - The plaintiff, upon recovery, received monetary damages.


<u>Tort</u> - An infringement or violation by one person of the rights of another person, his possessions, his business, his social standing or his family security.

<u>Common reasons for civil suits against police officers</u>:

1. Illegal search and seizure

2. Taking an involuntary confession

3. Failure to provide medical attention

4. False arrest

5. Brutality

6. Assault and battery

7. Excessive force

8. Wrongful death

<u>Four conditions a plaintiff must prove in a civil case</u>:

1. Defendant had a duty to act or not to act

2. Defendant breached that duty

3. The breach was the cause of the injury

4. Damages were indeed suffered

<u>Categories of conduct which bring on liability</u>

A. <u>Negligent</u> - Unintentional action which caused damage even though proper procedures were followed.

B. <u>Grossly Negligent</u> - Conduct where there has been a failure to exercise even slight care.

C. <u>Intentional</u> - Voluntary actions which were intended to bring a result against the interest of another in a way the law will not sanction.

## The Massachusetts Tort Claims Act

The Torts Claim Act allocates liability between government units and their employees. In allowing a right of recovery against the public employer, the legislature took away the injured person's right to sue the negligent public employee. To a police officer this means he is indemnified by his employer as long as his actions adhere to State statutes, Municipal ordinances and Departmental procedures and he is acting within the scope of his employment. The police officer whose actions are found to be intentional or grossly negligent may be personally responsible for damages awarded by a court.

Misfeasance - Wrongful exercise of lawful authority

Nonfeasance - Failure to act when one is obligated to

## GENERALLY STANDARD FOR DETERMINING POLICE LIABILITY

Were officers actions reasonable and prudent under the given circumstances?

91