Julian v. Randazzo
403 N.E.2d 931
Mass., 1980.
Decided April 15, 1980. (Approx. 5 pages)

168I(B) Actions
  168k37 Trial
    168k40 k. Instructions. Most Cited Cases

In action brought against police officers to recover for assault, assault and battery, false imprisonment and negligent denial of medical care, trial court did not err in charging jury in accordance with section of the Model Code of Pre-Arraignment Procedure relating to law enforcement officer's use of force while making an arrest.

[6] KeyCite this headnote

388 Trial
  388VII Instructions to Jury
    388VII(E) Requests or Prayers
      388k260 Instructions Already Given
        388k260(6) k. Actions for Torts in General. Most Cited Cases

In action brought against police officers to recover for assault, assault and battery, false imprisonment and negligent denial of medical care, in which trial court properly informed jury that an officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest and properly stated the limitations upon the use of deadly force, trial court did not abuse its discretion in refusing plaintiff's request that it give a more elaborate definition of excessive force and the factors to be considered in determining whether excessive force was used.
**932 *391 Philip M. Weinberg, Cambridge, for plaintiff.
Robert J. Blumsack, Asst. City Sol., for defendants.

BRAUCHER, Justice.
The plaintiff brought this tort action against the defendant police officers for assault, assault and battery, false imprisonment and "negligent denial of medical care." A jury returned verdicts for the defendants, and the plaintiff appeals, challenging the admission in evidence of a police investigation report and the instructions to the jury on the use of deadly force by a police officer. We transferred *392 the case from the Appeals Court to this court, and we uphold the plaintiff's evidentiary argument and reverse the judgments.
We summarize the evidence. The two defendants were Medford police officers. About 7 P.M. on July 5, 1976, while in a patrol car, they received a radio report of a hold-up in Malden. A short time later they began pursuit of three suspects in a Corvette automobile. A high speed chase ensued, in which shots were fired from the fleeing car. At an intersection in Cambridge, the Corvette "spun out" and stopped; the three suspects got out and ran, and the patrol car ran into the Corvette. The officers continued the chase on foot, and the defendant Randazzo fired his gun twice. The plaintiff, a bystander in front of his house, was hit in the elbow by a bullet. A little later each of the officers came up to the plaintiff, pointed a gun at him, and told him not to move; a neighbor persuaded the officers that the plaintiff was a bystander, and they continued their pursuit.
Several witnesses testified to the circumstances of the shooting. The defendant Randazzo testified that after he got out of the patrol car he yelled to the suspects to halt or he would shoot, that one of them stopped and aimed a pistol at him, that he fired two shots at the suspect, and that he first saw the plaintiff after resuming pursuit. Bystander witnesses testified that Randazzo gave no warning, that none of the suspects stopped and turned toward Randazzo, and that none of the suspects was carrying a gun. One bystander testified that the suspects were out of sight before the defendants arrived at the scene; another testified that Randazzo fired while still in the patrol car. Estimates of time and distance

varied. There was also ballistics testimony indicating that the bullet which struck the plaintiff's arm was not of the type used by the police.

[1] 1. Police investigation report. A police lieutenant testified that he was assigned to make the usual investigation made when a police officer discharges his weapon, and his written report was admitted in evidence as a business record over the plaintiff's objection that it was the officer's opinion *393 based on hearsay and that its probative value did not balance the prejudice to the plaintiff. We think the objection was well taken.

The report contains a narrative account of the incident. In general that account agrees with Randazzo's account where his account differs from those of other witnesses. It concludes, "After an extensive study of this case it is my opinion that Officer Randzaao (sic ) was justified in using his firearm. I recommend that no departmental action be taken." It is apparent that most of the narrative was supplied by police officers; the lieutenant testified that in preparing the report he spoke with the defendants, read their reports, interviewed the plaintiff and at least one of the other bystander witnesses, and had the assistance of other officers.

Many years ago, with respect to "public records," this court recognized a principle "that a record of a primary fact, made by a public officer in the performance of official duty is or may be made by legislation competent prima facie evidence as to the existence of that fact, but that records of investigations and inquiries conducted, either **933 voluntarily or pursuant to requirement of law, by public officers concerning causes and effects involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are not admissible in evidence as public records." Commonwealth v. Slavski, 245 Mass. 405, 417, 140 N.E. 465, 469 (1923). That principle was applied in Middlesex Supply, Inc. v. Martin & Sons, 354 Mass. 373, 374-375, 237 N.E.2d 692 (1968), where the report of an assistant fire chief on the cause of a fire was held inadmissible as "opinion only." We think the same principle is applicable to evidence offered as a business record under G.L. c. 233, s 78. See Sawyer & Co. v. Southern Pac. Co., 354 Mass. 481, 484, 238 N.E.2d 357 (1968); Colvin v. United States, 479 F.2d 998, 1002-1003 (9th Cir. 1973). Cf. Kelly v. O'Neil, 1 Mass.App. 313, 317, 296 N.E.2d 223 (1973). Thus the conclusion of the report in issue here, comprising the investigating officer's opinion and recommendation, was not admissible.

*394 The defendants argue that any error in this respect did not affect the substantial rights of the plaintiff. The argument has force, since the jury were fully instructed that it was their task to decide whether the defendants' conduct was justified and that they were to judge police testimony by the same standards as the testimony of other witnesses. In view of the discrepancies in the eyewitness testimony, the aura of officialdom inherent in the report, and the fact that it was taken to the jury room during the jury's deliberations, however, we cannot say that the error was harmless. Kelly v. O'Neil, 1 Mass.App. 313, 317, 296 N.E.2d 223 (1973).

[2] The question may arise on a new trial whether the police report is admissible if the investigating officer's opinion and recommendation are deleted. But the record before us does not permit us to rule on that question with confidence, since the bases for the report were not fully developed in the evidence. We have held police reports admissible as business records under G.L. c. 233, s 78. Commonwealth v. Sellon, --- Mass. ---, --- [FNa], 402 N.E.2d 1329 (1980). Commonwealth v. Walker, --- Mass. ---, --- - --- [FNb], 397 N.E.2d 1105 (1979). Carey v. New Yorker of Worcester, Inc., 355 Mass. 450, 453, 245 N.E.2d 420 (1969). See Annot., 77 A.L.R.3d 115, 124-126 (1977). But statements in such a report made by bystanders may be inadmissible as "second level" or "totem-pole" hearsay. See Commonwealth v. Walker, --- Mass. ---, --- [FNc], 397 N.E.2d 1105 (1979), and cases cited; Fagan v. Newark, 78 N.J.Super. 294, 307-323, 188 A.2d 427 (1963); Advisory Committee's Note to Rule 803(6) of the Federal Rules of Evidence, 56 F.R.D. 308-309 (1972). Moreover, there is authority that police reports should ordinarily be excluded when offered by the party at whose instance they were made. See Bracey v. Herringa, 466 F.2d 702, 705 n.9 (7th Cir. 1972); United States v. Smith, 521 F.2d 957, 964-968 (D.C. Cir. 1975), and cases cited. We do not now rule on the application of those authorities to the report before us.

FNa. Mass.Adv.Sh. (1980) 789, 798.

FNb. Mass.Adv.Sh. (1979) 2573, 2577-2578.

FNc. Mass.Adv.Sh. (1979) 2573, 2577.

2. The privilege to arrest. After charging the jury on self-defense, the judge gave a separate charge on the question whether the defendant Randazzo was justified in using deadly force to effect an arrest. He correctly defined deadly *395 force in the language we used in Commonwealth v. Klein, 372 Mass. 823, 827, 363 N.E.2d 1313 (1977), and used substantially the language of s 120.7 of the Model Code of Pre-Arraignment Procedure (1975) summarized by us in the Klein case. See id. at 831 n.7, 363 N.E.2d 1313. He also stated that "police officers have a right to arrest, without a warrant, any person whom (sic ) they reasonably believe has committed a felony," explained the circumstances to be considered in passing upon whether the police officers had reasonable belief that a felony has been committed, and added that "if you find that the defendant was justified in using deadly force, then you should find for **934 the defendant, even though the plaintiff was an innocent victim, as his injury was as a result of an unfortunate accident."

At the close of the entire charge the plaintiff's counsel requested "an instruction on probable cause, not only as to the existence of the felony, but that the police officer had probable cause to arrest the person to whom the force was directed." He also requested the judge to give a more elaborate definition of excessive force and the factors to be considered in determining whether excessive force was used. The judge indicated that he had adequately covered both points, and gave no further charge.

[3][4][5] There was no error. If the police had sufficient information to constitute probable cause to believe, and did believe, that a person had committed a felony, even though not in their presence, they had the right to arrest him without a warrant. Commonwealth v. Snow, 363 Mass. 778, 788, 298 N.E.2d 804 (1973), and cases cited. The burden was on the defendants to prove justification. They did not need to show that a felony had actually been committed; it was enough if they believed upon reasonable cause that the person being arrested had committed a felony. See Muniz v. Mehlman, 327 Mass. 353, 356, 99 N.E.2d 37 (1951), and cases cited. The judge's instructions clearly stated these principles. There is no requirement of probable cause to believe that the plaintiff, as the person injured, was a felon, unless he was the person being arrested.

*396 We have said that the person attempting a valid arrest has the right to use the force which is reasonably necessary to overcome physical resistance by the person sought to be arrested; cases of physical resistance almost inevitably involve principles relating to self-defense. See Commonwealth v. Klein, 372 Mass. 823, 832 n.8, 363 N.E.2d 1313 (1977), and cases cited; Model Penal Code s 3.07, Comment 3 (Tent. Draft No. 8, 1958). There was evidence in the present case, however, that would have warranted a finding that deadly force was used solely to prevent escape. In the Klein case we announced, with prospective effect only, that in cases of arrest by a private person we shall limit the justification for the use of deadly force to prevent escape in accordance with Model Penal Code s 3.07. Id. at 830-832, 363 N.E.2d 1313. We left open the question whether the same limitations apply to arrests by peace officers. Id. at 830 n.6, 363 N.E.2d 1313. Cf. Uraneck v. Lima, 359 Mass. 749, 269 N.E.2d 670 (1971) (rejecting distinction between serious and nonserious felony). See Annot.. 83 A.L.R.3d 174 (1978).

[6] In the present case, the conduct in question took place before our decision in the Klein case. Nevertheless, we approve the action of the judge in charging the jury in accordance with s 120.7 of the Model Code of Pre- Arraignment Procedure (1975).[FN1] The present case is not a criminal case, and the regulations of the Medford Police Department, placed in evidence by the defendants, gave adequate notice of the limitations placed on the use of deadly force to effect an arrest.

> FN1. "A law enforcement officer authorized to make an arrest . . . may use such force as is reasonably necessary to effect the arrest, . . . The officer may use deadly force for these purposes only if (a) the arrest is for a felony; and (b) the officer reasonably believes that the force

employed creates no substantial risk to innocent persons; and (c) the officer reasonably believes that: (i) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or (ii) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed."

In this setting, the judge's charge properly informed the jury that an officer authorized to make an arrest may use "such force as is reasonably necessary to effect the arrest," and that the use of deadly force is subject to the additional *397 limitations stated. It was within the judge's discretion to decide that the additional elaboration requested by the plaintiff as to what constitutes excessive force might have been confusing rather than helpful.

Judgments reversed.

Mass., 1980.

END OF DOCUMENT

Copr. (C) West 2001 No Claim to Orig. U.S. Govt. Works

# U.S. Supreme Court

## TENNESSEE v. GARNER, 471 U.S. 1 (1985)

### 471 U.S. 1

### TENNESSEE v. GARNER ET AL.
### APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

### No. 83-1035.

### Argued October 30, 1984
### Decided March 27, 1985*

A Tennessee statute provides that if, after a police officer has given notice of an intent to arrest a criminal suspect, the suspect flees or forcibly resists, "the officer may use all the necessary means to effect the arrest." Acting under the authority of this statute, a Memphis police officer shot and killed appellee-respondent Garner's son as, after being told to halt, the son fled over a fence at night in the backyard of a house he was suspected of burglarizing. The officer used deadly force despite being "reasonably sure" the suspect was unarmed and thinking that he was 17 or 18 years old and of slight build. The father subsequently brought an action in Federal District Court, seeking damages under 42 U.S.C. 1983 for asserted violations of his son's constitutional rights. The District Court held that the statute and the officer's actions were constitutional. The Court of Appeals reversed.

*Held:*

The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against, as in this case, an apparently unarmed, nondangerous fleeing suspect; such force may not be used unless necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others. Pp. 7-22. [471 U.S. 1, 2]

(a) Apprehension by the use of deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement. To determine whether such a seizure is reasonable, the extent of the intrusion on the suspect's rights under that Amendment must be balanced against the governmental interests in effective law enforcement. This balancing process demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. Pp. 7-12.

(b) The Fourth Amendment, for purposes of this case, should not be construed in light of the common-law rule allowing the use of whatever force is necessary to effect the arrest of a fleeing felon. Changes in the legal and technological context mean that that rule is distorted almost beyond recognition when literally applied. Whereas felonies were formerly capital crimes, few are now, or can be, and many crimes classified as misdemeanors, or nonexistent, at common law are now felonies. Also, the common-law rule developed at a time when weapons were rudimentary. And, in light of the varied rules adopted in the States indicating a long-term movement away from the common-law rule, particularly in the police departments themselves, that rule is a dubious indicium of the constitutionality of the Tennessee statute. There is no indication that holding a police practice such as that authorized by the statute unreasonable will severely hamper effective law enforcement. Pp. 12-20.

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

(c) While burglary is a serious crime, the officer in this case could not reasonably have believed that the suspect - young, slight, and unarmed - posed any threat. Nor does the fact that an unarmed suspect has broken into a dwelling at night automatically mean he is dangerous. Pp. 20-22.

710 F.2d 240, affirmed and remanded.

WHITE, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, post, p. 22.

[Footnote *] Together with No. 83-1070, Memphis Police Department et al. v. Garner et al., on certiorari to the same court.

Henry L. Klein argued the cause for petitioners in No. 83-1070. With him on the briefs were Clifford D. Pierce, Jr., Charles V. Holmes, and Paul F. Goodman. W. J. Michael Cody, Attorney General of Tennessee, argued the cause for appellant in No. 83-1035. With him on the briefs were William M. Leech, Jr., former Attorney General, and Jerry L. Smith, Assistant Attorney General. [471 U.S. 1, 3]

Steven L. Winter argued the cause for appellee-respondent Garner. With him on the brief was Walter L. Bailey, Jr.Fn

Fn [471 U.S. 1, 3] Briefs of amici curiae urging affirmance were filed for the Florida Chapter of the National Bar Association by Deitra Micks; and for the Police Foundation et al. by William Josephson, Robert Kasanof, Philip Lacovara, and Margaret Bush Wilson.

JUSTICE WHITE delivered the opinion of the Court.

This case requires us to determine the constitutionality of the use of deadly force to prevent the escape of an apparently unarmed suspected felon. We conclude that such force may not be used unless it is necessary to prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.

I

At about 10:45 p. m. on October 3, 1974, Memphis Police Officers Elton Hymon and Leslie Wright were dispatched to answer a "prowler inside call." Upon arriving at the scene they saw a woman standing on her porch and gesturing toward the adjacent house.1 She told them she had heard glass breaking and that "they" or "someone" was breaking in next door. While Wright radioed the dispatcher to say that they were on the scene, Hymon went behind the house. He heard a door slam and saw someone run across the backyard. The fleeing suspect, who was appellee-respondent's decedent, Edward Garner, stopped at a 6-feet-high chain link fence at the edge of the yard. With the aid of a flashlight, Hymon was able to see Garner's face and hands. He saw no sign of a weapon, and, though not certain, was "reasonably sure" and "figured" that Garner was unarmed. App. 41, 56; Record 219. He thought Garner was 17 or 18 years old and [471 U.S. 1, 4] about 5' 5" or 5' 7" tall.2 While Garner was crouched at the base of the fence, Hymon called out "police, halt" and took a few steps toward him. Garner then began to climb over the fence. Convinced that if Garner made it over the fence he would elude capture,3 Hymon shot him. The bullet hit Garner in the back of the head. Garner was taken by ambulance to a hospital, where he died on the operating table. Ten dollars and a purse taken from the house were found on his body.4

In using deadly force to prevent the escape, Hymon was acting under the authority of a Tennessee statute and pursuant to Police Department policy. The statute provides that "[i]f, after notice of the intention to arrest the defendant, he either flee or forcibly resist, the officer may use all the necessary means to effect the arrest." Tenn. Code Ann. [471 U.S. 1, 5] 40-7-108 (1982).5 The Department policy was slightly more restrictive than the statute, but still allowed the use of deadly force in cases of burglary. App. 140-144. The incident was reviewed by the Memphis Police Firearm's Review Board and presented to a grand jury. Neither took any action. Id., at 57.

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

Garner's father then brought this action in the Federal District Court for the Western District of Tennessee, seeking damages under 42 U.S.C. 1983 for asserted violations of Garner's constitutional rights. The complaint alleged that the shooting violated the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. It named as defendants Officer Hymon, the Police Department, its Director, and the Mayor and city of Memphis. After a 3-day bench trial, the District Court entered judgment for all defendants. It dismissed the claims against the Mayor and the Director for lack of evidence. It then concluded that Hymon's actions were authorized by the Tennessee statute, which in turn was constitutional. Hymon had employed the only reasonable and practicable means of preventing Garner's escape. Garner had "recklessly and heedlessly attempted to vault over the fence to escape, thereby assuming the risk of being fired upon." App. to Pet. for Cert. A10.

The Court of Appeals for the Sixth Circuit affirmed with regard to Hymon, finding that he had acted in good-faith reliance on the Tennessee statute and was therefore within the scope of his qualified immunity. 600 F.2d 52 (1979). It remanded for reconsideration of the possible liability of the city, however, in light of Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978), which had come down after the District Court's decision. The District Court was [471 U.S. 1, 6] directed to consider whether a city enjoyed a qualified immunity, whether the use of deadly force and hollow point bullets in these circumstances was constitutional, and whether any unconstitutional municipal conduct flowed from a "policy or custom" as required for liability under Monell. 600 F.2d, at 54-55.

The District Court concluded that Monell did not affect its decision. While acknowledging some doubt as to the possible immunity of the city, it found that the statute, and Hymon's actions, were constitutional. Given this conclusion, it declined to consider the "policy or custom" question. App. to Pet. for Cert. A37-A39.

The Court of Appeals reversed and remanded. 710 F.2d 240 (1983). It reasoned that the killing of a fleeing suspect is a "seizure" under the Fourth Amendment,6 and is therefore constitutional only if "reasonable." The Tennessee statute failed as applied to this case because it did not adequately limit the use of deadly force by distinguishing between felonies of different magnitudes - "the facts, as found, did not justify the use of deadly force under the Fourth Amendment." Id., at 246. Officers cannot resort to deadly force unless they "have probable cause . . . to believe that the suspect [has committed a felony and] poses a threat to the safety of the officers or a danger to the community if left at large." Ibid.7 [471 U.S. 1, 7]

The State of Tennessee, which had intervened to defend the statute, see 28 U.S.C. 2403(b), appealed to this Court. The city filed a petition for certiorari. We noted probable jurisdiction in the appeal and granted the petition. 465 U.S. 1098 (1984).

II

Whenever an officer restrains the freedom of a person to walk away, he has seized that person. United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). While it is not always clear just when minimal police interference becomes a seizure, see United States v. Mendenhall, 446 U.S. 544 (1980), there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.

A

A police officer may arrest a person if he has probable cause to believe that person committed a crime. E. g., United States v. Watson, 423 U.S. 411 (1976). Petitioners and appellant argue that if this requirement is satisfied the Fourth Amendment has nothing to say about how that seizure is made. This submission ignores the many cases in which this Court, by balancing the extent of the intrusion against the need for it, has examined the reasonableness of [471 U.S. 1, 8] the manner in which a search or seizure is conducted. To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

interests alleged to justify the intrusion." United States v. Place, <u>462 U.S. 696, 703</u> (1983); see Delaware v. Prouse, <u>440 U.S. 648, 654</u> (1979); United States v. Martinez-Fuerte, <u>428 U.S. 543, 555</u> (1976). We have described "the balancing of competing interests" as "the key principle of the Fourth Amendment." Michigan v. Summers, <u>452 U.S. 692, 700</u>, n. 12 (1981). See also Camara v. Municipal Court, <u>387 U.S. 523, 536</u>-537 (1967). Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out. United States v. Ortiz, <u>422 U.S. 891, 895</u> (1975); Terry v. Ohio, <u>392 U.S. 1, 28</u>-29 (1968).

Applying these principles to particular facts, the Court has held that governmental interests did not support a lengthy detention of luggage, United States v. Place, supra, an airport seizure not "carefully tailored to its underlying justification," Florida v. Royer, <u>460 U.S. 491, 500</u> (1983) (plurality opinion), surgery under general anesthesia to obtain evidence, Winston v. Lee, <u>470 U.S. 753</u> (1985), or detention for fingerprinting without probable cause, Davis v. Mississippi, <u>394 U.S. 721</u> (1969); Hayes v. Florida, <u>470 U.S. 811</u> (1985). On the other hand, under the same approach it has upheld the taking of fingernail scrapings from a suspect, Cupp v. Murphy, <u>412 U.S. 291</u> (1973), an unannounced entry into a home to prevent the destruction of evidence, Ker v. California, <u>374 U.S. 23</u> (1963), administrative housing inspections without probable cause to believe that a code violation will be found, Camara v. Municipal Court, supra, and a blood test of a drunken-driving suspect, Schmerber v. California, <u>384 U.S. 757</u> (1966). In each of these cases, the question was whether [471 U.S. 1, 9] the totality of the circumstances justified a particular sort of search or seizure.

B

The same balancing process applied in the cases cited above demonstrates that, notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. The intrusiveness of a seizure by means of deadly force is unmatched. The suspect's fundamental interest in his own life need not be elaborated upon. The use of deadly force also frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment. Against these interests are ranged governmental interests in effective law enforcement.<u>8</u> It is argued that overall violence will be reduced by encouraging the peaceful submission of suspects who know that they may be shot if they flee. Effectiveness in making arrests requires the resort to deadly [471 U.S. 1, 10] force, or at least the meaningful threat thereof. "Being able to arrest such individuals is a condition precedent to the state's entire system of law enforcement." Brief for Petitioners 14.

Without in any way disparaging the importance of these goals, we are not convinced that the use of deadly force is a sufficiently productive means of accomplishing them to justify the killing of nonviolent suspects. Cf. Delaware v. Prouse, supra, at 659. The use of deadly force is a self-defeating way of apprehending a suspect and so setting the criminal justice mechanism in motion. If successful, it guarantees that that mechanism will not be set in motion. And while the meaningful threat of deadly force might be thought to lead to the arrest of more live suspects by discouraging escape attempts,<u>9</u> the presently available evidence does not support this thesis.<u>10</u> The fact is that a majority of police departments [471 U.S. 1, 11] in this country have forbidden the use of deadly force against nonviolent suspects. See infra, at 18-19. If those charged with the enforcement of the criminal law have abjured the use of deadly force in arresting nondangerous felons, there is a substantial basis for doubting that the use of such force is an essential attribute of the arrest power in all felony cases. See Schumann v. McGinn, 307 Minn. 446, 472, 240 N. W. 2d 525, 540 (1976) (Rogosheske, J., dissenting in part). Petitioners and appellant have not persuaded us that shooting nondangerous fleeing suspects is so vital as to outweigh the suspect's interest in his own life.

The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. It is no doubt unfortunate when a suspect who is in sight escapes, but the fact that the police arrive a little late or are a little slower afoot does not always justify killing the suspect. A police officer may not seize an unarmed, nondangerous suspect by

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.

It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where [471 U.S. 1, 12] feasible, some warning has been given. As applied in such circumstances, the Tennessee statute would pass constitutional muster.

### III

### A

It is insisted that the Fourth Amendment must be construed in light of the common-law rule, which allowed the use of whatever force was necessary to effect the arrest of a fleeing felon, though not a misdemeanant. As stated in Hale's posthumously published Pleas of the Crown:

> "[I]f persons that are pursued by these officers for felony or the just suspicion thereof . . . shall not yield themselves to these officers, but shall either resist or fly before they are apprehended or being apprehended shall rescue themselves and resist or fly, so that they cannot be otherwise apprehended, and are upon necessity slain therein, because they cannot be otherwise taken, it is no felony." 2 M. Hale, Historia Placitorum Coronae 85 (1736).

See also 4 W. Blackstone, Commentaries *289. Most American jurisdictions also imposed a flat prohibition against the use of deadly force to stop a fleeing misdemeanant, coupled with a general privilege to use such force to stop a fleeing felon. E. g., Holloway v. Moser, 193 N.C. 185, 136 S. E. 375 (1927); State v. Smith, 127 Iowa 534, 535, 103 N. W. 944, 945 (1905); Reneau v. State, 70 Tenn. 720 (1879); Brooks v. Commonwealth, 61 Pa. 352 (1869); Roberts v. State, 14 Mo. 138 (1851); see generally R. Perkins & R. Boyce, Criminal Law 1098-1102 (3d ed. 1982); Day, Shooting the Fleeing Felon: State of the Law, 14 Crim. L. Bull. 285, 286-287 (1978); Wilgus, Arrest Without a Warrant, 22 Mich. L. Rev. 798, 807-816 (1924). But see Storey v. State, 71 Ala. 329 (1882); State v. Bryant, 65 N.C. 327, 328 (1871); Caldwell v. State, 41 Tex. 86 (1874). [471 U.S. 1, 13]

The State and city argue that because this was the prevailing rule at the time of the adoption of the Fourth Amendment and for some time thereafter, and is still in force in some States, use of deadly force against a fleeing felon must be "reasonable." It is true that this Court has often looked to the common law in evaluating the reasonableness, for Fourth Amendment purposes, of police activity. See, e. g., United States v. Watson, 423 U.S. 411, 418-419 (1976); Gerstein v. Pugh, 420 U.S. 103, 111, 114 (1975); Carroll v. United States, 267 U.S. 132, 149-153 (1925). On the other hand, it "has not simply frozen into constitutional law those law enforcement practices that existed at the time of the Fourth Amendment's passage." Payton v. New York, 445 U.S. 573, 591, n. 33 (1980). Because of sweeping change in the legal and technological context, reliance on the common-law rule in this case would be a mistaken literalism that ignores the purposes of a historical inquiry.

### B

It has been pointed out many times that the common-law rule is best understood in light of the fact that it arose at a time when virtually all felonies were punishable by death.11 "Though effected without the protections and formalities of an orderly trial and conviction, the killing of a resisting or [471 U.S. 1, 14] fleeing felon resulted in no greater consequences than those authorized for punishment of the felony of which the individual was charged or suspected." American Law Institute, Model Penal Code 3.07, Comment 3, p. 56 (Tentative Draft No. 8, 1958) (hereinafter Model Penal Code Comment). Courts have also justified the common-law rule by emphasizing the relative dangerousness of felons. See, e. g.,

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

Schumann v. McGinn, 307 Minn., at 458, 240 N. W. 2d, at 533; Holloway v. Moser, supra, at 187, 136 S. E., at 376 (1927).

Neither of these justifications makes sense today. Almost all crimes formerly punishable by death no longer are or can be. See, e. g., Enmund v. Florida, 458 U.S. 782 (1982); Coker v. Georgia, 433 U.S. 584 (1977). And while in earlier times "the gulf between the felonies and the minor offences was broad and deep," 2 Pollock & Maitland 467, n. 3; Carroll v. United States, supra, at 158, today the distinction is minor and often arbitrary. Many crimes classified as misdemeanors, or nonexistent, at common law are now felonies. Wilgus, 22 Mich. L. Rev., at 572-573. These changes have undermined the concept, which was questionable to begin with, that use of deadly force against a fleeing felon is merely a speedier execution of someone who has already forfeited his life. They have also made the assumption that a "felon" is more dangerous than a misdemeanant untenable. Indeed, numerous misdemeanors involve conduct more dangerous than many felonies.12

There is an additional reason why the common-law rule cannot be directly translated to the present day. The common-law rule developed at a time when weapons were rudimentary. Deadly force could be inflicted almost solely in a hand-to-hand struggle during which, necessarily, the safety [471 U.S. 1, 15] of the arresting officer was at risk. Handguns were not carried by police officers until the latter half of the last century. L. Kennett & J. Anderson, The Gun in America 150-151 (1975). Only then did it become possible to use deadly force from a distance as a means of apprehension. As a practical matter, the use of deadly force under the standard articulation of the common-law rule has an altogether different meaning - and harsher consequences - now than in past centuries. See Wechsler & Michael, A Rationale for the Law of Homicide: I, 37 Colum. L. Rev. 701, 741 (1937).13

One other aspect of the common-law rule bears emphasis. It forbids the use of deadly force to apprehend a misdemeanant, condemning such action as disproportionately severe. See Holloway v. Moser, 193 N.C., at 187, 136 S. E., at 376; State v. Smith, 127 Iowa, at 535, 103 N. W., at 945. See generally Annot., 83 A. L. R. 3d 238 (1978).

In short, though the common-law pedigree of Tennessee's rule is pure on its face, changes in the legal and technological context mean the rule is distorted almost beyond recognition when literally applied.

c

In evaluating the reasonableness of police procedures under the Fourth Amendment, we have also looked to prevailing [471 U.S. 1, 16] rules in individual jurisdictions. See, e. g., United States v. Watson, 423 U.S. , at 421-422. The rules in the States are varied. See generally Comment, 18 Ga. L. Rev. 137, 140-144 (1983). Some 19 States have codified the common-law rule,14 though in two of these the courts have significantly limited the statute.15 Four States, though without a relevant statute, apparently retain the common-law rule.16 Two States have adopted the Model Penal Code's [471 U.S. 1, 17] provision verbatim.17 Eighteen others allow, in slightly varying language, the use of deadly force only if the suspect has committed a felony involving the use or threat of physical or deadly force, or is escaping with a deadly weapon, or is likely to endanger life or inflict serious physical injury if not arrested.18 Louisiana and Vermont, though without statutes or case law on point, do forbid the use of deadly force to prevent any but violent felonies.19 The remaining States either have no relevant statute or case law, or have positions that are unclear.20 [471 U.S. 1, 18]

It cannot be said that there is a constant or overwhelming trend away from the common-law rule. In recent years, some States have reviewed their laws and expressly rejected abandonment of the common-law rule.21 Nonetheless, the long-term movement has been away from the rule that deadly force may be used against any fleeing felon, and that remains the rule in less than half the States.

This trend is more evident and impressive when viewed in light of the policies adopted by the police departments themselves. Overwhelmingly, these are more restrictive than the common-law rule. C. Milton, J. Halleck, J. Lardner, & G. Abrecht, Police Use of Deadly Force 45-46 (1977). The Federal

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

Bureau of Investigation and the New York City Police Department, for example, both forbid the use of firearms except when necessary to prevent death or grievous bodily harm. Id., at 40-41; App. 83. For accreditation by the Commission on Accreditation for Law Enforcement Agencies, a department must restrict the use of deadly force to situations where "the officer reasonably believes that the action is in defense of human life . . . or in defense of any person in immediate danger of serious physical injury." Commission on Accreditation for Law Enforcement Agencies, Inc., Standards for Law Enforcement Agencies 1-2 (1983) (italics deleted). A 1974 study reported that the police department regulations in a majority of the large cities of the United States allowed the firing of a weapon only when a [471 U.S. 1, 19] felon presented a threat of death or serious bodily harm. Boston Police Department, Planning & Research Division, The Use of Deadly Force by Boston Police Personnel (1974), cited in Mattis v. Schnarr, 547 F.2d 1007, 1016, n. 19 (CA8 1976), vacated as moot sub nom. Ashcroft v. Mattis, 431 U.S. 171 (1977). Overall, only 7.5% of departmental and municipal policies explicitly permit the use of deadly force against any felon; 86.8% explicitly do not. K. Matulia, A Balance of Forces: A Report of the International Association of Chiefs of Police 161 (1982) (table). See also Record 1108-1368 (written policies of 44 departments). See generally W. Geller & K. Karales, Split-Second Decisions 33-42 (1981); Brief for Police Foundation et al. as Amici Curiae. In light of the rules adopted by those who must actually administer them, the older and fading common-law view is a dubious indicium of the constitutionality of the Tennessee statute now before us.

D

Actual departmental policies are important for an additional reason. We would hesitate to declare a police practice of long standing "unreasonable" if doing so would severely hamper effective law enforcement. But the indications are to the contrary. There has been no suggestion that crime has worsened in any way in jurisdictions that have adopted, by legislation or departmental policy, rules similar to that announced today. Amici note that "[a]fter extensive research and consideration, [they] have concluded that laws permitting police officers to use deadly force to apprehend unarmed, non-violent fleeing felony suspects actually do not protect citizens or law enforcement officers, do not deter crime or alleviate problems caused by crime, and do not improve the crime-fighting ability of law enforcement agencies." Id., at 11. The submission is that the obvious state interests in apprehension are not sufficiently served to warrant the use of lethal weapons against all fleeing felons. See supra, at 10-11, and n. 10. [471 U.S. 1, 20]

Nor do we agree with petitioners and appellant that the rule we have adopted requires the police to make impossible, split-second evaluations of unknowable facts. See Brief for Petitioners 25; Brief for Appellant 11. We do not deny the practical difficulties of attempting to assess the suspect's dangerousness. However, similarly difficult judgments must be made by the police in equally uncertain circumstances. See, e. g., Terry v. Ohio, 392 U.S., at 20, 27. Nor is there any indication that in States that allow the use of deadly force only against dangerous suspects, see nn. 15, 17-19, supra, the standard has been difficult to apply or has led to a rash of litigation involving inappropriate second-guessing of police officers' split-second decisions. Moreover, the highly technical felony/misdemeanor distinction is equally, if not more, difficult to apply in the field. An officer is in no position to know, for example, the precise value of property stolen, or whether the crime was a first or second offense. Finally, as noted above, this claim must be viewed with suspicion in light of the similar self-imposed limitations of so many police departments.

IV

The District Court concluded that Hymon was justified in shooting Garner because state law allows, and the Federal Constitution does not forbid, the use of deadly force to prevent the escape of a fleeing felony suspect if no alternative means of apprehension is available. See App. to Pet. for Cert. A9-A11, A38. This conclusion made a determination of Garner's apparent dangerousness unnecessary. The court did find, however, that Garner appeared to be unarmed, though Hymon could not be certain that was the case. Id., at A4, A23. See also App. 41, 56; Record 219. Restated in Fourth Amendment terms, this means Hymon had no articulable basis to think Garner was armed.

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

In reversing, the Court of Appeals accepted the District Court's factual conclusions and held that "the facts, as found, did not justify the use of deadly force." 710 F.2d, at 246. [471 U.S. 1, 21] We agree. Officer Hymon could not reasonably have believed that Garner - young, slight, and unarmed - posed any threat. Indeed, Hymon never attempted to justify his actions on any basis other than the need to prevent an escape. The District Court stated in passing that "[t]he facts of this case did not indicate to Officer Hymon that Garner was `nondangerous.'" App. to Pet. for Cert. A34. This conclusion is not explained, and seems to be based solely on the fact that Garner had broken into a house at night. However, the fact that Garner was a suspected burglar could not, without regard to the other circumstances, automatically justify the use of deadly force. Hymon did not have probable cause to believe that Garner, whom he correctly believed to be unarmed, posed any physical danger to himself or others.

The dissent argues that the shooting was justified by the fact that Officer Hymon had probable cause to believe that Garner had committed a nighttime burglary. Post, at 29, 32. While we agree that burglary is a serious crime, we cannot agree that it is so dangerous as automatically to justify the use of deadly force. The FBI classifies burglary as a "property" rather than a "violent" crime. See Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 1 (1984).22 Although the armed burglar would present a different situation, the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous. This case demonstrates as much. See also Solem v. Helm, 463 U.S. 277, 296-297, and nn. 22-23 (1983). In fact, the available statistics demonstrate that burglaries only rarely involve physical violence. During the 10-year period from 1973-1982, only 3.8% of all burglaries involved violent crime. Bureau of Justice Statistics, Household [471 U.S. 1, 22] Burglary 4 (1985).23 See also T. Reppetto, Residential Crime 17, 105 (1974); Conklin & Bittner, Burglary in a Suburb, 11 Criminology 208, 214 (1973).

V

We wish to make clear what our holding means in the context of this case. The complaint has been dismissed as to all the individual defendants. The State is a party only by virtue of 28 U.S.C. 2403(b) and is not subject to liability. The possible liability of the remaining defendants - the Police Department and the city of Memphis - hinges on Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978), and is left for remand. We hold that the statute is invalid insofar as it purported to give Hymon the authority to act as he did. As for the policy of the Police Department, the absence of any discussion of this issue by the courts below, and the uncertain state of the record, preclude any consideration of its validity.

The judgment of the Court of Appeals is affirmed, and the case is remanded for further proceedings consistent with this opinion.

So ordered.

Footnotes

[Footnote 1] The owner of the house testified that no lights were on in the house, but that a back door light was on. Record 160. Officer Hymon, though uncertain, stated in his deposition that there were lights on in the house. Id., at 209.

[Footnote 2] In fact, Garner, an eighth-grader, was 15. He was 5' 4" tall and weighed somewhere around 100 or 110 pounds. App. to Pet. for Cert. A5.

[Footnote 3] When asked at trial why he fired, Hymon stated:

"Well, first of all it was apparent to me from the little bit that I knew about the area at the time that he was going to get away because, number 1, I couldn't get to him. My partner then couldn't find where he was because, you know, he was late coming around. He didn't know where I was talking about. I couldn't get to him because of the fence here, I couldn't have jumped this fence and come up, consequently jumped this fence and caught him before he got away because he was already up on the fence, just one leap and he was already over the fence, and so there is no way that I could have

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

caught him." App. 52.

He also stated that the area beyond the fence was dark, that he could not have gotten over the fence easily because he was carrying a lot of equipment and wearing heavy boots, and that Garner, being younger and more energetic, could have outrun him. Id., at 53-54.

[Footnote 4] Garner had rummaged through one room in the house, in which, in the words of the owner, "[a]ll the stuff was out on the floors, all the drawers was pulled out, and stuff was scattered all over." Id., at 34. The owner testified that his valuables were untouched but that, in addition to the purse and the 10 dollars, one of his wife's rings was missing. The ring was not recovered. Id., at 34-35.

[Footnote 5] Although the statute does not say so explicitiy, Tennessee law forbids the use of deadly force in the arrest of a misdemeanant. See Johnson v. State, 173 Tenn. 134, 114 S. W. 2d 819 (1938).

[Footnote 6] "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const., Amdt. 4.

[Footnote 7] The Court of Appeals concluded that the rule set out in the Model Penal Code "accurately states Fourth Amendment limitations on the use of deadly force against fleeing felons." 710 F.2d, at 247. The relevant portion of the Model Penal Code provides:

"The use of deadly force is not justifiable . . . unless (i) the arrest is for a felony; and (ii) the person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a peace officer; and (iii) the actor believes that the force employed creates no substantial risk of injury to innocent persons; and (iv) the actor believes [471 U.S. 1, 7] that (1) the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or (2) there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed." American Law Institute, Model Penal Coded 3.07(2)(b) (Proposed Official Draft 1962).

The court also found that "[a]n analysis of the facts of this case under the Due Process Clause" required the same result, because the statute was not narrowly drawn to further a compelling state interest. 710 F.2d, at 246-247. The court considered the generalized interest in effective law enforcement sufficiently compelling only when the the suspect is dangerous. Finally, the court held, relying on Owen v. City of Independence, 445 U.S. 622 (1980), that the city was not immune.

[Footnote 8] The dissent emphasizes that subsequent investigation cannot replace immediate apprehension. We recognize that this is so, see n. 13, infra; indeed, that is the reason why there is any dispute. If subsequent arrest were assured, no one would argue that use of deadly force was justified. Thus, we proceed on the assumption that subsequent arrest is not likely. Nonetheless, it should be remembered that failure to apprehend at the scene does not necessarily mean that the suspect will never be caught.

In lamenting the inadequacy of later investigation, the dissent relies on the report of the President's Commission on Law Enforcement and Administration of Justice. It is worth noting that, notwithstanding its awareness of this problem, the Commission itself proposed a policy for use of deadly force arguably even more stringent than the formulation we adopt today. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Police 189 (1967). The Commission proposed that deadly force be used only to apprehend "perpetrators who, in the course of their crime threatened the use of deadly force, or if the officer believes there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if his apprehension is delayed." In addition, the officer would have "to know, as a virtual certainty, that the suspect committed an offense for which the use of deadly force is permissible." Ibid.

[Footnote 9] We note that the usual manner of deterring illegal conduct - through punishment - has been largely ignored in connection with flight from arrest. Arkansas, for example, specifically excepts flight from

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

arrest from the offense of "obstruction of governmental operations." The commentary notes that this "reflects the basic policy judgment that, absent the use of force or violence, a mere attempt to avoid apprehension by a law enforcement officer does not give rise to an independent offense." Ark. Stat. Ann. 41-2802(3)(a) (1977) and commentary. In the few States that do outlaw flight from an arresting officer, the crime is only a misdemeanor. See, e. g., Ind. Code 35-44-3-3 (1982). Even forceful resistance, though generally a separate offense, is classified as a misdemeanor. E. g., Ill. Rev. Stat., ch. 38, _ 31-1 (1984); Mont. Code Ann. 45-7-301 (1984); N. H. Rev. Stat. Ann. 642:2 (Supp. 1983); Ore. Rev. Stat. 162.315 (1983).

This lenient approach does avoid the anomaly of automatically transforming every fleeing misdemeanant into a fleeing felon - subject, under the common-law rule, to apprehension by deadly force - solely by virtue of his flight. However, it is in real tension with the harsh consequences of flight in cases where deadly force is employed. For example, Tennessee does not outlaw fleeing from arrest. The Memphis City Code does, 22-34.1 (Supp. 17, 1971), subjecting the offender to a maximum fine of $50, 1-8 (1967). Thus, Garner's attempted escape subjected him to (a) a $50 fine, and (b) being shot.

[Footnote 10] See Sherman, Reducing Police Gun use, in Control in the Police Organization 98, 120-123 (M. Punch ed. 1983); Fyfe, Observations on Police [471 U.S. 1, 11] Deadly Force, 27 Crime & Delinquency 376, 378-381 (1981); W. Geller & K. Karales, Split-Second Decisions 67 (1981); App. 84 (affidavit of William Bracey, Chief of Patrol, New York City Police Department). See generally Brief for Police Foundation et al. as Amici Curiae.

[Footnote 11] The roots of the concept of a "felony" lie not in capital punishment but in forfeiture. 2 F. Pollock & F. Maitland, The History of English Law 465 (2d ed. 1909) (hereinafter Pollock & Maitland). Not all felonies were always punishable by death. See id., at 466-467, n. 3. Nonetheless, the link was profound. Blackstone was able to write: "The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them; and to this usage the interpretations of the law do now conform. And therefore if a statute makes any new offence felony, the law implies that is shall be punished with death, viz. by hanging, as well as with forfeiture . . . ." 4 W. Blackstone, Commentaries *98. See also R. Perkins & R. Boyce, Criminal Law 14-15 (3d ed. 1982); 2 Pollock & Maitland 511.

[Footnote 12] White-collar crime, for example, poses a less significant physical threat than, say, drunken driving. See Welsh v. Wisconsin, 466 U.S. 740 (1984); id., at 755 (BLACKMUN, J., concurring). See Model Penal Code Comment, at 57.

[Footnote 13] It has been argued that sophisticated techniques of apprehension and increased communication between the police in different jurisdictions have made it more likely that an escapee will be caught than was once the case, and that this change has also reduced the "reasonableness" of the use of deadly force to prevent escape. E. g., Sherman, Execution Without Trial: Police Homicide and the Constitution, 33 Vand. L. Rev. 71, 76 (1980). We are unaware of any data that would permit sensible evaluation of this claim. Current arrest rates are sufficiently low, however, that we have some doubt whether in past centuries the failure to arrest at the scene meant that the police had missed their only chance in a way that is not presently the case. In 1983, 21% of the offenses in the Federal Bureau of Investigation crime index were cleared by arrest. Federal Bureau of Investigation, Uniform Crime Reports, Crime in the United States 159 (1984). The clearance rate for burglary was 15%. Ibid.

[Footnote 14] Ala. Code 13A-3-27 (1982); Ark. Stat. Ann. 41-510 (1977); Cal. Penal Code Ann. 196 (West 1970); Conn. Gen. Stat. 53a-22 (1972); Fla. Stat. 776.05 (1983); Idaho Code 19-610 (1979); Ind. Code 35-41-3-3 (1982); Kan. Stat. Ann. 21-3215 (1981); Miss. Code Ann. 97-3-15(d) (Supp. 1984); Mo. Rev. Stat. 563.046 (1979); Nev. Rev. Stat. 200.140 (1983); N. M. Stat. Ann. 30-2-6 (1984); Okla. Stat., Tit. 21, 732 (1981); R. I. Gen. Laws 12-7-9 (1981); S. D. Codified Laws 22-16-32, 22-16-33 (1979); Tenn. Code Ann. 40-7-108 (1982); Wash. Rev. Code 9A 16.040(3) (1977). Oregon limits use of deadly force to violent felons, but also allows its use against any felon if "necessary." Ore. Rev. Stat. 161.239 (1983). Wisconsin's statute is ambiguous, but should probably be added to this list. Wis. Stat. 939.45(4) (1981-1982) (officer may use force necessary for "a reasonable accomplishment of a lawful arrest"). But see

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

Clark v. Ziedonis, 368 F. Supp. 544 (ED Wis. 1973), aff'd on other grounds, 513 F.2d 79 (CA7 1975).

[Footnote 15] In California, the police may use deadly force to arrest only if the crime for which the arrest is sought was "a forcible and atrocious one which threatens death or serious bodily harm," or there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if apprehension is delayed. Kortum v. Alkire, 69 Cal. App. 3d 325, 333, 138 Cal. Rptr. 26, 30-31 (1977). See also People v. Ceballos, 12 Cal. 3d 470, 476-484, 526 P.2d 241, 245-250 (1974); Long Beach Police Officers Assn. v. Long Beach, 61 Cal. App. 3d 364, 373-374, 132 Cal. Rptr. 348, 353-354 (1976). In Indiana, deadly force may be used only to prevent injury, the imminent danger of injury or force, or the threat of force. It is not permitted simply to prevent escape. Rose v. State, 431 N. E. 2d 521 (Ind. App. 1982).

[Footnote 16] These are Michigan, Ohio, Virginia, and West Virginia. Werner v. Hartfelder, 113 Mich. App. 747, 318 N. W. 2d 825 (1982); State v. Foster, 60 Ohio Misc. 46, 59-66, 396 N. E. 2d 246, 255-258 (Com. Pl. 1979) (citing cases); Berry v. Hamman, 203 Va. 596, 125 S. E. 2d 851 (1962); Thompson v. Norfolk & W. R. Co., 116 W. Va. 705, 711-712, 182 S. E. 880, 883-884 (1935).

[Footnote 17] Haw. Rev. Stat. 703-307 (1976); Neb. Rev. Stat. 28-1412 (1979). Massachusetts probably belongs in this category. Though it once rejected distinctions between felonies, Uraneck v. Lima, 359 Mass. 749, 750, 269 N. E. 2d 670, 671 (1971), it has since adopted the Model Penal Code limitations with regard to private citizens, Commonwealth v. Klein, 372 Mass. 823, 363 N. E. 2d 1313 (1977), and seems to have extended that decision to police officers, Julian v. Randazzo, 380 Mass. 391, 403 N. E. 2d 931 (1980).

[Footnote 18] Alaska Stat. Ann. 11.81.370(a) (1983); Ariz. Rev. Stat. Ann. 13-410 (1978); Colo. Rev. Stat. 18-1-707 (1978); Del. Code Ann., Tit. 11, 467 (1979) (felony involving physical force and a substantial risk that the suspect will cause death or serious bodily injury or will never be recaptured); Ga. Code 16-3-21(a) (1984); Ill. Rev. Stat., ch. 38, _ 7-5 (1984); Iowa Code 804.8 (1983) (suspect has used or threatened deadly force in commission of a felony, or would use deadly force if not caught); Ky. Rev. Stat. 503.090 (1984) (suspect committed felony involving use or threat of physical force likely to cause death or serious injury, and is likely to endanger life unless apprehended without delay); Me. Rev. Stat. Ann., Tit. 17-A, 107 (1983) (commentary notes that deadly force may be used only "where the person to be arrested poses a threat to human life"); Minn. Stat. 609.066 (1984); N. H. Rev. Stat. Ann. 627:5(II) (Supp. 1983); N. J. Stat. Ann. 2C-3-7 (West 1982); N. Y. Penal Law 35.30 (McKinney Supp. 1984-1985); N.C. Gen. Stat. 15A-401 (1983); N. D. Cent. Code 12.1-05-07.2.d (1976); 18 Pa. Cons. Stat. 508 (1982); Tex. Penal Code Ann. 9.51(c) (1974); Utah Code Ann. 76-2-404 (1978).

[Footnote 19] See La. Rev. Stat. Ann. 14:20(2) (West 1974); Vt. Stat. Ann., Tit. 13, 2305 (1974 and Supp. 1984). A Federal District Court has interpreted the Louisiana statute to limit the use of deadly force against fleeing suspects to situations where "life itself is endangered or great bodily harm is threatened." Sauls v. Hutto, 304 F. Supp. 124, 132 (ED La. 1969).

[Footnote 20] These are Maryland, Montana, South Carolina, and Wyoming. A Maryland appellate court has indicated, however, that deadly force may not be used against a felon who "was in the process of fleeing and, at the [471 U.S. 1, 18] time, presented no immediate danger to . . . anyone . . . ." Giant Food, Inc. v. Scherry, 51 Md. App. 586, 589, 596, 444 A. 2d 483, 486, 489 (1982).

[Footnote 21] In adopting its current statute in 1979, for example, Alabama expressly chose the common-law rule over more restrictive provisions. Ala. Code 13A-3-27, Commentary, pp. 67-63 (1982). Missouri likewise considered but rejected a proposal akin to the Model Penal Code rule. See Mattis v. Schnarr, 547 F.2d 1007, 1022 (CA8 1976) (Gibson, C. J., dissenting), vacated as moot sub nom. Ashcroft v. Mattis, 431 U.S. 171 (1977). Idaho, whose current statute codifies the common-law rule, adopted the Model Penal Code in 1971, but abandoned it in 1972.

[Footnote 22] In a recent report, the Department of Corrections of the District of Columbia also noted that

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

"there is nothing inherently dangerous or violent about the offense," which is a crime against property. D.C. Department of Corrections, Prisoner Screening Project 2 (1985).

[Footnote 23] The dissent points out that three-fifths of all rapes in the home, three-fifths of all home robberies, and about a third of home assaults are committed by burglars. Post, at 26-27. These figures mean only that if one knows that a suspect committed a rape in the home, there is a good chance that the suspect is also a burglar. This has nothing to do with the question here, which is whether the fact that someone has committed a burglary indicates that he has committed, or might commit, a violent crime.

The dissent also points out that this 3.8% adds up to 2.8 million violent crimes over a 10-year period, as if to imply that today's holding will let loose 2.8 million violent burglars. The relevant universe is, of course, far smaller. At issue is only that tiny fraction of cases where violence has [471 U.S. 1, 23] taken place and an officer who has no other means of apprehending the suspect is unaware of its occurrence.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

The Court today holds that the Fourth Amendment prohibits a police officer from using deadly force as a last resort to [471 U.S. 1, 23] apprehend a criminal suspect who refuses to halt when fleeing the scene of a nighttime burglary. This conclusion rests on the majority's balancing of the interests of the suspect and the public interest in effective law enforcement. Ante, at 8. Notwithstanding the venerable common-law rule authorizing the use of deadly force if necessary to apprehend a fleeing felon, and continued acceptance of this rule by nearly half the States, ante, at 14, 16-17, the majority concludes that Tennessee's statute is unconstitutional inasmuch as it allows the use of such force to apprehend a burglary suspect who is not obviously armed or otherwise dangerous. Although the circumstances of this case are unquestionably tragic and unfortunate, our constitutional holdings must be sensitive both to the history of the Fourth Amendment and to the general implications of the Court's reasoning. By disregarding the serious and dangerous nature of residential burglaries and the longstanding practice of many States, the Court effectively creates a Fourth Amendment right allowing a burglary suspect to flee unimpeded from a police officer who has probable cause to arrest, who has ordered the suspect to halt, and who has no means short of firing his weapon to prevent escape. I do not believe that the Fourth Amendment supports such a right, and I accordingly dissent.

I

The facts below warrant brief review because they highlight the difficult, split-second decisions police officers must make in these circumstances. Memphis Police Officers Elton Hymon and Leslie Wright responded to a late-night call that a burglary was in progress at a private residence. When the officers arrived at the scene, the caller said that "they" were breaking into the house next door. App. in No. 81-5605 (CA6), p. 207. The officers found the residence had been forcibly entered through a window and saw lights [471 U.S. 1, 24] on inside the house. Officer Hymon testified that when he saw the broken window he realized "that something was wrong inside," id., at 656, but that he could not determine whether anyone - either a burglar or a member of the household - was within the residence. Id., at 209. As Officer Hymon walked behind the house, he heard a door slam. He saw Edward Eugene Garner run away from the house through the dark and cluttered backyard. Garner crouched next to a 6-foot-high fence. Officer Hymon thought Garner was an adult and was unsure whether Garner was armed because Hymon "had no idea what was in the hand [that he could not see] or what he might have had on his person." Id., at 658-659. In fact, Garner was 15 years old and unarmed. Hymon also did not know whether accomplices remained inside the house. Id., at 657. The officer identified himself as a police officer and ordered Garner to halt. Garner paused briefly and then sprang to the top of the fence. Believing that Garner would escape if he climbed over the fence, Hymon fired his revolver and mortally wounded the suspected burglar.

Appellee-respondent, the deceased's father, filed a 42 U.S.C. 1983 action in federal court against Hymon, the city of Memphis, and other defendants, for asserted violations of Garner's constitutional rights. The District Court for the Western District of Tennessee held that Officer Hymon's actions were justified by a

Tennessee statute that authorizes a police officer to "use all the necessary means to effect the arrest," if "after notice of the intention to arrest the defendant, he either flee or forcibly resist." Tenn. Code Ann. 40-7-108 (1982). As construed by the Tennessee courts, this statute allows the use of deadly force only if a police officer has probable cause to believe that a person has committed a felony, the officer warns the person that he intends to arrest him, and the officer reasonably believes that no means less than such force will prevent the escape. See, e. g., Johnson v. State, 173 Tenn. 134, 114 S. W. 2d 819 [471 U.S. 1, 25] (1938). The District Court held that the Tennessee statute is constitutional and that Hymon's actions as authorized by that statute did not violate Garner's constitutional rights. The Court of Appeals for the Sixth Circuit reversed on the grounds that the Tennessee statute "authorizing the killing of an unarmed, nonviolent fleeing felon by police in order to prevent escape" violates the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment. 710 F.2d 240, 244 (1983).

The Court affirms on the ground that application of the Tennessee statute to authorize Officer Hymon's use of deadly force constituted an unreasonable seizure in violation of the Fourth Amendment. The precise issue before the Court deserves emphasis, because both the decision below and the majority obscure what must be decided in this case. The issue is not the constitutional validity of the Tennessee statute on its face or as applied to some hypothetical set of facts. Instead, the issue is whether the use of deadly force by Officer Hymon under the circumstances of this case violated Garner's constitutional rights. Thus, the majority's assertion that a police officer who has probable cause to seize a suspect "may not always do so by killing him," ante, at 9, is unexceptionable but also of little relevance to the question presented here. The same is true of the rhetorically stirring statement that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." ante, at 11. The question we must address is whether the Constitution allows the use of such force to apprehend a suspect who resists arrest by attempting to flee the scene of a nighttime burglary of a residence.

II

For purposes of Fourth Amendment analysis, I agree with the Court that Officer Hymon "seized" Garner by shooting him. Whether that seizure was reasonable and therefore permitted by the Fourth Amendment requires a careful balancing [471 U.S. 1, 26] of the important public interest in crime prevention and detection and the nature and quality of the intrusion upon legitimate interests of the individual. United States v. Place, 462 U.S. 696, 703 (1983). In striking this balance here, it is crucial to acknowledge that police use of deadly force to apprehend a fleeing criminal suspect falls within the "rubric of police conduct . . . necessarily [involving] swift action predicated upon the on-the-spot observations of the officer on the beat." Terry v. Ohio, 392 U.S. 1, 20 (1968). The clarity of hindsight cannot provide the standard for judging the reasonableness of police decisions made in uncertain and often dangerous circumstances. Moreover, I am far more reluctant than is the Court to conclude that the Fourth Amendment proscribes a police practice that was accepted at the time of the adoption of the Bill of Rights and has continued to receive the support of many state legislatures. Although the Court has recognized that the requirements of the Fourth Amendment must respond to the reality of social and technological change, fidelity to the notion of constitutional - as opposed to purely judicial - limits on governmental action requires us to impose a heavy burden on those who claim that practices accepted when the Fourth Amendment was adopted are now constitutionally impermissible. See, e. g., United States v. Watson, 423 U.S. 411, 416-421 (1976); Carroll v. United States, 267 U.S. 132, 149-153 (1925). Cf. United States v. Villamonte-Marquez, 462 U.S. 579, 585 (1983) (noting "impressive historical pedigree" of statute challenged under Fourth Amendment).

The public interest involved in the use of deadly force as a last resort to apprehend a fleeing burglary suspect relates primarily to the serious nature of the crime. Household burglaries not only represent the illegal entry into a person's home, but also "pos[e] real risk of serious harm to others." Solem v. Helm, 463 U.S. 277, 315-316 (1983) (BURGER, C. J., dissenting). According to recent Department of Justice statistics, "[t]hree-fifths of all rapes in the home, [471 U.S. 1, 27] three-fifths of all home robberies, and about a third of home aggravated and simple assaults are committed by burglars." Bureau of Justice Statistics Bulletin, Household Burglary 1 (January 1985). During the period 1973-1982, 2.8 million such

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

violent crimes were committed in the course of burglaries. Ibid. Victims of a forcible intrusion into their home by a nighttime prowler will find little consolation in the majority's confident assertion that "burglaries only rarely involve physical violence." Ante, at 21. Moreover, even if a particular burglary, when viewed in retrospect, does not involve physical harm to others, the "harsh potentialities for violence" inherent in the forced entry into a home preclude characterization of the crime as "innocuous, inconsequential, minor, or 'nonviolent.'" Solem v. Helm, supra, at 316 (BURGER, C. J., dissenting). See also Restatement of Torts 131, Comment g (1934) (burglary is among felonies that normally cause or threaten death or serious bodily harm); R. Perkins & R. Boyce, Criminal Law 1110 (3d ed. 1982) (burglary is dangerous felony that creates unreasonable risk of great personal harm).

Because burglary is a serious and dangerous felony, the public interest in the prevention and detection of the crime is of compelling importance. Where a police officer has probable cause to arrest a suspected burglar, the use of deadly force as a last resort might well be the only means of apprehending the suspect. With respect to a particular burglary, subsequent investigation simply cannot represent a substitute for immediate apprehension of the criminal suspect at the scene. See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: The Challenge of Crime in a Free Society 97 (1967). Indeed, the Captain of the Memphis Police Department testified that in his city, if apprehension is not immediate, it is likely that the suspect will not be caught. App. in No. 81-5605 (CA6), p. 334. Although some law enforcement agencies may choose to assume the risk that a criminal will remain at large, the [471 U.S. 1, 28] Tennessee statute reflects a legislative determination that the use of deadly force in prescribed circumstances will serve generally to protect the public. Such statutes assist the police in apprehending suspected perpetrators of serious crimes and provide notice that a lawful police order to stop and submit to arrest may not be ignored with impunity. See, e. g., Wiley v. Memphis Police Department, 548 F.2d 1247, 1252-1253 (CA6), cert. denied, 434 U.S. 822 (1977); Jones v. Marshall, 528 F.2d 132, 142 (CA2 1975).

The Court unconvincingly dismisses the general deterrence effects by stating that "the presently available evidence does not support [the] thesis" that the threat of force discourages escape and that "there is a substantial basis for doubting that the use of such force is an essential attribute to the arrest power in all felony cases." Ante, at 10, 11. There is no question that the effectiveness of police use of deadly force is arguable and that many States or individual police departments have decided not to authorize it in circumstances similar to those presented here. But it should go without saying that the effectiveness or popularity of a particular practice does not determine its constitutionality. Cf. Spaziano v. Florida, 468 U.S. 447, 464 (1984) ("The Eighth Amendment is not violated every time a State reaches a conclusion different from a majority of its sisters over how best to administer its criminal laws"). Moreover, the fact that police conduct pursuant to a state statute is challenged on constitutional grounds does not impose a burden on the State to produce social science statistics or to dispel any possible doubts about the necessity of the conduct. This observation, I believe, has particular force where the challenged practice both predates enactment of the Bill of Rights and continues to be accepted by a substantial number of the States.

Against the strong public interests justifying the conduct at issue here must be weighed the individual interests implicated in the use of deadly force by police officers. The [471 U.S. 1, 29] majority declares that "[t]he suspect's fundamental interest in his own life need not be elaborated upon." Ante, at 9. This blithe assertion hardly provides an adequate substitute for the majority's failure to acknowledge the distinctive manner in which the suspect's interest in his life is even exposed to risk. For purposes of this case, we must recall that the police officer, in the course of investigating a nighttime burglary, had reasonable cause to arrest the suspect and ordered him to halt. The officer's use of force resulted because the suspected burglar refused to heed this command and the officer reasonably believed that there was no means short of firing his weapon to apprehend the suspect. Without questioning the importance of a person's interest in his life, I do not think this interest encompasses a right to flee unimpeded from the scene of a burglary. Cf. Payton v. New York, 445 U.S. 573, 617, n. 14 (1980) (WHITE, J., dissenting) ("[T]he policeman's hands should not be tied merely because of the possibility that the suspect will fail to cooperate with legitimate actions by law enforcement personnel"). The legitimate interests of the suspect in these circumstances are adequately accommodated by the

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

Tennessee statute: to avoid the use of deadly force and the consequent risk to his life, the suspect need merely obey the valid order to halt.

A proper balancing of the interests involved suggests that use of deadly force as a last resort to apprehend a criminal suspect fleeing from the scene of a nighttime burglary is not unreasonable within the meaning of the Fourth Amendment. Admittedly, the events giving rise to this case are in retrospect deeply regrettable. No one can view the death of an unarmed and apparently nonviolent 15-year-old without sorrow, much less disapproval. Nonetheless, the reasonableness of Officer Hymon's conduct for purposes of the Fourth Amendment cannot be evaluated by what later appears to have been a preferable course of police action. The officer pursued a suspect in the darkened backyard of a house that from all indications had just been burglarized. The [471 U.S. 1, 30] police officer was not certain whether the suspect was alone or unarmed; nor did he know what had transpired inside the house. He ordered the suspect to halt, and when the suspect refused to obey and attempted to flee into the night, the officer fired his weapon to prevent escape. The reasonableness of this action for purposes of the Fourth Amendment is not determined by the unfortunate nature of this particular case; instead, the question is whether it is constitutionally impermissible for police officers, as a last resort, to shoot a burglary suspect fleeing the scene of the crime.

Because I reject the Fourth Amendment reasoning of the majority and the Court of Appeals, I briefly note that no other constitutional provision supports the decision below. In addition to his Fourth Amendment claim, appellee-respondent also alleged violations of due process, the Sixth Amendment right to trial by jury, and the Eighth Amendment proscription of cruel and unusual punishment. These arguments were rejected by the District Court and, except for the due process claim, not addressed by the Court of Appeals. With respect to due process, the Court of Appeals reasoned that statutes affecting the fundamental interest in life must be "narrowly drawn to express only the legitimate state interests at stake." 710 F.2d, at 245. The Court of Appeals concluded that a statute allowing police use of deadly force is narrowly drawn and therefore constitutional only if the use of such force is limited to situations in which the suspect poses an immediate threat to others. Id., at 246-247. Whatever the validity of Tennessee's statute in other contexts, I cannot agree that its application in this case resulted in a deprivation "without due process of law." Cf. Baker v. McCollan, 443 U.S. 137, 144-145 (1979). Nor do I believe that a criminal suspect who is shot while trying to avoid apprehension has a cognizable claim of a deprivation of his Sixth Amendment right to trial by jury. See Cunningham v. Ellington, 323 F. Supp. 1072, 1075-1076 (WD Tenn. 1971) (three-judge court). Finally, because there is no indication that the use [471 U.S. 1, 31] of deadly force was intended to punish rather than to capture the suspect, there is no valid claim under the Eighth Amendment. See Bell v. Wolfish, 441 U.S. 520, 538-539 (1979). Accordingly, I conclude that the District Court properly entered judgment against appellee-respondent, and I would reverse the decision of the Court of Appeals.

III

Even if I agreed that the Fourth Amendment was violated under the circumstances of this case, I would be unable to join the Court's opinion. The Court holds that deadly force may be used only if the suspect "threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." Ante, at 11. The Court ignores the more general implications of its reasoning. Relying on the Fourth Amendment, the majority asserts that it is constitutionally unreasonable to use deadly force against fleeing criminal suspects who do not appear to pose a threat of serious physical harm to others. Ibid. By declining to limit its holding to the use of firearms, the Court unnecessarily implies that the Fourth Amendment constrains the use of any police practice that is potentially lethal, no matter how remote the risk. Cf. Los Angeles v. Lyons, 461 U.S. 95 (1983).

Although it is unclear from the language of the opinion, I assume that the majority intends the word "use" to include only those circumstances in which the suspect is actually apprehended. Absent apprehension of the suspect, there is no "seizure" for Fourth Amendment purposes. I doubt that the Court intends to allow criminal suspects who successfully escape to return later with 1983 claims against officers who

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

used, albeit unsuccessfully, deadly force in their futile attempt to capture the fleeing suspect. The Court's opinion, despite its broad language, actually decides only that the [471 U.S. 1, 32] shooting of a fleeing burglary suspect who was in fact neither armed nor dangerous can support a 1983 action.

The Court's silence on critical factors in the decision to use deadly force simply invites second-guessing of difficult police decisions that must be made quickly in the most trying of circumstances. Cf. Payton v. New York, 445 U.S., at 619 (WHITE, J., dissenting). Police are given no guidance for determining which objects, among an array of potentially lethal weapons ranging from guns to knives to baseball bats to rope, will justify the use of deadly force. The Court also declines to outline the additional factors necessary to provide "probable cause" for believing that a suspect "poses a significant threat of death or serious physical injury," ante, at 3, when the officer has probable cause to arrest and the suspect refuses to obey an order to halt. But even if it were appropriate in this case to limit the use of deadly force to that ambiguous class of suspects, I believe the class should include nighttime residential burglars who resist arrest by attempting to flee the scene of the crime. We can expect an escalating volume of litigation as the lower courts struggle to determine if a police officer's split-second decision to shoot was justified by the danger posed by a particular object and other facts related to the crime. Thus, the majority opinion portends a burgeoning area of Fourth Amendment doctrine concerning the circumstances in which police officers can reasonably employ deadly force.

IV

The Court's opinion sweeps broadly to adopt an entirely new standard for the constitutionality of the use of deadly force to apprehend fleeing felons. Thus, the Court "lightly brushe[s] aside," Payton v. New York, supra, at 600, a longstanding police practice that predates the Fourth Amendment and continues to receive the approval of nearly half of the state legislatures. I cannot accept the majority's creation of a constitutional right to flight for burglary suspects [471 U.S. 1, 33] seeking to avoid capture at the scene of the crime. Whatever the constitutional limits on police use of deadly force in order to apprehend a fleeing felon, I do not believe they are exceeded in a case in which a police officer has probable cause to arrest a suspect at the scene of a residential burglary, orders the suspect to halt, and then fires his weapon as a last resort to prevent the suspect's escape into the night. I respectfully dissent. [471 U.S. 1, 34]

---

TENNESSEE v. GARNER, 471 U.S. 1 (1985)

167

# U.S. Supreme Court

## GRAHAM v. CONNOR, 490 U.S. 386 (1989)

### 490 U.S. 386

### GRAHAM v. CONNOR ET AL.
### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

### No. 87-6571.

### Argued February 21, 1989
### Decided May 15, 1989

Petitioner Graham, a diabetic, asked his friend, Berry, to drive him to a convenience store to purchase orange juice to counteract the onset of an insulin reaction. Upon entering the store and seeing the number of people ahead of him, Graham hurried out and asked Berry to drive him to a friend's house instead. Respondent Connor, a city police officer, became suspicious after seeing Graham hastily enter and leave the store, followed Berry's car, and made an investigative stop, ordering the pair to wait while he found out what had happened in the store. Respondent backup police officers arrived on the scene, handcuffed Graham, and ignored or rebuffed attempts to explain and treat Graham's condition. During the encounter, Graham sustained multiple injuries. He was released when Connor learned that nothing had happened in the store. Graham filed suit in the District Court under 42 U.S.C. 1983 against respondents, alleging that they had used excessive force in making the stop, in violation of "rights secured to him under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. 1983." The District Court granted respondents' motion for a directed verdict at the close of Graham's evidence, applying a four-factor test for determining when excessive use of force gives rise to a 1983 cause of action, which inquires, inter alia, whether the force was applied in a good-faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm. Johnson v. Glick, 481 F.2d 1028. The Court of Appeals affirmed, endorsing this test as generally applicable to all claims of constitutionally excessive force brought against government officials, rejecting Graham's argument that it was error to require him to prove that the allegedly excessive force was applied maliciously and sadistically to cause harm, and holding that a reasonable jury applying the Johnson v. Glick test to his evidence could not find that the force applied was constitutionally excessive.

*Held:*

All claims that law enforcement officials have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard. Pp. 392-399. [490 U.S. 386, 387]

(a) The notion that all excessive force claims brought under 1983 are governed by a single generic standard is rejected. Instead, courts must identify the specific constitutional right allegedly infringed by the challenged application of force and then judge the claim by reference to the specific constitutional standard which governs that right. Pp. 393-394.

(b) Claims that law enforcement officials have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are most properly characterized as invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable seizures," and must be judged by reference to the Fourth Amendment's "reasonableness" standard. Pp. 394-395.

---

GRAHAM v. CONNOR, 490 U.S. 386 (1989)

(c) The Fourth Amendment "reasonableness" inquiry is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police officers are often forced to make split-second decisions about the amount of force necessary in a particular situation. Pp. 396-397.

(d) The Johnson v. Glick test applied by the courts below is incompatible with a proper Fourth Amendment analysis. The suggestion that the test's "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances is rejected. Also rejected is the conclusion that because individual officers' subjective motivations are of central importance in deciding whether force used against a convicted prisoner violates the Eighth Amendment, it cannot be reversible error to inquire into them in deciding whether force used against a suspect or arrestee violates the Fourth Amendment. The Eighth Amendment terms "cruel" and "punishments" clearly suggest some inquiry into subjective state of mind, whereas the Fourth Amendment term "unreasonable" does not. Moreover, the less protective Eighth Amendment standard applies only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. Pp. 397-399.

827 F.2d 945, vacated and remanded.

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, STEVENS, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and concurring in the judgment, in which BRENNAN and MARSHALL, JJ., joined, post, p. 399. [490 U.S. 386, 388]

H. Gerald Beaver argued the cause for petitioner. On the briefs was Richard B. Glazier.

Mark I. Levy argued the cause for respondents. On the brief was Frank B. Aycock III.*

[Footnote *] Briefs of amici curiae urging reversal were filed for the United States by Solicitor General Fried, Assistant Attorney General Reynolds, Deputy Assistant Attorney General Clegg, David L. Shapiro, Brian J. Martin, and David K. Flynn; and for the American Civil Liberties Union et al. by Steven R. Shapiro. Lacy H. Thornburg, Attorney General of North Carolina, Isaac T. Avery III, Special Deputy Attorney General, and Linda Anne Morris, Assistant Attorney General, filed a brief for the State of North Carolina as amicus curiae urging affirmance.

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case requires us to decide what constitutional standard governs a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other "seizure" of his person. We hold that such claims are properly analyzed under the Fourth Amendment's "objective reasonableness" standard, rather than under a substantive due process standard.

In this action under 42 U.S.C. 1983, petitioner Dethorne Graham seeks to recover damages for injuries allegedly sustained when law enforcement officers used physical force against him during the course of an investigatory stop. Because the case comes to us from a decision of the Court of Appeals affirming the entry of a directed verdict for respondents, we take the evidence hereafter noted in the light most favorable to petitioner. On November 12, 1984, Graham, a diabetic, felt the onset of an insulin reaction. He asked a friend, William Berry, to drive him to a nearby convenience store so he could purchase some orange juice to counteract the reaction. Berry agreed, but when Graham entered the store, he saw a number of people ahead of him in the checkout [490 U.S. 386, 389] line. Concerned about the delay, he hurried out of the store and asked Berry to drive him to a friend's house instead.

Respondent Connor, an officer of the Charlotte, North Carolina, Police Department, saw Graham hastily enter and leave the store. The officer became suspicious that something was amiss and followed Berry's car. About one-half mile from the store, he made an investigative stop. Although Berry told Connor that Graham was simply suffering from a "sugar reaction," the officer ordered Berry and Graham to wait while he found out what, if anything, had happened at the convenience store. When Officer Connor returned to

GRAHAM v. CONNOR, 490 U.S. 386 (1989)

his patrol car to call for backup assistance, Graham got out of the car, ran around it twice, and finally sat down on the curb, where he passed out briefly.

In the ensuing confusion, a number of other Charlotte police officers arrived on the scene in response to Officer Connor's request for backup. One of the officers rolled Graham over on the sidewalk and cuffed his hands tightly behind his back, ignoring Berry's pleas to get him some sugar. Another officer said: "I've seen a lot of people with sugar diabetes that never acted like this. Ain't nothing wrong with the M. F. but drunk. Lock the S. B. up." App. 42. Several officers then lifted Graham up from behind, carried him over to Berry's car, and placed him face down on its hood. Regaining consciousness, Graham asked the officers to check in his wallet for a diabetic decal that he carried. In response, one of the officers told him to "shut up" and shoved his face down against the hood of the car. Four officers grabbed Graham and threw him headfirst into the police car. A friend of Graham's brought some orange juice to the car, but the officers refused to let him have it. Finally, Officer Connor received a report that Graham had done nothing wrong at the convenience store, and the officers drove him home and released him. [490 U.S. 386, 390]

At some point during his encounter with the police, Graham sustained a broken foot, cuts on his wrists, a bruised forehead, and an injured shoulder; he also claims to have developed a loud ringing in his right ear that continues to this day. He commenced this action under 42 U.S.C. 1983 against the individual officers involved in the incident, all of whom are respondents here,1 alleging that they had used excessive force in making the investigatory stop, in violation of "rights secured to him under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. 1983." Complaint _ 10, App. 5.2 The case was tried before a jury. At the close of petitioner's evidence, respondents moved for a directed verdict. In ruling on that motion, the District Court considered the following four factors, which it identified as "[t]he factors to be considered in determining when the excessive use of force gives rise to a cause of action under 1983": (1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; (3) the extent of the injury inflicted; and (4) "[w]hether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." 644 F. Supp. 246, 248 (WDNC 1986). Finding that the amount of force used by the officers was "appropriate under the circumstances," that "[t]here was no discernable injury inflicted," and that the force used "was not applied maliciously or sadistically for the very purpose of causing harm," but in "a good faith effort to maintain or restore order in the face of a potentially explosive [490 U.S. 386, 391] situation." id., at 248-249, the District Court granted respondents' motion for a directed verdict.

A divided panel of the Court of Appeals for the Fourth Circuit affirmed. 827 F.2d 945 (1987). The majority ruled first that the District Court had applied the correct legal standard in assessing petitioner's excessive force claim. Id., at 948-949. Without attempting to identify the specific constitutional provision under which that claim arose,3 the majority endorsed the four-factor test applied by the District Court as generally applicable to all claims of "constitutionally excessive force" brought against governmental officials. Id., at 948. The majority rejected petitioner's argument, based on Circuit precedent,4 that it was error to require him to prove that the allegedly excessive force used against him was applied "maliciously and sadistically for the very purpose of causing harm."5 Ibid. Finally, the majority held that a reasonable jury applying the four-part test it had just endorsed [490 U.S. 386, 392] to petitioner's evidence "could not find that the force applied was constitutionally excessive." Id., at 949-950. The dissenting judge argued that this Court's decisions in Terry v. Ohio, 392 U.S. 1 (1968), and Tennessee v. Garner, 471 U.S. 1 (1985), required that excessive force claims arising out of investigatory stops be analyzed under the Fourth Amendment's "objective reasonableness" standard. 827 F.2d, at 950-952. We granted certiorari, 488 U.S. 816 (1988), and now reverse.

Fifteen years ago, in Johnson v. Glick, 481 F.2d 1028, cert. denied, 414 U.S. 1033 (1973), the Court of Appeals for the Second Circuit addressed a 1983 damages claim filed by a pretrial detainee who claimed that a guard had assaulted him without justification. In evaluating the detainee's claim, Judge Friendly applied neither the Fourth Amendment nor the Eighth, the two most textually obvious sources of constitutional protection against physically abusive governmental conduct.6 Instead, he looked to "substantive due process," holding that "quite apart from any 'specific' of the Bill of Rights, application of undue force by [490 U.S. 386, 393] law enforcement officers deprives a suspect of liberty without due process of law." 481 F.2d, at 1032. As support for this proposition, he relied upon our decision in Rochin v. California, 342 U.S. 165 (1952), which used the Due Process Clause to void a state criminal conviction

based on evidence obtained by pumping the defendant's stomach. 481 F.2d, at 1032-1033. If a police officer's use of force which "shocks the conscience" could justify setting aside a criminal conviction, Judge Friendly reasoned, a correctional officer's use of similarly excessive force must give rise to a due process violation actionable under 1983. Ibid. Judge Friendly went on to set forth four factors to guide courts in determining "whether the constitutional line has been crossed" by a particular use of force - the same four factors relied upon by the courts below in this case. Id., at 1033.

In the years following Johnson v. Glick, the vast majority of lower federal courts have applied its four-part "substantive due process" test indiscriminately to all excessive force claims lodged against law enforcement and prison officials under 1983, without considering whether the particular application of force might implicate a more specific constitutional right governed by a different standard.7 Indeed, many courts have seemed to assume, as did the courts below in this case, that there is a generic "right" to be free from excessive force, grounded not in any particular constitutional provision but rather in "basic principles of 1983 jurisprudence."8

We reject this notion that all excessive force claims brought under 1983 are governed by a single generic standard. As we have said many times, 1983 "is not itself a [490 U.S. 386, 394] source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 443 U.S. 137, 144, n. 3 (1979). In addressing an excessive force claim brought under 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force. See id., at 140 ("The first inquiry in any 1983 suit" is "to isolate the precise constitutional violation with which [the defendant] is charged").9 In most instances, that will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments, which are the two primary sources of constitutional protection against physically abusive governmental conduct. The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized "excessive force" standard. See Tennessee v. Garner, supra, at 7-22 (claim of excessive force to effect arrest analyzed under a Fourth Amendment standard); Whitley v. Albers, 475 U.S. 312, 318-326 (1986) (claim of excessive force to subdue convicted prisoner analyzed under an Eighth Amendment standard).

Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures" of the person. This much is clear from our decision in Tennessee v. Garner, supra. In Garner, we addressed a claim that the use of deadly force to apprehend a fleeing suspect who did not appear to be armed or otherwise dangerous violated the suspect's constitutional rights, notwithstanding the existence of probable cause to arrest. [490 U.S. 386, 395] Though the complaint alleged violations of both the Fourth Amendment and the Due Process Clause, see 471 U.S., at 5, we analyzed the constitutionality of the challenged application of force solely by reference to the Fourth Amendment's prohibition against unreasonable seizures of the person, holding that the "reasonableness" of a particular seizure depends not only on when it is made, but also on how it is carried out. Id., at 7-8. Today we make explicit what was implicit in Garner's analysis, and hold that all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.10 [490 U.S. 386, 396]

Determining whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake. Id., at 8, quoting United States v. Place, 462 U.S. 696, 703 (1983). Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. See Terry v. Ohio, 392 U.S., at 22-27. Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), however, its proper application

GRAHAM v. CONNOR, 490 U.S. 386 (1989)

requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. See Tennessee v. Garner, 471 U.S., at 8-9 (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, at 20-22. The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, Hill v. California, 401 U.S. 797 (1971), nor by the mistaken execution of a valid search warrant on the wrong premises, Maryland v. Garrison, 480 U.S. 79 (1987). With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody [490 U.S. 386, 397] allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation.

As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139 (1978); see also Terry v. Ohio, supra, at 21 (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional. See Scott v. United States, supra, at 138, citing United States v. Robinson, 414 U.S. 218 (1973).

Because petitioner's excessive force claim is one arising under the Fourth Amendment, the Court of Appeals erred in analyzing it under the four-part Johnson v. Glick test. That test, which requires consideration of whether the individual officers acted in "good faith" or "maliciously and sadistically for the very purpose of causing harm," is incompatible with a proper Fourth Amendment analysis. We do not agree with the Court of Appeals' suggestion, see 827 F.2d, at 948, that the "malicious and sadistic" inquiry is merely another way of describing conduct that is objectively unreasonable under the circumstances. Whatever the empirical correlations between "malicious and sadistic" behavior and objective unreasonableness may be, the fact remains that the "malicious and sadistic" factor puts in issue the subjective motivations of the individual officers, which our prior cases make clear has no bearing on whether a particular seizure is "unreasonable" under the Fourth Amendment. Nor do we agree with the [490 U.S. 386, 398] Court of Appeals' conclusion, see id., at 948, n. 3, that because the subjective motivations of the individual officers are of central importance in deciding whether force used against a convicted prisoner violates the Eighth Amendment, see Whitley v. Albers, 475 U.S., at 320-321,11 it cannot be reversible error to inquire into them in deciding whether force used against a suspect or arrestee violates the Fourth Amendment. Differing standards under the Fourth and Eighth Amendments are hardly surprising: the terms "cruel" and "punishments" clearly suggest some inquiry into subjective state of mind, whereas the term "unreasonable" does not. Moreover, the less protective Eighth Amendment standard applies "only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Ingraham v. Wright, 430 U.S. 651, 671, [490 U.S. 386, 399] n. 40 (1977). The Fourth Amendment inquiry is one of "objective reasonableness" under the circumstances, and subjective concepts like "malice" and "sadism" have no proper place in that inquiry.12

Because the Court of Appeals reviewed the District Court's ruling on the motion for directed verdict under an erroneous view of the governing substantive law, its judgment must be vacated and the case remanded to that court for reconsideration of that issue under the proper Fourth Amendment standard.

It is so ordered.

---

GRAHAM v. CONNOR, 490 U.S. 386 (1989)

172

Footnotes

[Footnote 1] Also named as a defendant was the city of Charlotte, which employed the individual respondents. The District Court granted a directed verdict for the city, and petitioner did not challenge that ruling before the Court of Appeals. Accordingly, the city is not a party to the proceedings before this Court.

[Footnote 2] Petitioner also asserted pendent state-law claims of assault, false imprisonment, and intentional infliction of emotional distress. Those claims have been dismissed from the case and are not before this Court.

[Footnote 3] The majority did note that because Graham was not an incarcerated prisoner, "his complaint of excessive force did not, therefore, arise under the eighth amendment." 827 F.2d, at 948, n. 3. However, it made no further effort to identify the constitutional basis for his claim.

[Footnote 4] Petitioner's argument was based primarily on Kidd v. O'Neil, 774 F.2d 1252 (CA4 1985), which read this Court's decision in Tennessee v. Garner, 471 U.S. 1 (1985), as mandating application of a Fourth Amendment "objective reasonableness" standard to claims of excessive force during arrest. See 774 F.2d, at 1254-1257. The reasoning of Kidd was subsequently rejected by the en banc Fourth Circuit in Justice v. Dennis, 834 F.2d 380, 383 (1987), cert. pending, No. 87-1422.

[Footnote 5] The majority noted that in Whitley v. Albers, 475 U.S. 312 (1986), we held that the question whether physical force used against convicted prisoners in the course of quelling a prison riot violates the Eighth Amendment "ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" 827 F.2d, at 948, n. 3, quoting Whitley v. Albers, supra, at 320-321. Though the Court of Appeals acknowledged that petitioner was not a convicted prisoner, it thought it "unreasonable . . . to suggest that a conceptual factor could be central to one type of excessive force claim but reversible error when merely considered by the court in another context." 827 F.2d, at 948, n. 3.

[Footnote 6] Judge Friendly did not apply the Eighth Amendment's Cruel and Unusual Punishments Clause to the detainee's claim for two reasons. First, he thought that the Eighth Amendment's protections did not attach until after conviction and sentence. 481 F.2d, at 1032. This view was confirmed by Ingraham v. Wright, 430 U.S. 651, 671, n. 40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions"). Second, he expressed doubt whether a "spontaneous attack" by a prison guard, done without the authorization of prison officials, fell within the traditional Eighth Amendment definition of "punishments." 481 F.2d, at 1032. Although Judge Friendly gave no reason for not analyzing the detainee's claim under the Fourth Amendment's prohibition against "unreasonable . . . seizures" of the person, his refusal to do so was apparently based on a belief that the protections of the Fourth Amendment did not extend to pretrial detainees. See id., at 1033 (noting that "most of the courts faced with challenges to the conditions of pretrial detention have primarily based their analysis directly on the due process clause"). See n. 10, infra.

[Footnote 7] See Freyermuth, Rethinking Excessive Force, 1987 Duke L. J. 692, 694-696, and nn. 16-23 (1987) (collecting cases).

[Footnote 8] See Justice v. Dennis, supra, at 382 ("There are . . . certain basic principles in section 1983 jurisprudence as it relates to claims of excessive force that are beyond question [,] [w]hether the factual circumstances involve an arrestee, a pretrial detainee or a prisoner").

[Footnote 9] The same analysis applies to excessive force claims brought against federal law enforcement and correctional officials under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).

[Footnote 10] A "seizure" triggering the Fourth Amendment's protections occurs only when government actors have, "by means of physical force or show of authority, . . . in some way restrained the liberty of a citizen," Terry v. Ohio, 392 U.S. 1, 19, n. 16 (1968); see Brower v. County of Inyo, 489 U.S. 593, 596

GRAHAM v. CONNOR, 490 U.S. 386 (1989)

(1989). Our cases have not resolved the question whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today. It is clear, however, that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment. See Bell v. Wolfish, 441 U.S. 520, 535-539 (1979). After conviction, the Eighth Amendment "serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified." Whitley v. Albers, 475 U.S., at 327. Any protection that "substantive due process" affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment. Ibid.

[Footnote 11] In Whitley, we addressed a 1983 claim brought by a convicted prisoner, who claimed that prison officials had violated his Eighth Amendment rights by shooting him in the knee during a prison riot. We began our Eighth Amendment analysis by reiterating the long-established maxim that an Eighth Amendment violation requires proof of the ""'unnecessary and wanton infliction of pain.'"" 475 U.S., at 319, quoting Ingraham v. Wright, 430 U.S., at 670, in turn quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976). We went on to say that when prison officials use physical force against an inmate "to restore order in the face of a prison disturbance, . . . the question whether the measure taken inflicted unnecessary and wanton pain . . . ultimately turns on 'whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" 475 U.S., at 320-321 (emphasis added), quoting Johnson v. Glick, 481 F.2d, at 1033. We also suggested that the other prongs of the Johnson v. Glick test might be useful in analyzing excessive force claims brought under the Eighth Amendment. 475 U.S., at 321. But we made clear that this was so not because Judge Friendly's four-part test is some talismanic formula generally applicable to all excessive force claims, but because its four factors help to focus the central inquiry in the Eighth Amendment context, which is whether the particular use of force amounts to the "unnecessary and wanton infliction of pain." See id., at 320-321. Our endorsement of the Johnson v. Glick test in Whitley thus had no implications beyond the Eighth Amendment context.

[Footnote 12] Of course, in assessing the credibility of an officer's account of the circumstances that prompted the use of force, a factfinder may consider, along with other factors, evidence that the officer may have harbored ill-will toward the citizen. See Scott v. United States, 436 U.S. 128, 139, n. 13 (1978). Similarly, the officer's objective "good faith" - that is, whether he could reasonably have believed that the force used did not violate the Fourth Amendment - may be relevant to the availability of the qualified immunity defense to monetary liability under 1983. See Anderson v. Creighton, 483 U.S. 635 (1987). Since no claim of qualified immunity has been raised in this case, however, we express no view on its proper application in excessive force cases that arise under the Fourth Amendment.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, concurring in part and concurring in the judgment.

I join the Court's opinion insofar as it rules that the Fourth Amendment is the primary tool for analyzing claims of excessive force in the prearrest context, and I concur in the judgment remanding the case to the Court of Appeals for reconsideration of the evidence under a reasonableness standard. In light of respondents' concession, however, that the pleadings in this case properly may be construed as raising a Fourth Amendment claim, see Brief for Respondents 3, I see no reason for the Court to find it necessary further to reach out to decide that prearrest excessive force claims are to be analyzed under the Fourth Amendment rather than under a [490 U.S. 386, 400] substantive due process standard. I also see no basis for the Court's suggestion, ante, at 395, that our decision in Tennessee v. Garner, 471 U.S. 1 (1985), implicitly so held. Nowhere in Garner is a substantive due process standard for evaluating the use of excessive force in a particular case discussed; there is no suggestion that such a standard was offered as an alternative and rejected.

In this case, petitioner apparently decided that it was in his best interest to disavow the continued applicability of substantive due process analysis as an alternative basis for recovery in prearrest excessive force cases. See Brief for Petitioner 20. His choice was certainly wise as a matter of litigation strategy in his own case, but does not (indeed, cannot be expected to) serve other potential plaintiffs equally well. It is for that reason that the Court would have done better to leave that question for another

day. I expect that the use of force that is not demonstrably unreasonable under the Fourth Amendment only rarely will raise substantive due process concerns. But until I am faced with a case in which that question is squarely raised, and its merits are subjected to adversary presentation, I do not join in foreclosing the use of substantive due process analysis in prearrest cases. [490 U.S. 386, 401]